**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: | : |
| | : |
| **TERRORIST ATTACKS ON** | : |
| **SEPTEMBER 11, 2001** | : |
| | : |
| | : |
| _____ | : |
| | : |
| **HERMAN RAY**, surviving Sibling | : |
| of Denease Conley | : |
| | : |
| **HERMAN RAY,** as Personal | : |
| Representative of the **ESTATE OF** | : |
| **DENEASE CONLEY, Deceased** | : |
| | : |
| **CHERRIE L. ALLEN**, surviving Sibling | : |
| of Denease Conley | : |
| | : |
| **IRMA JOYCE FLETCHER**, surviving | : |
| Sibling of Denease Conley | : |
| | : |
| **IRMA JOYCE FLETCHER**, as Personal | : |
| Representative of the **ESTATE OF EARL** | : |
| **RAY, Deceased**, a surviving Sibling of | : |
| Denease Conley | : |
| | : |
| **BARBARA HAYNES-JENKINS**, | : |
| surviving Sibling of Denease Conley | : |
| | : |
| **HERMAN RAY**, as Personal | : |
| Representative of the **ESTATE OF** | : |
| **JAMES RAY**, **Deceased,** a surviving | : |
| Sibling of Denease Conley | : |
| | : |
| **STANLEY RAY,** surviving Sibling of | : |
| Denease Conley | : |
| | : |
| **AARON ADLER**, surviving Sibling of | : |
| Lee Alan Adler | : |
| | : |
| **ALICE DOERGE ADLER**, the surviving | : |
| Spouse of Lee Alan Adler | : |
| | : |
| **ALICE DOERGE ADLER,** as Personal | : |

Representative of the **ESTATE OF LEE**
**ALAN ADLER**, **Deceased**

**ISABELL DANSIGER ADLER**,
surviving Parent of Lee Alan Alder

**JAY ADLER**, surviving Sibling of Lee
Alan Adler

**LAUREN SARAH ADLER**
**MARTINELLI**, surviving Child of Lee
Alan Adler

**RANDI ADLER**, surviving Sibling of Lee
Alan Adler

**ANTHONY BEHETTE**, surviving
Sibling of Michael G. Behette

**ESTER DINARDO**, surviving Parent of
Marisa DiNardo-Schorpp

**HARLEY DINARDO**, surviving Sibling
of Marisa DiNardo-Schorpp

**PIO DINARDO**, surviving Parent of
Marisa DiNardo-Schorpp

**ANDREW ECONOMOS**, surviving
Sibling of Constantine Economos

**OLGA VALINOTTI**, surviving Sibling of
Constantine Economos

**ANDREW ECONOMOS,** as Co-Personal
Representative of the **ESTATE OF LEON**
**ECONOMOS, Deceased**, a surviving
Parent of Constantine Economos

**OLGA VALINOTTI,** as Co-Personal
Representative of the **ESTATE OF LEON**
**ECONOMOS, Deceased**, a surviving
Parent of Constantine Economos

**CONSTANCE FINNICUM**, a surviving
Sibling of Richard Gabrielle

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**GEORGE GABRIELLE,**
**a/k/a GABE GABRIELLE**, a surviving
Sibling of Richard Gabrielle

**HANK GRAZIOSO**, surviving Parent of
John Grazioso

**HANK GRAZIOSO**, surviving Parent of
Timmy Grazioso

**THERESA COOKE**, surviving Sibling of
LeRoy W. Homer, Jr.

**MICHELLE HARGIS**, surviving Sibling
of LeRoy W. Homer, Jr.

**CHRISTINE HOMER**, surviving Sibling
of LeRoy W. Homer, Jr.

**CHRISTINE HOMER**, as Personal
Representative of the **ESTATE OF**
**THOMAS FREIMARK, Deceased,**
surviving Sibling of LeRoy W. Homer, Jr.

**ILSE HOMER**, a surviving Parent of
LeRoy W. Homer, Jr.

**MONIQUE HOMER**, surviving Sibling
of LeRoy W. Homer, Jr.

**MARILYN JOHNSON**, surviving Sibling
of LeRoy W. Homer, Jr.

**CHERYL HOMER WILSON**, surviving
Sibling of LeRoy W. Homer, Jr.

**GERMAINE WILSON**, surviving Sibling
of LeRoy Homer, Jr.

**ANDREW BRIAN JORDAN, JR.**,
surviving Child of Andrew Brian Jordan,
Sr.

**DAVID LEBOR**, surviving Sibling of
Leon Lebor

3

|  | : |
| --- | --- |
| **RINA KAUFFMAN, a/k/a Joy Kaufman**, as Personal Representative of the **ESTATE OF PHILIP LEBOR, Deceased**, a surviving Parent of Leon Lebor | : |
|  | : |
| **DANIELLE MCGUIRE**, as Personal Representative of the **ESTATE OF PATRICK MCGUIRE, Deceased** | : |
|  | : |
| **DANIELLE MCGUIRE**, the surviving Spouse of Patrick McGuire | : |
|  | : |
| **MARA MCGUIRE**, surviving Child of Patrick McGuire | : |
|  | : |
| **RYAN MCGUIRE**, surviving Child of Patrick McGuire | : |
|  | : |
| **SEAN MCGUIRE**, surviving Child of Patrick McGuire | : |
|  | : |
| **SHEA MCGUIRE**, surviving Child of Patrick McGuire | : |
|  | : |
| **ANNEMARIE MEDAGLIA**, surviving Parent of Rocco Medaglia | : |
|  | : |
| **DIANA MEDAGLIA,** surviving Child of Rocco Medaglia | : |
|  | : |
| **KATHLEEN MEDAGLIA-DELLAPENNA**, surviving Sibling of Rocco Medaglia | : |
|  | : |
| **MARYELLEN MEDAGLIA**, surviving Sibling of Rocco Medaglia | : |
|  | : |
| **MICHAEL MEDGALIA**, surviving Sibling of Rocco Medaglia | : |
|  | : |
| **ELIZABETH MEDAGLIA-CORDES**, a surviving Child of Rocco Medaglia | : |
|  | : |
| **ELIZABETH MEDAGLIA-CORDES,** | : |

as Personal Representative of the **ESTATE :
OF ROCCO MEDAGLIA, Deceased**
                                                        :

**MARY ELLEN MURACH**, surviving :
Parent of Robert M. Murach
 :

**MARY ELLEN MURACH**, as Personal :
Representative of the **ESTATE OF :
EDWARD JOHN MURACH, Deceased**, :
a surviving Parent of Robert M. Murach :

**RICHARD J. MURACH**, surviving :
Sibling of Robert M. Murach
 :

**KATHARINE TYNION**, surviving :
Sibling of Robert M. Murach
 :

**PAULA NACKE JACOBS**, surviving :
Sibling of Louis J. Nacke
 :

**DALE ALLEN NACKE**, surviving :
Sibling of Louis J. Nacke
 :

**DALE ALLEN NACKE,** as Personal :
Representative of the **ESTATE OF :
LOUIS P. NACKE, Deceased,** a surviving :
Parent of Louis J. Nacke
 :

**DALE ALLEN NACKE,** Personal :
Representative of the **ESTATE OF :
PHILOMENA MILLACE NACKE, :
Deceased,** a surviving Parent of Louis J. :
Nacke
 :

**KENNETH NACKE**, surviving Sibling of :
Louis J. Nacke
 :

**LOUIS PAUL NACKE, II**, surviving :
Child of Louis J. Nacke
 :

**JOSEPH NICHOLAS NACKE**, :
surviving Child of Louis J. Nacke
 :

**THOMAS PAPASSO**, surviving Sibling :
of Salvatore T. Papasso
 :
 :

5

**PATRICIA MASON**, surviving Sibling of                 :
Sandra Wright-Cartledge                                   :
                                                          :
**EYTAN YAMMER**, an adult individual                    :
suing on his own behalf                                   :
                                                          :
                  Plaintiffs,   :
        v.                      :
                                                          :
**ISLAMIC REPUBLIC OF IRAN**                             :
c/o H.E. Mohammad Javad Zarif                             :
Minister of Foreign Affairs                               :
Imam Khomeini Street                                      :
Tehran, Iran                                              :
                                                          :
**AYATOLLAH ALI HOSEINI-**                               :
  **KHAMENEI**                                   :
c/o H.E. Mohammad Javad Zarif                             :
Minister of Foreign Affairs                               :
Imam Khomeini Street                                      :
Tehran, Iran                                              :
                                                          :
**ESTATE OF ALI AKBAR HASHEMI**                          :
  **RAFSANJANI, Deceased**                       :
c/o H.E. Mohammad Javad Zarif                             :
Minister of Foreign Affairs                               :
Imam Khomeini Street                                      :
Tehran, Iran                                              :
                                                          :
**IRAN'S MINISTRY OF INFORMATION**                       :
**AND SECURITY**                                         :
c/o H.E. Mohammad Javad Zarif                             :
Minister of Foreign Affairs                               :
Imam Khomeini Street                                      :
Tehran, Iran                                              :
                                                          :
**ISLAMIC REVOLUTIONARY**                                :
  **GUARD CORPS**                               :
c/o H.E. Mohammad Javad Zarif                             :
Minister of Foreign Affairs                               :
Imam Khomeini Street                                      :
Tehran, Iran                                              :
                                                          :
**IRAN'S MINISTRY OF ECONOMIC**                          :
**AFFAIRS AND FINANCE**                                  :
c/o H.E. Mohammad Javad Zarif                             :

Minister of Foreign Affairs                    :
Imam Khomeini Street                           :
Tehran, Iran                                   :
                                               :
**IRAN'S MINISTRY OF COMMERCE**                :
c/o H.E. Mohammad Javad Zarif                  :
Minister of Foreign Affairs                    :
Imam Khomeini Street                           :
Tehran, Iran                                   :
                                               :
**IRAN'S MINISTRY OF DEFENSE**                 :
**AND ARMED FORCES LOGISTICS**                 :
c/o H.E. Mohammad Javad Zarif                  :
Minister of Foreign Affairs                    :
Imam Khomeini Street                           :
Tehran, Iran                                   :
                                               :
**IRAN'S MINISTRY OF PETROLEUM**               :
c/o H.E. Mohammad Javad Zarif                  :
Minister of Foreign Affairs                    :
Imam Khomeini Street                           :
Tehran, Iran                                   :
                                               :
**CENTRAL BANK OF IRAN,**                      :
  **a/k/a BANK MARKAZI**                       :
c/o Abdolnaser Hemmati                         :
(President/Governor)                           :
144, Mirdamad Blvd.                            :
Tehran, Iran                                   :
          and                                  :
c/o H.E. Mohammad Javad Zarif                  :
Minister of Foreign Affairs                    :
Imam Khomeini Street                           :
Tehran, Iran                                   :
                                               :
**NATIONAL IRANIAN OIL**                       :
  **CORPORATION**                              :
c/o Bijan Namdar Zangeneh (Chairman)           :
    and Masoud Karbasian (CEO)                 :
Hafez Crossing, Taleghani Avenue               :
Tehran, Iran                                   :
                                               :
**NATIONAL IRANIAN TANKER**                    :
  **CORPORATION**                              :
c/o Nasrollah Sardashti (Managing             :
Director)                                      :

65 Shahid Atefi Street, Africa Expressway    :
Tehran, Iran                                 :
                                             :
**NATIONAL IRANIAN GAS**                     :
  **COMPANY**                       :
c/o Hassan Montazer Torbati (Managing        :
Director)                                    :
National Iranian Gas Company Building        :
South Aban Street, Karimkhan Boulevard       :
P.O. Box 15875                               :
Tehran, Iran                                 :
                                             :
**NATIONAL IRANIAN**                         :
**PETROCHEMICAL COMPANY**                    :
c/o Bijan Zanganeh (Chairman)                :
   and Marzieh Shahdaei (President)    :
144, North, Sheikh Bahaie Avenue,            :
P.O. Box 19395-6896                          :
Tehran, Iran                                 :
                                             :
**IRAN AIRLINES a/k/a IRAN AIR**             :
c/o Farzaneh Sharafbafi (CEO)                :
Iran Air H.Q.                                :
Mehrabad Airport                             :
P.O. Box 13185-775                           :
Tehran, Iran                                 :
                                             :
   and                        :
                                             :
**HEZBOLLAH**                                :
Valiasr Avenue                               :
Shahid Rahimi Alley No. 7                    :
Tehran, Iran                                 :
                                             :
              Defendants.    :
_____    :

## COMPLAINT

Plaintiffs in this action are personal representatives of the Estates, or family members of, seventeen (17) Decedents who were murdered, or later died, as a result of the terrorist attacks against the United States on September 11, 2001. There is also one plaintiff who sustained personal injuries on the day of the attacks.  The instant lawsuit is filed by the same counsel who obtained

judgments against the sixteen (16) Defendants named herein ("Iranian Defendants") in *Havlish, et al. v. bin Laden*, *et al.*, 1:03-cv-09848 (GBD)(SN) and *Hoglan, et al. v. Islamic Republic of Iran*, *et al.*, 1:11-cv-07550 (GBD)(SN).  Plaintiffs seek compensatory and punitive damages against the Iranian Defendants for their role in providing direct and material support to al-Qaeda in carrying out the attacks on September 11, 2001.  In support of their claims, Plaintiffs state the following:

## INTRODUCTION

1.      On September 11, 2001, 2,976 individuals were murdered, and many others injured, when nineteen terrorists caused four airliners to crash into the World Trade Center Towers in New York, the Pentagon Building in Arlington County, Virginia and a field near the town of Shanksville, Pennsylvania.  Other persons died thereafter as a result of their rescue or reclamation work at "Ground Zero," the site of the collapsed World Trade Center towers.  The nineteen hijackers (hereinafter collectively referred to as the "al-Qaeda hijackers" or the "hijackers") were members of a network known as al-Qaeda, a terrorist organization dedicated to the destruction of the United States and its citizens. The al-Qaeda organization was, and is, dedicated to the goal of establishing a universal Islamic state through the use of violence. Immediately prior to the 9/11 attacks, al-Qaeda maintained its headquarters in Afghanistan.

2.      The leader of al-Qaeda was Osama bin Laden (hereinafter referred to as "bin Laden"), a former citizen of Saudi Arabia who, prior to his death on May 2, 2011, planned, conspired, funded, directed, controlled, and engaged in terrorist activities and pursuits involving intentional and willful mass murder of thousands of innocent men, women, and children, including the victims of the 9/11 terrorist attacks.  On several occasions, bin Laden admitted al-Qaeda's participation in, and responsibility for, the 9/11 attacks.

3.      Al-Qaeda trained, funded and supported the hijackers, with the aid and assistance

of various individuals, organizations and governments, including Iranian Defendants named herein
- the Islamic Republic of Iran ("Iran"), seven (7) of Iran's political subdivisions, and eight (8) of
its agencies and instrumentalities (referred to collectively as the "Iranian Defendants"), including
Iran's terrorist proxy, Hezbollah.

4.      For years prior to the 9/11 attacks, bin Laden had declared and advocated "jihad" -
holy war - against the United States.  For example, on February 23, 1998, bin Laden urged jihad
against Americans and published in the newspaper *Al Quds al-Arabi* the following: "*the ruling to
kill the Americans and their allies - civilians and military - is an individual duty for every Muslim
who can do it in any country in which it is possible to do it.*"  On August 20, 1998, President
Clinton advised that the United States was taking military action against terrorist objectives in
Afghanistan and Sudan: "*Our target was terror; our mission was clear: to strike at the network of
radical groups affiliated with and funded by Osama Bin Laden, perhaps the preeminent organizer
and financer of international terrorism in the world today.*"  On August 21, 1998, the United States
Department of State found that: "*Bin Laden's network leads, funds and inspires a wide range of
Islamic extremist groups that perpetrate acts of terrorism around the world.*"

5.      In conducting their terrorist activities, bin Laden and al-Qaeda received financial,
logistical and other material support from foreign states.  In particular, the Iranian Defendants
provided bin Laden and al-Qaeda with material support that aided the 9/11 terrorist attacks.
Plaintiffs now seek to hold the Iranian Defendants accountable for their role in facilitating these
murders, deaths and injuries.

## JURISDICTION AND VENUE

6.      Jurisdiction arises pursuant to 28 U.S.C. § 1330(a)-(b) (suits against foreign states),
§ 1331 (federal question) and § 1332(a)(2) (diversity of citizenship via an action by citizens of a

State against citizens or subjects of a foreign state).

7.      Jurisdiction also arises under the anti-terrorism exception to foreign sovereign immunity codified at 28 U.S.C. § 1605A.

8.      Jurisdiction also arises under 28 U.S.C. § 1605B, which abrogates foreign sovereign immunity in cases where money damages are sought against a foreign state in connection with an act of international terrorism which occurs in the United States.  By statute, the courts of the United States "shall have exclusive jurisdiction in any action in which a foreign state is subject to the jurisdiction of a court of the United States under section 1610B, title 28, United States Code." *See* Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 5(a), 130 Stat. 852, 854 (2016) (codified at 28 U.S.C. § 1605B note).

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(1).

10.     Venue is proper in this District because the Air Transportation Safety and System Stabilization Act, 49 U.S.C. 40101 note, mandates that this District "shall have original and exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes on September 11, 2001." *See* § 408(b)(3).

11.     Venue is also proper in this District because the Multidistrict Litigation captioned *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (SN) is situated in this Court.

12.     As herein alleged, actions for wrongful death, personal injury and related torts perpetrated by the Iranian Defendants through the foreign state itself, its political subdivisions, its agencies and instrumentalities, and through Iran's officials, employees and agents, fall within the exceptions to jurisdictional immunity contained in the Foreign Sovereign Immunities Act,

specifically the terrorism exceptions contained at 28 U.S.C. §§ 1605A and 1605B.

## PLAINTIFFS

13.     **Herman Ray**, a citizen of the United States and a resident of the State of Missouri, is a surviving Sibling of Denease Conley, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. Plaintiff **Herman Ray** brings a claim individually for solatium damages.

14.     **Herman Ray, as Personal Representative of the Estate of Denease Conley, Deceased**, also brings claims for Wrongful Death, Pain & Suffering, and Economic Loss on behalf of the Estate of Denease Conley.

15.      **Cherrie L. Allen**, a citizen of the United States and a resident of the State of California, is a surviving Sibling of Denease Conley, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Cherrie L. Allen** brings a claim for solatium damages.

16.     **Irma Joyce Fletcher**, a citizen of the United States and a resident of the State of Missouri, is a surviving Sibling of Denease Conley, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Irma Joyce Fletcher** brings a claim for solatium damages.

17.     **Irma Joyce Fletcher** brings a claim as **Personal Representative of the Estate of Earl Ray, Deceased**, a Sibling of Denease Conley, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran

and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Earl Ray**, who was a citizen of the United States and a resident of the State of Missouri, expired after his claim arose on September 11, 2001, and prior to the filing of the instant lawsuit. **Irma Joyce Fletcher** brings a claim on behalf of the Estate of Earl Ray for solatium damages.

18.      **Barbara Haynes-Jenkins**, a citizen of the United States and a resident of the State of Missouri, is a surviving Sibling of Denease Conley, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Barbara Haynes-Jenkins** brings a claim for solatium damages.

19.      **Herman Ray** brings a claim as **Personal Representative of the Estate of James Ray**, **Deceased**, who was a Sibling of Denease Conley, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **James Ray**, who was a citizen of the United States and a resident of the State of Missouri, expired after his claim arose on September 11, 2001, and prior to the filing of the instant lawsuit. **Herman Ray** brings an action on behalf of the Estate of James Ray for solatium damages.

20.      **Stanley Ray**, a citizen of the United States and a resident of the State of Missouri, is a surviving Sibling of Denease Conley, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Stanley Ray** brings a claim for solatium damages.

21.      **Aaron Adler**, a citizen of the United States and a resident of the State of New

Jersey, is a surviving Sibling of Lee Alan Adler, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Aaron Adler** brings a claim for solatium damages.

22.    **Alice Doerge Adler**, a citizen of the United States and a resident of the State of Alabama, is the surviving Spouse of Lee Alan Adler, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. Plaintiff **Alice Doerge Adler** brings a claim individually for solatium damages.

23.    **Alice Doerge Adler, as Personal Representative of the Estate of Lee Alan Adler, Deceased**, also brings claims for Wrongful Death, Pain & Suffering, and Economic Loss on behalf of the Estate of Lee Alan Adler.

24.    **Isabell Dansiger Adler**, a citizen of the United States and a resident of the State of Florida, is a surviving Parent of Lee Alan Adler, one of the Decedents murdered as a result of terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Isabell Dansiger Adler** brings a claim for solatium damages.

25.    **Jay Adler**, a citizen of the United States and a resident of the State of New York, is a surviving Sibling of Lee Alan Adler, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Jay Adler** brings a claim for solatium damages.

26.    **Lauren Sarah Adler Martinelli**, a citizen of the United States and a resident of

the State of California, is a surviving Child of Lee Alan Adler, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Lauren Sarah Adler Martinelli** brings a claim for solatium damages.

27.     **Randi Adler**, a citizen of the United States and a resident of the State of Florida, is a surviving Sibling of Lee Alan Adler, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Randi Adler** brings a claim for solatium damages.

28.     **Anthony Behette**, a citizen of the United States and a resident of the State of New York, is a surviving Sibling of Michael G. Behette, one of the Decedents who died as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Anthony Behette** brings a claim for solatium damages.

29.     **Ester DiNardo**, a citizen of the United States and a resident of the State of Florida, is a surviving Parent of Marisa DiNardo-Schorpp, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Ester DiNardo** brings a claim for solatium damages.

30.     **Harley DiNardo**, a citizen of the United States and a resident of the State of California, is a surviving Sibling of Marisa DiNardo-Schorpp, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in

furtherance of the attacks. **Harley DiNardo** brings a claim for solatium damages.

31.     **Pio DiNardo**, a citizen of the Italian Republic and a resident of the State of New York, is a surviving Parent of Marisa DiNardo-Schorpp, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. Decedent Marisa DiNardo-Schorpp was a citizen of the United States and, at the time of her death on September 11, 2001, a resident of the state of New York. **Pio DiNardo** brings a claim for solatium damages.

32.     **Andrew Economos**, a citizen of the United States and a resident of the State of New York, is a surviving Sibling of Constantine Economos, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Andrew Economos** brings a claim for solatium damages.

33.     **Olga Valinotti**, a citizen of the United States and a resident of the State of New York, is a surviving Sibling of Constantine Economos, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Olga Valinotti** brings a claim for solatium damages.

34.     **Andrew Economos** brings a claim as **co-Personal Representative of the Estate of Leon Economos**, **Deceased**, who was a Parent of Constantine Economos, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Leon Economos**, who was a citizen of the United States

and a resident of the State of New York, expired after his claim arose on September 11, 2001, and prior to the filing of the instant lawsuit. **Andrew Economos** brings an action on behalf of the Estate of Leon Economos for solatium damages.

35.     **Olga Valinotti** brings a claim as **co-Personal Representative of the Estate of Leon Economos**, **Deceased**, who was a Parent of Constantine Economos, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Leon Economos**, who was a citizen of the United States and a resident of the State of New York, expired after his claim arose on September 11, 2001, and prior to the filing of the instant lawsuit. **Olga Valinotti** brings an action on behalf of the Estate of Leon Economos for solatium damages.

36.     **Constance Finnicum**, a citizen of the United States and a resident of the State of Georgia, is a surviving Sibling of Richard Gabrielle, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Constance Finnicum** brings a claim for solatium damages.

37.     **George Gabrielle, a/k/a Gabe Gabrielle**, a citizen of the United States and a resident of the State of Florida, is a surviving Sibling of Richard Gabrielle, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **George Gabrielle, a/k/a Gabe Gabrielle,** brings a claim for solatium damages.

38.     **Hank Grazioso**, a citizen of the United States and a resident of the State of New

Jersey, is a surviving Parent of John Grazioso, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Hank Grazioso** brings a claim for solatium damages.

39.     **Hank Grazioso**, a citizen of the United States and a resident of the State of New Jersey, is a surviving Parent of Timmy Grazioso, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Hank Grazioso** brings a claim for solatium damages.

40.     **Theresa Cooke**, a citizen of the United States and a resident of the Commonwealth of Virginia, is a surviving Sibling of LeRoy W. Homer, Jr., one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Theresa Cooke** brings a claim for solatium damages.

41.     **Michelle Hargis**, a citizen of the United States and a resident of the State of New York, is a surviving Sibling of LeRoy W. Homer, Jr., one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Michelle Hargis** brings a claim for solatium damages.

42.     **Christine Homer**, a citizen of the United States and a resident of the State of New York, is a surviving Sibling of LeRoy W. Homer, Jr., one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of

the attacks. **Christine Homer** brings a claim for solatium damages.

43. **Christine Homer** brings a claim as **Personal Representative of the Estate of Thomas Freimark**, a Sibling of LeRoy W. Homer, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Thomas Freimark**, who was a citizen of the United States and a resident of the State of Florida, expired after his claim arose on September 11, 2001, and prior to the filing of the instant lawsuit. **Christine Homer** brings a claim on behalf of the Estate of Thomas Freimark for solatium damages.

44. **Ilse Homer**, a citizen of Germany and a resident of the State of New York, is a surviving Parent of LeRoy W. Homer, Jr., one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. Her son, Decedent LeRoy W. Homer, Jr., was a citizen of the United States. **Ilse Homer** brings a claim for solatium damages.

45. **Monique Homer**, a citizen of the United States and a resident of the State of New York, is a surviving Sibling of LeRoy W. Homer, Jr., one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Monique Homer** brings a claim for solatium damages.

46. **Marilyn Johnson**, a citizen of the United States and a resident of the State of New York, is a surviving Sibling of LeRoy W. Homer, Jr., one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran

19

and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Marilyn Johnson** brings a claim for solatium damages.

47.    **Cheryl Homer Wilson**, a citizen of the United States and a resident of the State of New York, is a surviving Sibling of LeRoy W. Homer, Jr., one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Cheryl Homer Wilson** brings a claim for solatium damages.

48.    **Germaine Wilson**, a citizen of the United States and a resident of the State of New York, is a surviving Sibling of LeRoy W. Homer, Jr., one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Germaine Wilson** brings a claim for solatium damages.

49.    **Andrew Brian Jordan, Jr.**, a citizen of the United States and a resident of the State of New York, is a surviving Child of Andrew Brian Jordan, Sr., one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Andrew Brian Jordan, Jr.** brings a claim for solatium damages.

50.    **David Lebor**, a citizen of the United States and a resident of the Commonwealth of Pennsylvania, is a surviving Sibling of Leon Lebor, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **David Lebor** brings a claim for solatium damages.

51.    **Rina Kauffman, a/k/a Joy Kaufman,** brings a claim as **Personal Representative**

**of the Estate of Philip Lebor, Deceased**, a Parent of Leon Lebor, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. The 9/11 Decedent, Leon Lebor, was a citizen of the United States. **Philip Lebor**, who was a citizen of the United Kingdom and the State of Israel, expired after his claim arose on September 11, 2001, and prior to the filing of the instant lawsuit. **Rina Kauffman, a/k/a Joy Kaufman,** brings a claim on behalf of the Estate of Philip Lebor for solatium damages.

52.    **Danielle McGuire**, a citizen of the United States and a resident of the State of New Jersey, is a surviving Spouse of Patrick McGuire, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. Plaintiff **Danielle McGuire** brings a claim individually for solatium damages.

53.    **Danielle McGuire, as Personal Representative of the Estate of Patrick McGuire, Deceased**, also brings claims for Wrongful Death, Pain & Suffering, and Economic Loss on behalf of the Estate of Patrick McGuire.

54.    **Mara McGuire**, a citizen of the United States and a resident of the State of New Jersey, is a surviving Child of Patrick McGuire, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Mara McGuire** brings a claim for solatium damages.

55.    **Ryan McGuire**, a citizen of the United States and a resident of the State of New Jersey, is a surviving Child of Patrick McGuire, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and

the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Ryan McGuire** brings a claim for solatium damages.

56.     **Sean McGuire**, a citizen of the United States and a resident of the State of New Jersey, is a surviving Child of Patrick McGuire, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Sean McGuire** brings a claim for solatium damages.

57.     **Shea McGuire**, a citizen of the United States and a resident of the State of New Jersey, is a surviving Child of Patrick McGuire, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Shea McGuire** brings a claim for solatium damages.

58.     **AnneMarie Medaglia**, a citizen of the United States and a resident of the State of New York, is a surviving Parent of Rocco Medaglia, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **AnneMarie Medaglia** brings a claim for solatium damages.

59.     **Diana Medaglia**, a citizen of the United States and a resident of the State of North Carolina, is a surviving Child of Rocco Medaglia, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Diana Medaglia** brings a claim for solatium damages.

60.     **Kathleen Medaglia-Dellapenna**, a citizen of the United States and a resident of

the State of New York, is a surviving Sibling of Rocco Medaglia, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Kathleen Medaglia-Dellapenna** brings a claim for solatium damages.

61. **MaryEllen Medaglia**, a citizen of the United States and a resident of the State of New York, is a surviving Sibling of Rocco Medaglia, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **MaryEllen Medaglia** brings a claim for solatium damages.

62. **Michael Medaglia**, a citizen of the United States and a resident of the State of New York, is a surviving Sibling of Rocco Medaglia, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Michael Medaglia** brings a claim for solatium damages.

63. **Elizabeth Medaglia-Cordes**, a citizen of the United States and a resident of the State of New York, is a surviving Child of Rocco Medaglia, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Elizabeth Medaglia-Cordes** brings a claim individually for solatium damages.

64. **Elizabeth Medaglia-Cordes, as Personal Representative of the Estate of Rocco Medaglia, Deceased**, also brings claims for Wrongful Death, Pain & Suffering, and Economic Loss on behalf of the Estate of Rocco Medaglia.

65. **Mary Ellen Murach**, a citizen of the United States and a resident of the State of

New Jersey, is a surviving Parent of Robert M. Murach, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Mary Ellen Murach** brings a claim for solatium damages.

66.    **Mary Ellen Murach** brings a claim as **Personal Representative of the Estate of Edward John Murach**, **Deceased**, who was a Parent of Robert M. Murach, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Edward John Murach**, who was a citizen of the United States and a resident of the State of New York, expired after his claim arose on September 11, 2001, and prior to the filing of the instant lawsuit. **Mary Ellen Murach** brings an action on behalf of the Estate of Edward John Murach for solatium damages.

67.    **Richard J. Murach**, a citizen of the United States and a resident of the State of New Jersey, is a surviving Sibling of Robert M. Murach, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Richard J. Murach** brings a claim for solatium damages.

68.    **Katharine Tynion**, a citizen of the United States and a resident of the State of New Jersey, is a surviving Sibling of Robert M. Murach, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Katharine Tynion** brings a claim for solatium damages.

69.    **Paula Nacke Jacobs**, a citizen of the United States and a resident of the State of

Maryland, is a surviving Sibling of Louis J. Nacke, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks.  Plaintiff **Paula Nacke Jacobs** brings a claim for solatium damages.

70.    **Dale Allen Nacke**, a citizen of the United States and a resident of the State of Georgia, is a surviving Sibling of Louis J. Nacke, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks.  **Dale Allen Nacke** brings a claim for solatium damages.

71.    **Dale Allen Nacke** brings a claim as **Personal Representative of the Estate of Louis P. Nacke, Deceased**, who was a Parent of Louis J. Nacke, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks.  **Louis P. Nacke** expired after his claim arose on September 11, 2001, and prior to the filing of the instant lawsuit.  **Dale Allen Nacke** brings a claim on behalf of the Estate of Louis P. Nacke for solatium damages.

72.    **Dale Allen Nacke** brings a claim as **Personal Representative of the Estate of Philomena Millace Nacke, Deceased**, who was a Parent of Louis J. Nacke, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks.  **Philomena Millace Nacke** expired after her claim arose on September 11, 2001, and prior to the filing of the instant lawsuit.  **Dale Allen Nacke** brings a claim on behalf of the Estate of Philomena Millace Nacke for solatium damages.

73.    **Joseph Nicholas Nacke**, a citizen of the United States and a resident of the Commonwealth of Pennsylvania, is a surviving Child of Louis J. Nacke, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks.   **Joseph Nicholas Nacke** brings a claim for solatium damages.

74.    **Kenneth Nacke**, a citizen of the United States and a resident of the State of Maryland, is a surviving Sibling of Louis J. Nacke, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks.   **Kenneth Nacke** brings a claim for solatium damages.

75.    **Louis Paul Nacke, II**, a citizen of the United States and a resident of the State of Maryland, is a surviving Child of Louis J. Nacke, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks.   **Louis Paul Nacke, II,** brings a claim for solatium damages.

76.    **Thomas Papasso**, a citizen of the United States and a resident of the State of New Jersey, is a surviving Sibling of Salvatore T. Papasso, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks.   **Thomas Papasso** brings a claim for solatium damages.

77.    **Patricia Mason**, a citizen of the United States and a resident of the State of New Jersey, is a surviving Sibling of Sandra Wright-Cartledge, one of the Decedents murdered as a

result of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Patricia Mason** brings a claim for solatium damages.

78.  **Eytan Yammer**, a citizen of the United States and resident of the State of Israel, is an adult individual bringing a claim for personal injuries suffered as a direct of the terrorist attacks of September 11, 2001, that were carried out by al-Qaeda and to which Iran and the Iranian Defendants provided direct and material support and assistance in furtherance of the attacks. **Eytan Yammer** brings a claim for money damages.

## DEFENDANTS

### *Islamic Republic Of Iran And Iran's State Actors*

79.  Defendant Islamic Republic of Iran ("Iran") is a foreign state within the meaning of 28 U.S.C. § 1391(f). Iran maintains an Interest Section within the United States at the Embassy of Pakistan at 2204 Wisconsin Avenue, NW, Washington, D.C. 20007.

80.  Iran has been waging virtually an undeclared war against the United States and Israel for thirty years. Iran wages this undeclared war through asymmetrical, or unconventional, strategies and terrorism, often through proxies such as Hezbollah, HAMAS, al-Qaeda and others.

81.  Iran has for many years been designated as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. §2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b). Iran has been so designated by the U.S. Department of State every year since 1984. Iran has repeatedly been found liable under the Foreign Sovereign Immunities Act, 28 U.S.C. §1602, *et seq.*, for deaths and injuries caused by its activities as a state sponsor of international terrorism, particularly in connection with acts perpetrated by the paramilitary terrorist organization sponsored by Iran known as "Hizballah" or "Hezbollah." Iran's involvement in international terrorism has been documented in a long line of cases in both this

Court and the United States District Court for the District of Columbia, including recent decisions in *Estate of Heiser v. Islamic Republic of Iran*, 659 F.Supp.2d 20 (D.D.C. 2009), *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52 (D.D.C. 2010), and *Havlish v. bin Laden*, 2012 WL 3090979 (S.D.N.Y. 2012). *See also* Findings of Fact and Conclusions of Law entered by the Honorable George B. Daniels in *Havlish, et al. v. bin Laden, et al.* on December 22, 2001.

82.     Since the time Iran was designated by the State Department as a state sponsor of terrorism, a large body of evidence has been collected and analyzed which shows conclusively that Iran views terrorism as an instrument of state policy, like diplomacy or military power - a tool to be used to further political objectives.  The evidence shows that Iran has, over the years, directly carried out assassinations, bombings and other terrorist acts against its enemies, and Iran has also carried out such terrorist acts through its terrorist proxy, Hezbollah.  Iran has also provided direct and indirect support to international terrorist groups, sometimes directly, and other times through Hezbollah, in the form of money, training, sanctuary, documentation, intelligence, weapons and other types of assistance.  Al-Qaeda is one such terrorist organization that has received direct and material support from Iran and Hezbollah.

83.     To carry out its policy of terrorism and support for terrorist groups, Iran has created and used government organizations including intelligence ministries, the military, and various types of quasi-governmental companies and entities which are directly answerable to, and receive instructions from, the Islamic regime in power in Iran.  Some of these entities are named herein as state actors, i.e. part and parcel of the Islamic Republic of Iran; others are named herein as the "Instrumentality Defendants."

84.     As described herein, Iran acted through its officials, officers, agents, employees, agencies and instrumentalities in providing direct and material support, and resources, to

Defendant al-Qaeda.  The support provided by Iran included assistance in, and contribution to, the preparation and execution of the plans that culminated in the hijacked flights and the extrajudicial killings of the 9/11 Decedents.

85.     The following individuals and governmental entities of Iran are named as Defendants in this action:

(a)     Ayatollah Ali Hoseini-Khamenei ("Khamenei"), is the most important and powerful official in Iran.  Ayatollah Khamenei has been the Supreme Leader of the Islamic Republic of Iran since 1989.  Khamenei is the commander-in-chief of the armed forces, appoints the head of each military service, declares war and peace for the nation-state of Iran, appoints the head of Iran's judiciary, and he may dismiss the elected president of Iran, among many other powers outlined in Article 110 of the Iranian Constitution.  Ayatollah Khamenei's power is, as his title suggests, supreme.  He is the head of state, and, for all intents and purposes, Khamenei is the Iranian government.  Khamenei is certainly - by far - the most powerful person in the Iranian government.  His term of office is unlimited. Defendant Khamenei has a long record of direct involvement in Iran's material support for terrorism.  In the late 1990s, Ayatollah Khamenei formed a special intelligence apparatus that reported directly to him and worked under his direct control.  This special intelligence apparatus has engaged in the planning, support, and direction of terrorism.  Khamenei has been found to be an instrumentality of Iran for purposes of liability and damages under the Foreign Sovereign Immunities Act.  *See, e.g., Flatow v. Islamic Republic if Iran,* 999 F.Supp. 1 (D.D.C. 1998).  As head of the Iranian state, Khamenei is responsible for formulating and executing the nation's policy of supporting terrorism and terrorist groups such as al-Qaeda.  As a government agent, Khamenei maintains a presence in the United

States through the Permanent Representative of the Islamic Republic of Iran to the United

Nations 622 Third Avenue, 34th Floor New York, N.Y. 10017, or through the Iranian

Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington,

D.C. 20007.

(b)   Estate of Ali Akbar Hashemi Rafsanjani, Deceased ("Rafsanjani"), is the

Estate of one of the wealthiest individuals in Iran, who held a number of top positions in

Iran's government.  From 1989 to 1997, Rafsanjani was the president of Iran; from 1981 to

1989, he was the speaker of the Iranian parliament.  Rafsanjani was the head of two

important bodies established by the Iranian Constitution: the Assembly of Experts and the

Expediency Council.  Defendant Rafsanjani had a long record of direct involvement in

Iran's material support for terrorism.  Rafsanjani was instrumental in planning, sponsoring

and hosting several meetings in Iran with leaders of al-Qaeda and other worldwide

terrorists.  It was at these meetings that the plans for the September 11, 2001, terrorist

attacks were discussed and finalized.  As a government agent, Rafsanjani maintained a

presence in the United States through the Permanent Representative of the Islamic

Republic of Iran to the United Nations 622 Third Avenue, 34th Floor New York, N.Y.

10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin

Avenue, NW, Washington, D.C. 20007.  In addition, it is believed that Rafsanjani held

financial interests in several properties throughout the United States.

(c)   Iran's Ministry of Information and Security ("MOIS") is a political

subdivision of the nation-state the Islamic Republic of Iran.  This agency has core functions

which are governmental, not commercial, in nature.  This agency was established by law,

its head is appointed by the president subject to confirmation by the parliament, its budget

30

is proposed by the president and approved by the parliament, and its funding comes almost entirely from general tax revenues.  Iran's MOIS is a well-funded and skilled intelligence agency with an annual budget between $100 million and $400 million.  MOIS has been a key instrument of the government of Iran for its material support of terrorist groups like Hezbollah and as a terrorist agency of the Iranian government.  Many of the U.S. State Department reports on global terrorism over the past twenty-five (25) years refer to MOIS as Iran's key facilitator and director of terrorist attacks.  MOIS has been found to be an instrumentality of Iran for purposes of liability and damages under the Foreign Sovereign Immunities Act.  *See, e.g., Sutherland. v. Islamic Republic of Iran,* 151 F.Supp.2d 27 (D.D.C. 2001).  With a large budget and extensive organization, MOIS is one of the most powerful ministries in the Iranian government.  The ministry has traditionally operated under the guidance of the *Velayat–e Faqih* apparatus of the Supreme Leader.

(d)    The Islamic Revolutionary Guard Corps ("IRGC") is a political/military subdivision of the nation-state the Islamic Republic of Iran.  This agency has core functions which are governmental in nature. The IRGC was established by the Iranian constitution, which sets forth the IRGC's responsibilities and powers.  The IRGC reports directly to Iran's Supreme Leader, and it operates as an agent and instrumentality of the Supreme Leader himself.  The IRGC is a military force parallel to the regular Iranian military and to the formal governmental structure.  The IRGC's funding comes in large part from general tax revenues, yet the IRGC also owns and controls hundreds of companies and commercial interests, and it holds billions of dollars in military, business, and other assets and government contracts.  The IRGC has a special foreign division, known as the Qods (or Quds or "Jerusalem") Force, which is the arm of the IRGC that works with militant

organizations abroad and promotes terrorism overseas.  The Qods Force has a long history of engaging in coups, insurgencies, assassinations, kidnappings, bombings, and arms dealing, and it is one of the most organized, disciplined, and violent terrorist organizations in the world.  The U.S. State Department has designated the IRGC as a "foreign terrorist organization," and the U.S. Treasury Department has designated the IRGC-Qods Force as a "terrorist organization."  As a government agency, the IRGC maintains a presence in the United States through the Permanent Representative of the Islamic Republic of Iran to the United Nations 622 Third Avenue, 34th Floor New York, N.Y. 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, D.C. 20007.

(e)     Iran's Ministry of Economic Affairs and Finance ("IMEAF") is a political subdivision of the nation-state the Islamic Republic of Iran located at Sour Esrafil Street, Bab Homayoun Avenue, Tehran, Iran.  This agency has core functions which are governmental, not commercial, in nature. This agency was established by law, its head is appointed by the president subject to confirmation by the parliament, its budget is proposed by the president and approved by the parliament, and its funding comes almost entirely from general tax revenues.  All Iranian government ministries are responsible for carrying out the policies of the Iranian government, among them state support for terrorism.  The IMEAF, as a government agency, maintains a presence in the United States through the Permanent Representative of the Islamic Republic of Iran to the United Nations 622 Third Avenue, 34th Floor New York, N.Y. 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, D.C.  20007.  The IMEAF funnels funds to the Iranian government with knowledge that the Iranian

government uses those funds to support its own terrorist activities as well as those of Defendant Hezbollah and al-Qaeda.

(f)     Iran's Ministry of Commerce ("IMOC") is a political subdivision of the nation-state the Islamic Republic of Iran located at 492 Valy-e Asr Avenue Between Taleghani Crossroad and Valy-e Asr Square, Tehran, Iran.  This agency has core functions which are governmental, not commercial, in nature. This agency was established by law, its head is appointed by the president subject to confirmation by the parliament, its budget is proposed by the president and approved by the parliament, and its funding comes almost entirely from general tax revenues.  All Iranian government ministries are responsible for carrying out the policies of the Iranian government, among them state support for terrorism. The IMOC, as a government agency, maintains a presence in the United States through the Permanent Representative of the Islamic Republic of Iran to the United Nations 622 Third Avenue, 34th Floor New York, N.Y. 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, D.C. 20007.  The IMOC funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Defendant Hezbollah and al-Qaeda.

(g)     Iran's Ministry of Defense and Armed Forces Logistics ("IMDAFL") is a political/military subdivision of the nation-state the Islamic Republic of Iran located at Ali Shamkhani Dabestan Street, Seyyed Khandan Bridge, Resalat Expressway, Tehran, Iran. This agency has core functions which are governmental, not commercial, in nature. This agency was established by law, its head is appointed by the president subject to confirmation by the parliament, its budget is proposed by the president and approved by

the parliament, and its funding comes almost entirely from general tax revenues.  All Iranian government ministries are responsible for carrying out the policies of the Iranian government, among them state support for terrorism.  The IMDAFL, as a government agency, maintains a presence in the United States through the Permanent Representative of the Islamic Republic of Iran to the United Nations 622 Third Avenue, 34th Floor New York, N.Y. 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, D.C. 20007.  The IMDAFL funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Defendant Hezbollah and al-Qaeda.

(h)     Iran's Ministry of Petroleum ("IMOP") is a political subdivision of the nation-state the Islamic Republic of Iran located at Hafez Crossing, Taleghani Avenue, Before Hafez Bridge, Tehran, Iran.  This agency has core functions which are governmental, not commercial, in nature.  This agency was established by law, its head is appointed by the president subject to confirmation by the parliament, its budget is proposed by the president and approved by the parliament, and its funding comes almost entirely from general tax revenues.  All Iranian government ministries are responsible for carrying out the policies of the Iranian government, among them state support for terrorism.  The affiliated entities of IMOP are Defendant National Iranian Gas Company, Defendant National Iranian Petrochemical Company and the Iranian Offshore Oil Company.  IMOP maintains a presence in the United States through the Permanent Representative of the Islamic Republic of Iran to the United Nations 622 Third Avenue, 34th Floor New York, N.Y. 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, D.C. 20007.  IMOP, in conjunction with and

through these affiliated entities, generates substantial money that is used by the Iranian government to fund its terrorist activities, including its support of Defendant Hezbollah and al-Qaeda.

### *The Instrumentality Defendants*

86.    The following Defendants are instrumentalities of the Islamic Republic of Iran:

(a)    Central Bank of Iran, a/k/a Bank Markazi ("CBI"), is a financial institution owned and controlled by the Iranian government.  The main offices of the CBI are located at No. 144, Mirdamad Boulevard, Tehran, Iran.  CBI, as a government-controlled entity, maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, D.C. 20007.  The main offices of the CBI are located at No. 198 Mirdamad Boulevard, Tehran, Iran.  CBI keeps accounts for, grants loans to and otherwise funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Defendant Hezbollah and al-Qaeda.

(b)    National Iranian Oil Corporation ("NIOC") is an Iranian corporation owned and controlled by the Iranian government located at the National Iranian Oil Company Building, Hafez Crossing, Taleghani Avenue, Tehran, Iran. NIOC, as a government-controlled entity, maintains a presence in the United States through the Permanent Representative of the Islamic Republic of Iran to the United Nations 622 Third Avenue, 34th Floor New York, N.Y. 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, D.C. 20007.  NIOC funnels funds

to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Defendant Hezbollah and al-Qaeda.

(c)     National Iranian Tanker Corporation ("NITC") is an Iranian corporation owned and controlled by the Iranian government located at 65 Shahid Atefi Street, Africa Expressway, Tehran, Iran.  NITC, as a government-controlled entity, maintains a presence in the United States through the Permanent Representative of the Islamic Republic of Iran to the United Nations 622 Third Avenue, 34th Floor New York, N.Y. 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, D.C. 20007.  NITC funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Defendant Hezbollah and al-Qaeda.

(d)     National Iranian Gas Company ("NIGC") is an Iranian corporation owned and controlled by the Iranian government located at National Iranian Gas Company Building, South Aban Street, Karimkhan Blvd., P.O. Box 15875, Tehran, Iran.  NIGC, as a government-controlled entity, maintains a presence in the United States through the Permanent Representative of the Islamic Republic of Iran to the United Nations 622 Third Avenue, 34th Floor New York, N.Y. 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, D.C. 20007.  NIGC funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Defendant Hezbollah and al-Qaeda.

(e)     National Iranian Petrochemical Company ("NIPC") is an Iranian corporation owned and controlled by the Iranian government located at No. 144, North

Sheikh Bahaie Avenue, P.O. Box 19395-6896, Tehran, Iran. NIPC, as a government-controlled entity, maintains a presence in the United States through the Permanent Representative of the Islamic Republic of Iran to the United Nations 622 Third Avenue, 34th Floor New York, N.Y. 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, D.C. 20007. NIPC funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Defendant Hezbollah and al-Qaeda.

(i) Iran Airlines, a/k/a Iran Air ("Iran Air"), is an Iranian corporation owned and controlled by the Iranian government located at Mehrabad Airport, P.O. Box 13185-775, Tehran, Iran. Iran Air, as a government-controlled entity, maintains a presence in the United States through the Permanent Representative of the Islamic Republic of Iran to the United Nations 622 Third Avenue, 34th Floor New York, N.Y. 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, D.C. 20007. Iran Air funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Defendant Hezbollah and al-Qaeda. In addition, Iran Air knowingly assists Iran's efforts to export terrorism by transporting individual terrorists to destinations for the purpose of committing terrorist acts in foreign countries.

(j) Hezbollah (alternatively spelled "Hizballah") is a surrogate of Iran's MOIS through which the Iranian government executes many of its terrorist plans. The goal of Hezbollah was to bring the ideals of the Islamic Revolution in Iran to Lebanon. Hezbollah is funded, directed and controlled by the Iranian government. President Clinton issued Executive Order 12947 on January 23, 1997, which named Hezbollah a Specially

Designated Terrorist, along with 11 other organizations which had committed, or posed a significant risk of committing, acts of violence which threatened to disrupt the Middle East peace process. *See* 60 Fed. Reg. 5079 (Jan. 23, 1997). On October 8, 1997, the U.S. Department of State further designated Hezbollah as a Foreign Terrorist Organization pursuant to the Immigration and Nationality Act, 8 U.S.C. §1189. *See* 62 Fed. Reg. 52650 (Oct. 8, 1997). A Foreign Terrorist Organization is one that engages in terrorist activity, retains the capability and intent to engage in terrorist activity, and whose terrorist activity threatens the security of U.S. nationals or the United States. In the wake of the attacks of September 11, 2001, which serve as the basis of this Complaint, President Bush issued Executive Order 13224, which identified 12 individuals and 15 entities which were a continuing and immediate threat to the security of U.S. nationals and the United States. *See* 66 Fed. Reg. 49079 (Sept. 23, 2001). Pursuant to this Order, the U.S. Department of State listed Hezbollah as a Specially Designated Global Terrorist. *See* Fed. Reg. 12633 (Mar. 19, 2002). Hezbollah, as a government agency, maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, D.C. 20007, or through the Permanent Representative of Lebanon to the United Nations, 866 United Nations Plaza, Room 531-533, New York, NY 10017.

At all relevant times, Iran used the Instrumentality Defendants to further its funding and support of terrorist activities against the United States and its citizens, including its support for Defendant Hezbollah and al-Qaeda.

## FACTUAL BACKGROUND

### *Background of al-Qaeda*

87.     In or about 1989, Osama bin Laden, Muhammad Atef and others founded an international terrorist group that became known as al-Qaeda ("the Base").  Osama bin Laden was the "emir" (prince) of al-Qaeda and was its leader at all relevant times.  Members of al-Qaeda pledged an oath of allegiance (called a "bayat") to Osama bin Laden and al-Qaeda.

88.     From 1989 until about 1991, al-Qaeda was headquartered in the Islamic Emirate of Afghanistan and Peshawar, Pakistan. In or about 1991, the leadership of al-Qaeda, including its emir, Osama bin Laden, relocated to the Sudan. Al-Qaeda was headquartered in the Sudan from approximately 1991 until approximately 1996 but also maintained a presence and activities in various parts of the world. In 1996, Osama bin Laden and other members of al-Qaeda relocated again to the Islamic Emirate of Afghanistan.

89.     Bin Laden and al-Qaeda violently opposed the United States for several reasons. First, the United States was regarded as an "infidel nation" because it was not governed in a manner consistent with the group's extremist interpretation of Islam. Second, the United States was viewed as providing essential support for other "infidel" governments and institutions. Third, al-Qaeda opposed the involvement of the United States armed forces in the Gulf War in 1991 and in Operation Restore Hope in Somalia in 1992 and 1993. In particular, al-Qaeda opposed the continued presence of American military forces in Saudi Arabia (and elsewhere on the Arabian peninsula) following the Gulf War.  Fourth, al-Qaeda opposed the United States Government because of the arrest, conviction and imprisonment of persons belonging to al-Qaeda or its affiliated terrorist groups or those with whom it worked.  For these and other reasons, bin Laden declared jihad, or holy war, against the United States, which he carried out through al-Qaeda and

its affiliated organizations.

90.     At relevant times, al-Qaeda functioned both on its own and through terrorist organizations that operated under its umbrella, including Egyptian Islamic Jihad, which was led by Ayman al-Zawahiri, the Islamic Group (also known as "el Gamaa el Islamia" or simply "Gamaa't"), and a number of jihad groups in other countries, including the Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the Philippines, Tajikistan, Azerbaijan, the Kashmiri region of India and the Chechnyan region of Russia.  Al-Qaeda also maintained cells and personnel in a number of countries to facilitate its activities, including Kenya, Tanzania, the United Kingdom, Germany, Canada, Malaysia, and the United States.

91.     Al-Qaeda had a command and control structure which included a "majlis al shura" (or consultation council) which discussed and approved major undertakings, including terrorist operations. Al-Qaeda also had a "military committee" which considered and approved "military" matters.

92.     Bin Laden and al-Qaeda forged alliances with representatives of the government of Iran, and its associated terrorist group Hezbollah, for the purpose of working together against their perceived common enemy in the West, the United States.

93.     At relevant times, bin Laden and al-Qaeda sponsored, managed, and/or financially supported training camps in Afghanistan.  Those camps were used to instruct members and associates of al-Qaeda and its affiliated terrorist groups in the use of firearms, explosives, chemical weapons, and other weapons of mass destruction. In addition to providing training in the use of various weapons, these camps were used to conduct operational planning against United States targets around the world and experiments in the use of chemical and biological weapons. These

camps were also used to train al-Qaeda members in security and counterintelligence methods, such as the use of codes and passwords, and to teach members and associates of al-Qaeda about traveling to perform operations. For example, al-Qaeda instructed its members and associates to dress in "Western" attire and to use other methods to avoid detection by security officials. The group also taught its members and associates to monitor media reports of its operations to determine the effectiveness of their terrorist activities.

94.     During the time from about 1996 when al-Qaeda operated from its headquarters in the Afghanistan, bin Laden and al-Qaeda forged close relations with the ruling regime, known as the "Taliban," and Taliban leader Muhammad Omar.  Bin Laden openly informed other al-Qaeda members and associates outside Afghanistan of their support of, and alliance with, the Taliban and Omar.

95.      One of the principal goals of al-Qaeda was to drive the United States armed forces out of Saudi Arabia (and elsewhere on the Arabian peninsula) and Somalia by violence. These goals eventually evolved into a declaration of jihad (holy war) against America and all Americans. Members of al-Qaeda issued fatwahs (rulings on Islamic law) indicating that such attacks on Americans were both proper and necessary.

96.     Like Iran, al-Qaeda and bin Laden used terrorism as an instrument of policy, as a tool to be used to further political objectives.  Al-Qaeda has, over the years, directly carried out murders, bombings and other terrorist acts against its enemies.  It has also provided direct and indirect support to other international terrorist groups and received support in return, often in the form of money, training, sanctuary, documentation, intelligence, weapons and other types of assistance.

97.     Al-Qaeda has often used operatives such as the hijackers to actively engage in

terrorist activities against the United States and its citizens.  In conducting those terrorist activities, al-Qaeda received financial, logistical and other material support from Iran other foreign states.

### Iran's Sponsorship of Terrorism and al-Qaeda

98.     For many years, the Department of State has included Iran among the state sponsors of terrorism.  Indeed, the Department of State has repeatedly described Iran as "the most active" state sponsor of terrorism.

99.     At relevant times, Iran provided material support to bin Laden and al-Qaeda, often through Iran's state-sponsored terrorist organization, Hezbollah.  That support included advice and assistance in planning attacks against American targets, as well as financial and logistical support for particular operations such as the 9/11 attacks.

100.     Imad Fayez Mughniyah (a/k/a Hajj Radwan) was, for decades prior to his death in February 2008, the terrorist operations chief of Hizballah.  Mughniyah was, since the early 1980s, affiliated with the Islamic regime in Iran, and he lived in Iran for many years.  Imad Mughniyah was an agent of the Iranian regime.  Imad Mughniyah had a direct reporting relationship to Iranian intelligence and a direct role in Iran's sponsorship of terrorist activities.

101.     While Osama bin Laden and al-Qaeda were headquartered in Sudan in the early 1990s, Hassan al Turabi fostered the creation of a foundation and alliance for combined Sunni and Shi'a Muslim opposition to the United States and the West, an effort that was agreed to and joined by Osama bin Laden and Ayman al Zawahiri, leaders of al-Qaeda, and by the leadership of Iran.

102.     The well-known historical religious division between Sunni and Shi'a Muslims did not pose an insurmountable barrier to cooperation in regard to terrorist operations by radical Islamic leaders and terrorists.  Iran, which is largely Shiite, and its terrorist proxy organization, Hizballah, also Shiite, entered into an alliance with al-Qaeda, which is Sunni, to work together to

conduct terrorist operations against the United States during the 1990s and continuing through, and after, September 11, 2001.

103.     In 1991 or 1992, discussions in Sudan between al-Qaeda and Iranian operatives led to an agreement to cooperate in providing support for actions carried out primarily against Israel and the United States.  Thereafter, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives.  Osama bin Laden also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hezbollah.

104.     On October 31, 1991, Iran hosted the International Conference for the Support of the Muslim Palestinian People's Revolution, which was attended by radical Palestinian groups, both Islamic and secular.  The conference established a permanent secretariat, funded by Iran, to coordinate pro-intifada activities.  In doing so, Iran tightened its ties to the radical groups Palestinian HAMAS and Islamic Jihad.

105.     At various times in or about 1992 and 1996, bin Laden and other ranking members of al-Qaeda made it known that they favored a policy under which al-Qaeda would put aside its differences with Shiite Muslim terrorist organizations, including the government of Iran and its affiliated terrorist group Hezbollah, in order to coordinate attacks against their perceived common enemy, the United States.

106.     On or before 1994, al-Qaeda forged an alliance with the National Islamic Front of Sudan and with representatives of the government of Iran, and its associated terrorist group Hezbollah, for the purpose of working together against the United States and other perceived common targets.

107.     Hezbollah is financed by the Iranian government.   The amounts of Iranian government contributions to Hezbollah have varied over the years, ranging from an estimated 15-

20 million dollars annually, to as much as 150-300 million dollars annually.  Sheikh Subhi al-Tufeili, Hezbollah's first leader, stated:

> To deny the Iranian connection to Lebanon's Hezbollah would be like denying that the sun provides light to the earth.  Who can deny such a thing?

108.    Hezbollah's manifesto, as declared by Hezbollah's spokesman, Sheikh Ibrahim al-Amin states:

> We, the sons of Hezbollah's Nation in Lebanon, whose vanguard God has given victory in Iran and which has established the nucleus of the world's central Islamic state, abide by the orders of a single wise and just command currently embodied in the supreme examples of Ayatollah Khomeini.
>
> From this basis, we in Lebanon are not a closed organizational structural party, nor are we a narrow political framework, but we are a nation interconnecting with all Muslims of the World.  We are linked by a strong ideological and political connection - Islam.
>
> From here what befalls the Muslims in Afghanistan, Iraq, the Philippines or anywhere else verily afflicts the body of our own Islamic nation of which we are an inseparable part, and moved to confront it on the basis of our main legal obligation in light of the political view decided by our leader Wilayat al-Faqih [Ayatollah Khomeini].

109.    In 1993, in a meeting in Khartoum, Sudan, arranged by Ali Mohamed, a confessed al Qaeda terrorist and trainer now in a U.S. prison, Osama bin Laden and Ayman al Zawahiri met directly with Iran's master terrorist Imad Mughniyah and Iranian officials, including IRGC Brigadier General Mohammad Baqr Zolqadr, a highly placed member of the Iranian terrorism apparatus.  At the 1993 Khartoum conference, representatives of Iran, Hezbollah, and al Qaeda worked out an alliance of joint cooperation and support on terrorism.  Ali Mohamed, who was charged with the 1998 bombing of the two United States Embassies in Africa, testified as follows during his guilty plea hearing on October 20, 2000:

> I was aware of certain contacts between al-Qaeda and al Jihad
> organization, on one side, and Iran and Hezbollah on the other side.  I
> arranged security for a meeting in the Sudan between Mughaniyah,
> Hezbollah's chief, and bin Laden.  Hezbollah provided explosives training
> for al-Qaeda and al Jihad.  Iran supplied Egyptian Jihad with weapons.
> Iran also used Hezbollah to supply explosives that were disguised to look
> like rocks.

110.    The 1993 meeting in Khartoum led to an ongoing series of communications, training arrangements, and operations among Iran and Hezbollah and al- Qaeda.  Osama bin Laden sent more terrorist operatives to Hezbollah training camps operated by Imad Mughniyah and the IRGC in Lebanon and Iran.   Among other tactics, Hezbollah taught bin Laden's al-Qaeda operatives how to bomb large buildings, and Hezbollah also gave the al-Qaeda operatives training in intelligence and security.

111.    Throughout the 1990s, the al-Qaeda/Iran/Hezbollah terrorist training arrangement continued.  Imad Mughniyah himself coordinated these training activities, including training of al-Qaeda personnel, with Iranian government officials in Iran and with IRGC officers working undercover at the Iranian embassy in Beirut, Lebanon.

112.    As a result of the creation of this terrorist alliance, al-Qaeda's Ayman al Zawahiri repeatedly visited Tehran during the 1990s and met with officers of MOIS, including chief Ali Fallahian, and Qods Force chief Ahmad Vahidi.

113.    At all times, Iran's Supreme Leader, Defendant Ayatollah Khamenei, was fully aware that Iran and Hezbollah were training foreign terrorists.

114.    On June 7, 1996, Iran's spiritual leader, Ayatollah Ali Khamenei, declared that Hezbollah must reach "all continents and all countries."

115.    In early June of 1996, Iran organized a pan-Islamist summit which had a primary objective of establishing an international coordination committee to oversee anticipated escalation

45

in hostilities.  Ayatollah Ahmad Jannati, a close associate of Ayatollah Khameini, emerged as the spokesperson for the working group.  The meeting was organized jointly by the Supreme Council for Intelligence Affairs and IRCG (Iranian Revolutionary Guard Corps) high command. Attending the working group were the following:  Ramadan Shallah (head of the Palestine Islamic Jihad); Ahmad Salah, a.k.a. Mamdouh Mahmoud Salim (Egyptian Islamic Jihad); Imad Mughniyah (Hezbollah); Muhammad Ali Ahmad (a representative of al-Qaeda and Osama Bin Laden); Ahmad Jibril (head of the Popular Front for the Liberation of Palestine-General Command); Imad al-Alami and Mustafa al-Liddawi (HAMAS); and Abdullah Ocalan (Kurdish People Party).  The summit participants agreed on the unification of their financial system and training.

116.    In or about July 1996, Osama bin Laden met with an Iranian intelligence official in Afghanistan.

117.    In early October 1996, bin Laden visited Tehran for consultations.  One of the issues addressed was the unification of various Egyptian terrorist organizations.  Iranian intelligence Minister Ali Fallahian chaired the meeting with representatives from the Iranian Interior Ministry, Islamic Guidance Ministry, and Foreign Ministry.  Among the Egyptians attending were the Tehran-based aide of Ayman al Zawahiri, Kamal Ujayzah, and Mustafa Hamzah.  The Iranians discussed specific long-term operational plans and explained to the Egyptian attendees that the degree of Iran's support depended on the extent of their unity.  The Egyptian attendees agreed to form a unified command with Osama bin Laden for operational purposes.

118.    In or about mid-September 1997, the Iranian leadership met to discuss the new course of the anti-American struggle.  The participants included Iran's supreme and spiritual leader Ayatollah Ali Khamenei.  Also present were newly-elected president Mohammad Khatami, former

president Ali Akbar Hashemi-Rafsanjani, and the minister of intelligence, Qurban Ali Dari Najafabadi.  Other participants in this conference were: General Rahim Safavi (the Commander-in-Chief of the IRGC); General Mohsen Rezai (former Commander-in-Chief of IRGC, later responsible for reorganizing the Iranian security services and their networks); Ali Fallahian (former intelligence minister); Mohammed Mohammadi Rayshahri (former intelligence minister, present as Khamenei's special adviser on intelligence affairs); Hossein Sheikh-ol-Islam (Iran's former deputy foreign minister and once again director on the Office of Liberation Movements); Ali Akbar Mohtashemi; General Diya Sayfi (the commander of the IRGC forces in Lebanon); members of the Supreme National Security Council; and senior IRGC and intelligence officials.

119.     In or about September 20-23, 1997, Iranian intelligence organized a major summit of terrorist leaders from all over the world.  Among the participants were:  Imad Mughniyah and Abdul-Hadi Hammadi (Hezbollah); Ayman al-Zawahiri (Egyptian Islamic Jihad); Ahmad Jibril (chief of the Popular Front for the Liberation of Palestine-General Command PFLP-GC); Osama Abu-Hamden and Imad al-Alami (HAMAS); Ramadan al-Shallah (chief of Palestinian Islamic Jihad); and three commanders representing branches of Hezbollah in the Persian Gulf States.

120.     Participants at the summit examined the Islamists' ability to escalate terrorism against the United States and the West.  Several senior Iranian officials addressed the summit and ordered the terrorist leaders to be ready to launch an unprecedented international terrorist campaign.

121.     In or about late September 1997, the Iranian leadership met again to discuss the course of the forthcoming terrorism offensive in light of the resolutions and findings of the recent international terrorist summit.

122.     In the second half of November 1997, Ayatollah Ali Khamenei convened a meeting

with General Rahim Safavi and Ahmad Vahidi, the former commander of al-Quds Forces, to discuss the establishment of a new elite terrorist force to carry out spectacular, but deniable, terrorist strikes against the United States and the West.

123. Al-Qaeda telephone bills of international calls between 1996 and 1998 were analyzed by United States investigators, showing that nearly 10% of the outgoing calls from Afghanistan went to Iran.

124. The creation of the Iran/Hezbollah/al-Qaeda terrorist alliance, which began in the early 1990s, and during which Hezbollah terror chief Imad Mughniyah oversaw the training activities of members of various terrorist groups until his death in 2008, resulted in a string of deadly terrorist strikes aimed directly at the U.S. and its allies. Among these terrorist attacks were the following: in March 1992, a Hezbollah terrorist team operating under Mughniyah's command truck-bombed the Israeli embassy in Buenos Aires, Argentina; on February 26, 1993, the first World Trade Center bombing by al-Qaeda operatives occurred; a few months later, an al-Qaeda conspiracy to bomb several New York City landmarks, including the Lincoln Tunnel and the Holland Tunnel, was disrupted; in July 1994, Imad Mughniyah and a Hezbollah team, under the direction of Iran, MOIS, and the IRGC, truck bombed the *Asociación Mutual Israelita Argentina* ("AMIA"), the Jewish cultural center in Buenos Aires; in December 1994, Algerian terrorists associated with al Qaeda hijacked a French airliner, intending to crash it into the Eiffel Tower in Paris, a precursor to 9/11; on July 7, 1995, Ayman al Zawahiri's Egyptian gunmen, supported, trained, and funded by Iran, attempted to assassinate Egyptian President Hosni Mubarak near Addis Ababa, Ethiopia; on June 25, 1996, Saudi Hezbollah terrorists, acting on directions from Iran and under planning by the IRGC Qods Force commander, and with assistance from al-Qaeda, truck bombed the Khobar Towers housing complex in Dhahran, Saudi Arabia, where U.S. military

servicemen were quartered; on August 7, 1998, two nearly simultaneous truck bombings, carried out by al- Qaeda under the direction Iran, MOIS, and the IRGC, and with training by Hezbollah, destroyed the U.S. embassies in Nairobi, Kenya, and Dar-es-Salaam, Tanzania; on October 12, 2000, al- Qaeda suicide bombers attacked the U.S.S. Cole in the harbor of Aden, Yemen.

125.    According to the State Department's *Patterns of Global Terrorism 2000*, Iran remained the most active state sponsor of terrorism in 2000.  It provided increasing support to numerous terrorist groups, including the Lebanese Hezbollah, HAMAS, and the Palestine Islamic Jihad (PIJ), which seek to undermine the Middle East peace negotiations through the use of terrorism.

126.    The State Department's *Patterns of Global Terrorism 2000* also stated that Iran's "Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS) continued to be involved in the planning and execution of terrorist acts and continued to support a variety of groups that use terrorism to pursue their goals."

127.    In January 2001, Dr. Ayman al-Zawahri and other al-Qaeda leaders met with Iranian intelligence officials near the town of Varamin, just south of Tehran.

128.    The Iranian delegation was headed by Hojjat-ol eslam Ali Akbar Nateq-Nouri and included Imad Fayez Mugniyeh, the Lebanese operative and leader of Hezbollah who is credited with numerous terrorist attacks on Americans.  The purpose of the meeting was to plan and coordinate Iranian support for an upcoming al-Qaeda operation against the United States.

129.    On May 4, 2001, a second planning meeting between al-Qaeda and Iranian intelligence officials was held in Iran.  Attendees at this planning meeting included Khamenei, Rafsanjani, and bin Laden's son, Sa'ad bin Laden.  Iranian intelligence memos written in the weeks following the meeting advise Iranian operatives to be prepared for U.S. retaliation for an attack

planned for September 2001.

### The September 11 Terrorist Attacks

130.    During the mid-to-late 1980s, Iran began formulating contingency plans for asymmetrical or unconventional warfare against the United States, including terrorist operations. These contingency plans were code-named "*Shaitan dar Atash*."

131.    One of the "*Shaitan dar Atash*" contingency plans was for the hijacking of U.S. commercial airliners and crashing them into buildings, particularly in New York City and Washington, D.C.  This contingency plan became the blueprint for the 9/11 attacks.

132.    Defendants Iran and Hezbollah had actual foreknowledge of, and were complicit in the planning and coordination of the 9/11 attacks upon the United States which were carried out by members of defendant al-Qaeda under the direction of Osama bin Laden.

133.    In the mid-1990s, when the Iran/Hezbollah/al-Qaeda terror alliance was forming, al Qaeda operative Mustafa Hamid had "negotiated a secret relationship with Iran that allowed safe transit via Iran to Afghanistan."  This safe Iran-Afghanistan passageway was managed by defendant MOIS.

134.    In 2000, Iran facilitated the international travel of al-Qaeda's operatives between October 2000 and February 2001, including travel of at least eight (8) of the 9/11 hijackers from Iran into Afghanistan, where bin Laden's training camps were located, and where the 9/11 hijackers trained for the 9/11 operation.  Iran thus provided essential material and direct support for the 9/11 attacks.

135.    The Iranian government materially and directly supported the 9/11 terrorist travel operation was by ordering its border inspectors not to place telltale Iranian stamps in the passports of these future hijackers traveling to and from Afghanistan via Iran.  Eight to fourteen of the 9/11

hijackers transited Iran on their way to or from Afghanistan, and Iranian border inspectors did not stamp their Saudi passports.  The Iranians were aware they were helping operatives who were part of an organization preparing attacks against the United States.  The actions of Iranian border authorities in refraining from stamping the passports of the Saudi hijackers, vastly increased the likelihood of the operational success of the 9/11 plot.

136.    A terrorist agent of Iran and Hezbollah also helped to coordinate other international travel by the 9/11 hijackers.  In October 2000, Imad Mughiyah, the Hezbollah terrorist commander, visited Saudi Arabia to coordinate future 9/11 hijacker activities there and assisted them in traveling on to Iran during November 2000.  During this time period, on their travels into and out of Iran, and through Beirut, Lebanon, some of the 9/11 hijackers were accompanied by Mughniyah or his Hezbollah associate.

137.    The actions of Imad Mughniyah, and his Hezbollah associate(s), in escorting 9/11 hijackers on flights to and from Iran, and coordinating passport and visa acquisition activities in Saudi Arabia constituted direct and material support for the 9/11 conspiracy.

138.    Prior to September 11, 2001, al-Qaeda, with the aid, assistance and support of the Iranian Defendants, planned, funded and coordinated an attack upon American citizens. On September 11, 2001, nineteen al-Qaeda operatives carried out that heinous attack by hijacking four airliners laden with jet fuel and causing them to crash into the World Trade Center Towers, the Pentagon Building and a field in Shanksville, Pennsylvania.

139.    On September 11, 2001, five of the al-Qaeda hijackers - Mohammed Atta, Abdul Alomari, Wail al-Shehri, Waleed al-Shehri, and Satam al-Suqami, hijacked American Airlines Flight 11 carrying 92 persons, bound from Boston to Los Angeles, and crashed it into the North Tower of the World Trade Center in New York at approximately 8:46 a.m., causing the collapse

of the tower and resulting in the deaths of the 9/11 Decedents.

140.    On September 11, 2001, five al-Qaeda hijackers - Marwan al-Shehhi, Fayez Ahmed, a/k/a "Banihammad Fayez," Ahmed al-Ghamdi, Hamza al-Ghamdi, and Mohand al-Shehri - hijacked United Airlines Flight 175 carrying 65 persons, bound from Boston to Los Angeles, and crashed it into the South Tower of the World Trade Center in New York at approximately 9:02 a.m., causing the collapse of the tower and resulting in the deaths of the 9/11 Decedents.

141.    On September 11, 2001, five al-Qaeda hijackers - Khalid al-Midhar, Nawaf al-Hazmi, Hani Hanjour, Salem al-Hamzi, and Majed Moqed - hijacked American Airlines Flight 77 carrying 64 persons, bound from Virginia to Los Angeles, and crashed it into the Pentagon Building in Arlington County, Virginia at approximately 9:37 a.m., causing the deaths of the 9/11 Decedents.

142.    On September 11, 2001, four of the al-Qaeda hijackers - Ziad Jarrah, Ahmed al-Haznawi, Saaed al-Ghamdi, and Ahmed al-Nami - hijacked United Airlines Flight 93 carrying 45 persons, bound from Newark to San Francisco, and caused it to crash in a field near the town of Shanksville, Pennsylvania at approximately 10:10 a.m., causing the deaths of the 9/11 Decedents.

143.    The September 11 terrorist hijackings and attacks referenced above resulted in the murder of 2,976 Decedents and injuries to many other persons, as well as the deaths of others who worked thereafter at Ground Zero, the site of the collapsed World Trade Center towers in New York City.  The hijackers used box cutters and knives to commit air piracy and murder on behalf of al-Qaeda.  They were assisted in their terrorist campaign by the Iranian Defendants.

### Iran's Support of al-Qaeda After the 9/11 Attacks

144.    The Iranian Defendants continued to support al-Qaeda after the September 11

attacks.  Iran provided material support to al-Qaeda after the 9/11 attacks by providing safe haven to al-Qaeda leaders and operatives, keeping them safe from retaliation by U.S. forces, which invaded Afghanistan.

145.    Former Secretary of Defense Donald Rumsfeld stated on February 3, 2002, "We have any number of reports that Iran has been permissive and allowed transit through their country of al-Qaeda."  On February 4, 2002, Rumsfeld elaborated: "We do have a good deal of information to the effect that al-Qaeda and the Taliban have taken refuge there and others have used it as a transit point.  We have no evidence at all that Iran has tried to stop them, that Iran has tried to turn them over to us or some other country or to incarcerate these people, the al-Qaeda, a terrorist network."

146.    In the late 1990s, al-Qaeda operative Mustafa Hamid had passed communications between Osama bin Laden and the Government of Iran.  In late 2001, while in Tehran, Hamid negotiated with the Iranians to relocate al-Qaeda operatives and their families to Iran after the 9/11 attacks.

147.    Pursuant to these negotiations, Iran facilitated the exit from Afghanistan, and into Iran, of numerous al Qaeda leaders, operatives, and their families when the United States-led multi-national coalition attacked the Taliban regime in Afghanistan in the fall of 2001. The Iran-Afghanistan safe passageway, established earlier to get al-Qaeda recruits into and out of the training camps in Afghanistan, was utilized to evacuate hundreds of al-Qaeda fighters and their families from Afghanistan into Iran for safe haven there.  The IRGC knew of, and facilitated, the border crossings of these al-Qaeda fighters and their families entering Iran.

148.    Among the high-level al-Qaeda officials who arrived in Iran from Afghanistan at this time were Sa'ad bin Laden, a son of Osama bin Laden, and the man who would soon lead "al-

Qaeda in Iraq," Abu Mussab Zarqawi. As the leader of al-Qaeda in Iraq, Zarqawi was responsible for a series of bombings, beheadings, and other attacks before being killed by U.S. forces in June 2006.

149.    The No. 2 official of al-Qaeda, Ayman al Zawahiri, made particular arrangements for his own family's safe haven in Iran after 9/11, with the aid of his son-in-law Muhammad Rab'a al Sayid al Bahtiyti, an Egyptian-born al-Qaeda operative.

150.    In late 2001, Sa'ad bin Laden facilitated the travel of bin Laden family members from Afghanistan to Iran. Thereafter, Sa'ad bin Laden made key decisions for al-Qaeda and was part of a small group of al Qaeda members involved in managing al-Qaeda from Iran.

151.    During the months and years after September 11, 2001, Defendants Iran, the IRGC, and MOIS continued to provide substantial direct and material support to the al-Qaeda leaders, operatives, and their families inside Iran, that provided for their needs and shelter and maintaining their safety from American and U.S.-led coalition military forces in Afghanistan.

152.    Since 2001, there have been numerous instances of al-Qaeda operatives and leaders meeting, planning, and directing international terrorist operations from the safety of Iranian territory. Senior al-Qaeda members continued to conduct terrorist operations from inside Iran. The U.S. intercepted communications from Saef al Adel, then in Mashad, Iran, to al-Qaeda assassination teams in Saudi Arabia just before their May 12, 2003 assault on three housing compounds in Riyadh. Al-Qaeda leaders in Iran planned and ordered the Riyadh attack.

153.    On July, 28, 2011, the U.S. Treasury Department designated a node of the al-Qaeda terror network based inside Iran, freezing all of its financial assets under U.S. jurisdiction and prohibiting any transactions with its identified operatives. The Treasury Department stated that some members of the network are based outside of Iran, but funnel recruits and cash through Iran

"under an agreement between al-Qaeda and the Iranian government."

154.    One member of this network is Atiyah Abd al-Rahman ("Rahman"). The documents captured in the safe house occupied by Osama bin Laden at the time of his capture identify Rahman as bin Laden's top deputy.  According to the Treasury Department, Rahman is al-Qaeda's "overall commander in Pakistan's tribal areas and as of late 2010, the leader of al- Qaeda in North and South Waziristan, Pakistan." The Treasury Department adds: "Rahman was previously appointed by Osama bin Laden to serve as al-Qaeda's emissary in Iran, a position which allowed him to travel in and out of Iran with the permission of Iranian officials."  For several years after 9/11, Rahman was protected by the Iranian regime. He is one of the senior al- Qaeda leaders supposedly held under a loose form of "house arrest" in Iran.

155.    The Iran-based al-Qaeda network is headed by another terrorist, Ezedin Abdel Aziz Khalil (a/k/a Yasin al Suri). The Treasury Department's designation notes that "Iranian authorities maintain a relationship with Khalil and have permitted him to operate within Iran's borders." Khalil's activities include moving "money and recruits from across the Middle East into Iran, then on to Pakistan," where they serve senior al-Qaeda leaders.

156.    According to David S. Cohen, Under Secretary of Treasury for Terrorism and Financial Intelligence, "There is an agreement between the Iranian government and al-Qaeda to allow this network to operate. There's no dispute in the intelligence community on this."

### *Defendants Are Liable to Plaintiffs for Their Material Support of al-Qaeda*

157.    The Iranian Defendants instructed, trained, directed, financed and otherwise supported and assisted al-Qaeda, or conspired in the instruction, training, direction, financing, and support of al- Qaeda, in connection with al-Qaeda's terrorist plans.  In furtherance of those plans, the al-Qaeda hijackers deliberately caused planes to crash into the World Trade Center Towers,

the Pentagon and a field in Shanksville, Pennsylvania on September 11, 2001.

158.   As a direct and proximate result of the intentional, willful, reckless, and careless actions of the Iranian Defendants, Plaintiffs have suffered severe and permanent personal injuries, damages, and losses, including one or more of the following:

(a)   Decedents' fear of death prior to the crash into and collapse of the World Trade Center Towers, the crash into the Pentagon and the crash of United Airlines flight 93;

(b)   the severe mental anguish suffered by the Decedents and all Plaintiffs;

(c)   the severe pain and suffering suffered by the Decedents and all Plaintiffs;

(d)   the inability of all Decedents to perform the usual household and personal activities that they normally would have performed through the remainder of their natural life expectancies;

(e)   loss of Decedents' earnings and future earning potential;

(f)   loss of Decedents' life and life's pleasures;

(g)   loss of consortium, solatium and/or companionship;

(h)   costs relating to managing the estates of all Decedents; and

(i)   death of the Decedents as a result of the Defendants' conduct and that of their co-conspirators.

159.   The aforementioned deaths, personal injuries and losses experienced by the Plaintiffs were caused by the intentional, outrageous, reckless, and careless acts of the Iranian Defendants, acting individually and in concert, and of their agents, servants, employees, agencies and instrumentalities, acting within and during the course and scope of their employment, authority, or apparent authority.

## CLAIMS

### COUNT ONE

### *CLAIMS BY ALL PLAINTIFFS AGAINST IRANIAN DEFENDANTS UNDER SECTION 1605A FOREIGN SOVEREIGN IMMUNITIES ACT 28 U.S.C. §1605A*

160.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

161.    At all relevant times, Defendant Iran was designated as a state sponsor of terrorism as required by § 1605A(a)(2)(A)(i)(I) in order to maintain an action under § 1605A of the Federal Sovereign Immunities Act ("FSIA"), 28 U.S.C.  §1605A(a)(2)(A)(i)(I).

162.    The conduct of the Al Qaeda hijackers constituted acts of extrajudicial killing and torture within the meaning of FSIA §1605A(a)(1).

163.    Iran and the Instrumentality Defendants provided material support and resources to al-Qaeda in furtherance of the murderous acts of the al-Qaeda hijackers.

164.    At all relevant times, al-Qaeda and the hijackers were agents of Iran acting within the scope of their agency.

165.    The conduct of all Defendants violated the provisions of the FSIA, in particular 28 U.S.C. §1605A, and all Plaintiffs suffered damages as a result of that violation.

166.    Plaintiffs, as estate representatives and family members, and as estate representatives of deceased family members of certain 9/11 Decedents, are entitled to recover damages from all Defendants under the provisions of the FSIA.

167.    The injuries and damages suffered by the Plaintiffs by virtue of the death the 9/11 Decedents, and the consequences resulting there from, were proximately caused by the intentional and reckless acts of the Iranian Defendants as described herein.

168.   As a direct and proximate result of the deaths of the 9/11 Decedents, Plaintiffs have been deprived of future aid, assistance, services, comfort, and financial support.

169.   As a direct and proximate result of the Iranian Defendants' cowardly, barbaric and outrageous acts of murder, Plaintiffs will forever grieve the deaths of the 9/11 Decedents.

170.   As a further result of intentional and reckless acts of the Iranian Defendants, Plaintiffs have been caused to expend various sums to administer the Estates of the 9/11 Decedents and have incurred other expenses for which they are entitled to recover.

171.   As a result of the Iranian Defendants' murderous conduct, the 9/11 Decedents suffered damages including pain and suffering, trauma, emotional distress, loss of life and life's pleasures, loss of earnings and earning capacity, loss of accretion to their estates and other items of damages as fully set forth in the paragraphs above which are incorporated herein by reference.

172.   As a result of the intentional, reckless and negligent acts of the Iranian Defendants as described above, the 9/11 Decedents were placed in apprehension of harmful and offensive bodily contact (assault), suffered offensive and harmful bodily contact (battery), suffered extreme fear, anxiety, emotional and psychological distress (intentional/negligent infliction of emotional distress), and were mentally and physically harmed, trapped, and falsely imprisoned (false imprisonment) prior to their deaths.

173.   The actions of the Iranian Defendants, acting in concert to carry out their unlawful objectives, were malicious, outrageous and in willful, wanton, and reckless disregard of the rights of the 9/11 Decedents and all Plaintiffs.  The Iranian Defendants, acting individually and jointly, intended to carry out actions that would end the lives of the Decedents.

174.   Plaintiffs are entitled to solatium and other damages, as stated in § 1605A(c)(4) of the FSIA, 28 U.S.C. § 1605A(c)(4).

175.    As a result of their intentional, malicious, outrageous, willful and wanton conduct, the Iranian Defendants are jointly and severally liable to all Plaintiffs for punitive damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor against the Iranian Defendants, jointly, severally, and/or individually, in an amount in excess of One Billion Dollars ($1,000,000,000) for compensatory damages, including but not limited to solatium, and punitive damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate.

### COUNT TWO

### *CLAIMS BY NON-U.S. CITIZEN PLAINTIFFS*
### *AGAINST THE IRANINAN DEFENDNATS*
### *UNDER NEW YORK STATE LAW*
### *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

177.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

178.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

179.    Certain named plaintiffs in this action are not United States citizens but are immediate family members of 9/11 decedent victims who were United States citizens.  In the alternative, these Non-U.S. Citizen Plaintiffs assert a state cause of action.

180.    Because such Non-U.S. Citizen Plaintiffs derive their right of action from their U.S. Citizen 9/11 Decedent family member, the Non-U.S. Citizen Plaintiffs assert a pass-through claim of intentional infliction of emotional distress under state law.

181.    The conduct of the Iranian Defendants in providing direct and material aid and support to al-Qaeda to carry out the attacks of September 11, 2001, was extreme and outrageous conduct that resulted in the murder of the 9/11 Decedents under circumstances that created

unimaginable pain and suffering for the 9/11 Decedents.

182. By providing direct and material aid and support to al-Qaeda in carrying out the attacks of September 11, 2001, which resulted in the murder and deaths of the 9/11 Decedents through international acts of terror, the Iranian Defendants intended to cause, or acted with disregard for the substantial probability of causing, the highest degree of emotional distress, literally, terror, in their targeted audience, which included the Non-U.S. Citizen Plaintiffs who are immediate family members of 9/11 Decedents.

183. The conduct of the Iranian Defendants caused extreme emotional distress of the U.S. Non-Citizen Plaintiffs. As a direct and proximate result of the murders and deaths of the 9/11 Decedents, the Non-U.S. Citizen Plaintiffs have incurred the highest degree of emotional distress, including physical harm therefrom, and, further, have been deprived of future aid, assistance, services, comfort, and financial support of their deceased family members.

184. As a direct and proximate result of the Iranian Defendants' murderous conduct, which caused the deaths of the 9/11 Decedents, the Non-U.S. Citizen Plaintiffs suffered damages including pain and suffering, trauma, extreme emotional distress, including physical harm, and loss of life's pleasures.

185. As a direct and proximate result of the Iranian Defendants' cowardly, barbaric and outrageous acts of murder, the Non-U.S. Citizen Plaintiffs will forever grieve the deaths of the 9/11 Decedents.

**WHEREFORE**, the Non-U.S. Citizen Plaintiffs demand judgment in their favor against the Iranian Defendants, jointly, severally, and/or individually, and be awarded in an amount in excess of One Billion Dollars ($1,000,000,000) for compensatory damages, including but not limited to solatium, and punitive damages, plus interest, costs, and such other monetary and

equitable relief as this Honorable Court deems appropriate.

## COUNT THREE

### CLAIM BY NON-U.S. NATIONAL PLAINTIFFS AGAINST IRANIAN DEFENDANTS PURSUANT TO THE ALIEN TORT CLAIMS ACT AND TORTURE VICTIM PROTECTION ACT OF 1991, 28 U.S.C. § 1350

186.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

187.    As set forth above, the Iranian Defendants, jointly and severally, caused the extrajudicial killings of each of the 9/11 Decedents through and by reason of acts of international terrorism.  These terrorist activities constitute violations of the law of nations, including those international legal norms prohibiting torture, genocide, air piracy, terrorism and mass murder.

188.    As a result of the Iranian Defendants' violation of the law of nations, all Plaintiffs suffered damages as fully set forth in the paragraphs above.

189.    Pursuant to 28 U.S.C. §1350, the estates, survivors and family members of the 9/11 Decedents who are not United States citizens are entitled to recover damages against the Iranian Defendants for wrongful death, survival, intentional infliction of emotional distress and solatium.

190.    The injuries and damages suffered by Plaintiffs who are non-U.S. citizens by virtue of the death the Decedents, and the consequences resulting there from, were proximately caused by the intentional and reckless acts of the Iranian Defendants as described herein.

191.    As a direct and proximate result of the Defendants' cowardly, barbaric and outrageous acts of murder, Plaintiffs who are non-U.S. citizens have suffered damages as described above.

192.    The actions of the Iranian Defendants, acting in concert to carry out their unlawful objectives, were malicious, outrageous and in willful, wanton, and reckless disregard of the rights

of all the Plaintiffs.  The Iranian Defendants, acting individually and jointly, intended to carry out actions that would end the lives of the Decedents.

193.    As a result of their intentional, malicious, outrageous, willful and wanton conduct, the Iranian Defendants are jointly and severally liable to all Plaintiffs for punitive damages.

**WHEREFORE**, the Non-U.S. Citizen Plaintiffs demand judgment in their favor against the Iranian Defendants, jointly, severally, and/or individually, and be awarded in an amount in excess of One Billion Dollars ($1,000,000,000) for compensatory damages, including but not limited to solatium, and punitive damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate.

## COUNT FOUR

### *CLAIMS BY ALL PLAINTIFFS AGAINST IRANIAN DEFENDANTS UNDER SECTION 1605B JUSTICE AGAINST SPONSORS OF TERRORISM ACT 28 U.S.C. §1605B*

194.    The Justice Against Sponsors of Terrorism Act ("JASTA") abrogates foreign sovereign immunity in cases where money damages are sought against a foreign state in connection with an act of international terrorism which occurs in the United States.  *See* Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 3(b)(1), 130 Stat. 852, 854 (2016) (codified at 28 U.S.C. § 1605B(b)(1)).

195.    A plaintiff pursuing a claim under JASTA may also establish liability for tortious acts of a foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.  *See* Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 3(b)(2), 130 Stat. 852, 854 (2016) (codified at 28 U.S.C. § 1605B(b)(2)).

196.    The attacks of September 11, 2001, constitute an act of international terrorism that

occurred in the United States and was planned by al-Qaeda in conjunction with the Iranian Defendants as described herein.

197.   Plaintiffs, as estate representatives and family members, and as estate representatives of deceased family members of certain 9/11 Decedents, are entitled to recover damages from all Defendants under the provisions of JASTA.

198.   The injuries and damages suffered by the Plaintiffs by virtue of the death of the 9/11 Decedents, and the consequences resulting there from, were proximately caused by the intentional and reckless acts of the Iranian Defendants as described herein.

199.   As a direct and proximate result of the deaths of the 9/11 Decedents, Plaintiffs have been deprived of future aid, assistance, services, comfort, and financial support.

200.   As a direct and proximate result of the Iranian Defendants' cowardly, barbaric and outrageous acts of murder, Plaintiffs will forever grieve the deaths of the 9/11 Decedents.

201.   As a further result of intentional and reckless acts of the Iranian Defendants, Plaintiffs have been caused to expend various sums to administer the Estates of the 9/11 Decedents and have incurred other expenses for which they are entitled to recover.

202.   As a result of the Iranian Defendants' murderous conduct, the 9/11 Decedents suffered damages including pain and suffering, trauma, emotional distress, loss of life and life's pleasures, loss of earnings and earning capacity, loss of accretion to their estates and other items of damages as fully set forth in the paragraphs above which are incorporated herein by reference.

203.   As a result of the intentional, reckless and negligent acts of the Iranian Defendants as described above, the 9/11 Decedents were placed in apprehension of harmful and offensive bodily contact (assault), suffered offensive and harmful bodily contact (battery), suffered extreme fear, anxiety, emotional and psychological distress (intentional/negligent infliction of emotional

distress), and were mentally and physically harmed, trapped, and falsely imprisoned (false imprisonment) prior to their deaths.

204.    The actions of the Iranian Defendants, acting in concert with al-Qaeda to carry out their unlawful objectives, engaged in conduct that was malicious, outrageous and in willful, wanton, and reckless disregard of the rights of the 9/11 Decedents and all Plaintiffs.  The Iranian Defendants, acting individually and jointly, intended to carry out actions that would end the lives of the Decedents.

205.    Plaintiffs are entitled to solatium and other damages.

206.    As a result of their intentional, malicious, outrageous, willful and wanton conduct, the Iranian Defendants are jointly and severally liable to all Plaintiffs for punitive damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor against the Iranian Defendants, jointly, severally, and/or individually, in an amount in excess of One Billion Dollars ($1,000,000,000) for compensatory damages, including but not limited to solatium, and punitive damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate.

## COUNT FIVE

*CLAIMS BY ALL PLAINTIFFS AGAINST*
*IRANIAN DEFENDANTS UNDER THE*
*JUSTICE AGAINST SPONSORS OF TERRORISM ACT*
*§ 4(a) AMENDING 18 U.S.C. § 2333*

207.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

208.    On October 8, 1999, al-Qaeda was designated as a Foreign Terrorist Organization under § 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189.

209.    JASTA amends the Anti-Terrorism Act, 18 U.S.C. § 2333, by permitting a plaintiff

to establish liability against a foreign state, such as Iran, for an injury arising from an act of international terrorism and "as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." *See* Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 4(a), 130 Stat. 852, 854 (2016) (codified at 18 U.S.C. § 2333(d)(1)-(2)).

210.    The term "person" includes corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.  See 18 U.S.C. § 2333(d)(1); 1 U.S.C. § 1.

211.    The nation-state of Iran and the other Iranian Defendants, some of which are corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals, as more fully described above, aided, abetted, and conspired with al-Qaeda to effectuate the terrorist attacks of September 11, 2001, and murder and death of the 9/11 Decedents.

212.    As a direct result of the Iranian Defendants aiding, abetting, and conspiring with al-Qaeda, Plaintiffs suffered damages.

213.    As a direct result of the Iranian Defendants aiding, abetting, and conspiring with al-Qaeda to effectuate the murders and deaths of the 9/11 Decedents, Plaintiffs have been deprived of future aid, assistance, services, comfort, and financial support.

214.    As a direct result of the Iranian Defendants aiding, abetting, and conspiring with al-Qaeda to effectuate the murders and deaths of the 9/11 Decedents, Plaintiffs will forever grieve the deaths of the 9/11 Decedents.

215.    As a direct result of the Iranian Defendants aiding, abetting, and conspiring with al-Qaeda to effectuate the murders and deaths of the 9/11 Decedents, the 9/11 Decedents suffered damages including pain and suffering, trauma, emotional distress, loss of life and life's pleasures,

loss of earnings and earning capacity, loss of accretion to their estates and other items of damages as fully set forth in the paragraphs above which are incorporated herein by reference.

216.    As a direct result of the Iranian Defendants aiding, abetting, and conspiring with al-Qaeda to effectuate the murders and deaths of the 9/11 Decedents, the 9/11 Decedents were placed in apprehension of harmful and offensive bodily contact (assault), suffered offensive and harmful bodily contact (battery), suffered extreme fear, anxiety, emotional and psychological distress (intentional/negligent infliction of emotional distress), and were mentally and physically harmed, trapped, and falsely imprisoned (false imprisonment) prior to their deaths.

217.    As a direct result of the Iranian Defendants aiding, abetting, and conspiring with al-Qaeda to effectuate the murders and deaths of the 9/11 Decedents, the Iranian Defendants engaged in conduct that was malicious, outrageous and in willful, wanton, and reckless disregard of the rights of the 9/11 Decedents and all Plaintiffs.  The Iranian Defendants, acting individually and jointly, intended to carry out actions that would end the lives of the Decedents.

218.    Plaintiffs are entitled to compensatory damages, including but not limited to solatium, and other damages, which are trebled under 18 U.S.C. § 2333(a).

219.    As a result of their intentional, malicious, outrageous, willful and wanton conduct, the Iranian Defendants are jointly and severally liable to all Plaintiffs for punitive damages, which are trebled under 18 U.S.C. § 2333(a).

**WHEREFORE**, Plaintiffs demand judgment in their favor against the Iranian Defendants, jointly, severally, and/or individually, in an amount in excess of One Billion Dollars ($1,000,000,000) for compensatory damages, punitive damages, and solatium, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate, to be trebled under 18 U.S.C. § 2333(a).

66

Respectfully Submitted,

Date:  January 2, 2019                    _____/s/_____

Timothy B. Fleming (DC Bar No. 351114)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB PLLC
1211 Connecticut Avenue, N.W.
Suite 420
Washington, D.C. 20036
(202) 467-4489


Dennis G. Pantazis (AL Bar No. ASB-2216-A59D)
WIGGINS CHILDS PANTAZIS *(Lead Counsel)*
FISHER GOLDFARB LLC
The Kress Building
301 19th Street North
Birmingham, AL  35203
(205) 314-0500

Richard D. Hailey (IN Bar No. 7375-49)
Mary Beth Ramey (IN Bar No. 5876-49)
RAMEY & HAILEY
3905 Vincennes Road #303
Indianapolis, IN 46268
(317) 582-0000

Robert M. Foote (IL Bar No. 03124325)
FOOTE, MIELKE, CHAVEZ
& O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
(630) 232-7450

*Attorneys for all of the Ray Plaintiffs*

and

Robert A. O'Hare Jr. (New York Bar No. 2601359)
Andrew C. Levitt (New York Bar No. 2734465)
O'HARE PARNAGIAN LLP
82 Wall Street, Suite 300
New York, NY 10005
(212) 425-1401

*Co-Counsel for Plaintiffs Anthony Behette; Harley
DiNardo; Ester DiNardo; Pio DiNardo; Andrew*

*Economos, Individually; Andrew Economos, as Co-Executor of the Estate of Leon Economos; Olga Valinotti, Individually; Olga Valinotti, as Co-Executor of the Estate of Leon Economos; Constance Finnicum; George Gabrielle a/k/a Gabe Gabrielle; Mary Ellen Murach, Individually; Mary Ellen Murach, as Executor of the Estate of Edward John Murach; Richard J. Murach; and Katharine Tynion*