MC85terA

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   IN RE: TERRORIST ATTACKS ON
     SEPTEMBER 11, 2001,
 4
                                         03 MDL 1570 (GBD)
 5
     ------------------------------x
 6                                       New York, N.Y.
                                         December 8, 2022
 7                                       10:05 a.m.

 8   Before:

 9                   HON. GEORGE B.  DANIELS,

10                                       U.S. District Judge

11
                          APPEARANCES
12

13   MORVILLO ABRAMOWITZ GRAND IASON & ANELLO, PC
          Attorneys for Kreindler & Kreindler
14   BY:  EDWARD M. SPIRO
          RAYMOND D. MOSS
15        -and-
     KIRSCH & NIEHAUS PLLC
16   BY:  EMILY KIRSCH
          -and-
17   KREINDLER & KREINDLER LLP
     BY:  ANDREW J. MALONEY, III
18        STEVEN POUNIAN
          JAMES KREINDLER
19        MEGAN W. BENETT

20   MOTLEY RICE
          Attorneys for Burnett and Plaintiffs Executive Committee
21   BY:  ROBERT T. HAEFELE
          DONALD MIGLIORI
22        JODI FLOWERS
          MARLON KIMPSON
23

24

25
```

MC85terA

```
 1                        APPEARANCES (Cont'd)

 2

 3   COZEN O'CONNOR
          Attorneys for Federal Insurance – Plaintiffs Executive
     Committee
 4   BY:  SEAN P. CARTER
          J. SCOTT TARBUTTON
 5
     ANDERSON KILL P.C.
 6        Attorneys for O'Neill – Plaintiffs Executive Committee
     BY:  JERRY S. GOLDMAN
 7        ETHAN GREENBERG
          BRUCE STRONG
 8        REGAN SAMSON
          ALEX GREENE
 9        JOSHUA ZELEN

10

11   KELLOGG, HUBER, HANSEN, TODD FIGEL & FREDERICK, PLLC
          Attorneys for Defendant Kingdom of Saudi Arabia
12   BY:  GREGORY G. RAPAWY
          ANDREW C. SHEN
13        CHRISTOPHER YOUNG
          CAROLINE A. SCHECHINGER
14
     MOLO LAMKEN, LLP
15        Attorneys for Dallah Avco
     BY:  ROBERT K. KRY
16

17

18

19

20

21

22

23

24

25
```

MC85terA

```
 1              (Case called)
 2              THE DEPUTY CLERK:  Will the parties please rise and
 3    make their appearances, beginning with the plaintiff.
 4              MR. SPIRO:  Edward Spiro of Morvillo Abramowicz Grand
 5    Iason & Anello for Kreindler & Kreindler LLP.  With me is my
 6    colleague Raymond Moss.  Mr. Moss is a member of the bars of
 7    Maryland and District of Columbia but has an application
 8    pending for admission to the bar of the State of New York.  So,
 9    with your Honor's permission?
10              THE COURT:  Sure.
11              MR. SPIRO:  I ask that Mr. Moss be with me.  Thank
12    you, Judge.
13              MR. POUNIAN:  Steven Pounian, your Honor, with
14    Kreindler & Kreindler.
15              THE COURT:  Good morning.
16              MR. MALONEY:  Good morning, your Honor.  Andrew
17    Maloney from Kreindler & Kreindler.
18              THE COURT:  Good morning.
19              MR. KREINDLER:  Good morning, your Honor.  Jim
20    Kreindler.
21              THE COURT:  Good morning, Mr. Kreindler.
22              MS. BENETT:  Good morning, Judge Daniels.  Megan
23    Benett, for Kreindler.
24              THE COURT:  Good morning.
25              MS. KIRSCH:  Good morning, Emily Kirsch from Kirsch &
```

MC85terA

1    Niehaus, also representing Kreindler & Kreindler.

2              THE COURT:  Good morning.

3              Yes?

4              MR. RAPAWY:  Good morning, your Honor.  Gregory Rapawy

5    of Kellogg Hansen for the Kingdom of Saudi Arabia, and with me

6    are my colleagues, Andrew Shen, Christopher Young and Caroline

7    Schechinger.

8              THE COURT:  Good morning.

9              Mr. Spiro, why don't I hear from you.

10             MR. SPIRO:  Thank you, your Honor.

11             First, your Honor, on behalf of the Kreindler firm, I

12   would like to thank your Honor for scheduling oral argument in

13   this very important matter.  The removal of the Kreindler firm

14   from the Plaintiffs Executive Committee for death and injury

15   claims is of utmost important to the firm.  This is a motion of

16   enormous consequences and this is an appeal of enormous

17   consequences for the firm in the September 11th death and

18   injury plaintiffs.  The firm has represented this group of

19   individuals and their families on the committee for nearly 20

20   years.  In addition, your Honor, the magistrate judge's opinion

21   has caused substantial, substantial reputational harm to the

22   firm and is likely to continue to do so.

23             We submit, your Honor, that Magistrate Judge Netburn's

24   opinion is clearly erroneous on the facts when viewed against

25   the full record including especially the documentary evidence,

MC85terA

1    and, in fact, I want to spend most of my time today, with your

2    Honor's permission, focusing on those documents which the

3    magistrate judge overlooked in her opinion and which disproved

4    the bedrock findings underlying her conclusion that the firm

5    willfully breached the protective orders.  But, before I do so,

6    your Honor, I want to briefly touch on the threshold Rule 37

7    issue.

8        As your Honor knows, an interpretation of the Federal

9    Rules of Civil Procedure is reviewed de novo and we submit that

10    Judge Netburn's analysis of Rule 37 was flawed as a matter of

11    law.

12        The Second Circuit's opinion in the *Apex Oil* case

13    should be the beginning and end of your Honor's decision to set

14    aside the magistrate judge's opinion as contrary to law.  In

15    *Apex Oil*, a law firm appealed sanctions imposed under former

16    Rule 37.  In vacating the sanctions, the Second Circuit made

17    clear that the term "party," under Rule 37, by its express

18    terms, does not include a party's attorney.  The reasoning of

19    *Apex Oil* has been followed by every circuit court to address

20    the issues and those include the Third Circuit, the Sixth

21    Circuit and the Seventh Circuit and the Tenth Circuit.

22        THE COURT:  Let me ask you a question right away

23    because I'm not sure that the *Apex* opinion stands for as broad

24    a proposition as you are urging.

25        The *Apex* opinion deals with whether or not it was

MC85terA

1    appropriate to utilize 37(c) with regard to the sanction

2    against the law firm.  It does not, my reading of it, it does

3    not say that you can't sanction a law firm and, as a matter of

4    fact, it says two things that are inconsistent with that.  It

5    says that, one, when they discuss Judge McLaughlin's opinion

6    below, they say, because the sanction imposed by Judge

7    McLaughlin may be justified under Rule 26(g), we consider the

8    applicability of that rule to the instant case.  And they cite

9    a case for the proposition that an order imposing sanctions

10   must be upheld if there is any basis upon which it can be

11   justified.  That's the language from the case.  And going

12   closer to the conclusion, the Court finally says, We reverse

13   the imposition of sanctions against Shea & Gould regarding

14   their responses to requests for admissions, except for the one

15   that is remanded.  We affirm as to the Section 1927 sanctions.

16        So, this case doesn't say you can't sanction a law

17   firm.  They did sanction a law firm.  Judge McLaughlin

18   sanctioned a law firm and the Second Circuit upheld that and

19   this case doesn't discuss any other basis for their decision

20   other than the application of 37(c), which the other side

21   argues that that's not the basis on which this Court ruled.

22        So, I'm not quite sure where you get the language that

23   says beyond 37(c) no sanctions can be imposed against a law

24   firm, and I don't see anywhere in this case where you say they

25   can't sanction a law firm.  Now, maybe your argument is that

MC85terA

1    you can sanction under some other rule, but the Court also

2    said, hey look, if there is any rule to uphold the sanction

3    then they're going to uphold the sanction.  And they did uphold

4    the sanction against the law firm.

5              So, I'm not quite sure that I understand nature of

6    your argument based on *Apex*.

7              MR. SPIRO:  Judge Netburn based her opinion on

8    Rule 37.

9              THE COURT:  Not 37(c).

10             MR. SPIRO:  37(b), your Honor.

11             THE COURT:  Right, 37(b).  This case doesn't address

12   37(b).

13             MR. SPIRO:  Well, the *Apex* holding with regard to

14   37(c) is that with regard to the word "party" that "party" does

15   not include an attorney and "party" does not include a law

16   firm.  In this case, Saudi Arabia is arguing that under 37(b)

17   "party" includes not only the actual parties but it includes

18   the lawyers representing the parties.

19             THE COURT:  But this case does not stand for that

20   proposition.  This case does not say you cannot impose

21   sanctions under any other rule outside of 37(c).  As a matter

22   of fact, it is just the opposite, it says that you can't

23   impose -- I mean, is it your position that -- and I have two

24   issues with this argument.  Is it your position that this

25   Court -- I want to separate two things because there are two

MC85terA

1    different buckets of sanctions.  There is removal from the

2    committee and there is reasonable attorneys fees.  Now, is it

3    your position -- let's forget about the sanction.  Is it your

4    position that the Court doesn't have the authority to either

5    eliminate or replace the Kreindler lawyers or any other lawyers

6    on the committee, short of sanctions?

7         MR. SPIRO:  Your Honor, the Court certainly would have

8    the authority to remove the members of the Kreindler firm who

9    were on the Plaintiffs Executive Committee but it does not have

10   authority to do that under Rule 37.

11        THE COURT:  So, what do you interpret the language in

12   the case to be that if there is any rule under which it can be

13   done the Court would affirm that even as a sanction?

14        MR. SPIRO:  There is a significant difference between

15   basing the Court's authority or basing the Court's decision

16   under Rule 37 and basing its decision on the Court's inherent

17   authority.  Under Rule 37 the standard is generally

18   preponderance of the evidence.  Under the Court's inherent

19   authority, it's clear and convincing evidence.

20        THE COURT:  OK.

21        MR. SPIRO:  In this case, Magistrate Judge Netburn

22   based her decision on Rule 37 and therefore applied an

23   incorrect standard and burden of proof, namely preponderance of

24   the evidence.  Whether sanctions would be appropriate we don't

25   believe sanctions would be appropriate under the Court's

MC85terA

```
1    inherent authority.  The fact is that the Court's decision

2    applied the wrong standard, the wrong burden of proof, and we

3    submit that requires --

4             THE COURT:  Wasn't it your responsibility to make sure

5    that the Court was applying the right standard of proof?  I

6    don't see in your arguments to the Court that this was a

7    controversial or disputed issue about what was attempting to be

8    decided on the basis of it being decided.  You never argued to

9    the Court that the Court was, during the hearing, applying the

10   wrong standard.

11            MR. SPIRO:  The Court never identified Rule 37 as the

12   basis for the hearing.  Instead, the Court said this was going

13   to be a contempt hearing and the Court indicated it was going

14   to make a recommendation to your Honor with regard to what the

15   sanction ought to be.

16            THE COURT:  So, what didn't you get an opportunity to

17   do at this hearing?

18            MR. SPIRO:  So, at the hearing, evidence was

19   presented.  After the hearing we briefed, provided proposed

20   findings of fact and conclusions of law that were based on the

21   Court's statement that this was going to be a contempt hearing

22   and that there were various potential remedies that the Court

23   was considering.

24            THE COURT:  But I thought even in your papers to the

25   Court, my recollection is even in your arguments to the Court
```

MC85terA

 1    after the hearing you laid out what you thought was the

 2    appropriate standard.

 3         MR. SPIRO:  Based on what the Court indicated the

 4    hearing was, which was a contempt hearing where the burden of

 5    proof is by clear and convincing evidence and we had no

 6    opportunity to submit reply papers.  We had no opportunity,

 7    although we requested oral argument, oral argument was denied.

 8    We had no opportunity to address the inapplicability --

 9         THE COURT:  Well, you did have that opportunity.  You

10    could have addressed that issue if you thought that that was

11    unclear or you were proceeding on different standards or the

12    wrong standard.  You could have raised that during a hearing

13    and you could have and, to some extent, you did address that in

14    your submission.  What didn't you get an opportunity to do?

15         MR. SPIRO:  We never got an opportunity to address

16    whether or not Rule 37 was applicable.  It was never indicated

17    in any order of the Court that that was a potential basis for

18    decision.  Rather, the Court treated --

19         THE COURT:  Wasn't that the subject of discussion in

20    your brief?  My recollection is you did, you had a section on

21    that.

22         MR. SPIRO:  We did not discuss in the conclusions of

23    law and proposed findings of fact that the Kreindler firm

24    submitted to Magistrate Judge Netburn, we did not discuss

25    Rule 37.  It was a surprise to my client --

MC85terA

1          THE COURT:  Wait, wait, wait.  But you keep -- I'm

2     trying to follow you and you keep jumping back and forth.

3          The question of whether you discussed Rule 37 is a

4     different issue, as far as I'm concerned, than the question of

5     whether or not you had a full and fair opportunity to apply

6     what you thought was going to be the appropriate standard for

7     the Court to apply and then urge upon the Court to apply the

8     appropriate standard.  Those are two different issues.  One is

9     a technical argument, as far as I'm concerned, and one is

10    fairness argument.  You say you didn't get an opportunity, the

11    Kreindler firm didn't get an opportunity to defend itself

12    because it had no idea that the Court was going to use a

13    different standard than what you thought they should have used

14    and it didn't dawn on you until after the magistrate judge

15    issued her opinion.

16         MR. SPIRO:  Your Honor, I don't believe that's a fair

17    statement with regard to what transpired below.  The magistrate

18    indicated this was going to be a contempt hearing.  In the

19    post-hearing submissions we briefed this as if it were a

20    contempt hearing.  We addressed the various sanctions that the

21    Judge had identified.  She never indicated that they were going

22    to be sanctions under Rule 37.  We submitted that there was no

23    clear and convincing evidence of contempt.

24         THE COURT:  Right.  So, you did lay out, in your

25    written papers -- my recollection -- that you thought that the

MC85terA

```
1   standard should be clear and convincing evidence, right?

2            MR. SPIRO:  That's right.

3            THE COURT:  OK.

4            MR. SPIRO:  And Judge Netburn applied a different

5   standard that we had no notice was going to be applied and that

6   was fundamentally unfair.  We tried to have oral argument.

7   Oral argument was denied.  We had no right to put in a reply

8   brief.  So, there was really not an opportunity to address it.

9   So, to argue --

10           THE COURT:  I'm not sure I can accept that.  You had

11  an opportunity to address it in your papers.  You could have

12  addressed it.  It was partially, if not primarily, your

13  responsibility to make sure you knew what standard of proof was

14  being used.

15           MR. SPIRO:  That's right.

16           THE COURT:  And you urged upon the Court that you used

17  a particular standard.

18           MR. SPIRO:  Under Second Circuit case law it is the

19  responsibility of the Court to identify the statutory basis

20  that it is proceeding under in the hearing of the type that the

21  Court conducted.

22           THE COURT:  Of course, but they're not supposed to

23  assume that you have some different view than the Court has.

24  You had an opportunity to expressly make clear what it is that

25  you thought the standard was and that somehow you were under
```

MC85terA

```
 1    the impression that she was applying the wrong standard during
 2    the hearing.
 3          MR. SPIRO:  We relied on what the Court said.  The
 4    Court said she was going to make a recommendation --
 5          THE COURT:  That's not advocacy.  I am talking about
 6    the advocacy of it.  The advocacy of it is that obviously, in
 7    representing the client it's, you know, for you to be
 8    successful you need to make sure that it's clear to you and
 9    clear to the Court and clear to the other side what the
10    standard is that is being applied and I'm not sure that I see
11    any -- I mean, I'm not sure I see any place where the Court
12    misled you about what standard the Court was going to use.
13          MR. SPIRO:  I think, your Honor, if you go back and
14    you look at the various orders that the magistrate judge
15    issued, starting with the order that was filed October 4 where
16    Magistrate Judge Netburn lists the various potential remedies
17    that she was considering, and then if you look at the
18    memorandum endorsement that was filed on November 1 where she
19    talks about there being a contempt hearing, you will see
20    exactly where we believed, in good faith, that there was going
21    to be a recommendation to your Honor with regard to a remedy
22    and that this was really proceeding under 636 under the
23    Magistrate's Act.  And that's what we did.
24          THE COURT:  So, what do you say is the appropriate
25    relief for me to give you?
```

MC85terA

1           MR. SPIRO:  That there ought to be a reversal and that

2      to the extent that either your Honor or the magistrate judge

3      wants to revisit this issue that it be revisited under the

4      appropriate evidentiary standard, namely clear and convincing

5      evidence.

6           THE COURT:  Even if you were to convince me that the

7      appropriate standard is clear and convincing evidence, why

8      would that require reversing the decision or why would it

9      require anything more than you convincing me to review this

10     case on that standard?

11          MR. SPIRO:  Your Honor could review it under a clear

12     and convincing evidence standard but, clearly --

13          THE COURT:  Isn't that the issue?  Your ultimate issue

14     is that the hearing evidence does not meet the clear and

15     convincing standard that should have been and should be applied

16     in this case.

17          MR. SPIRO:  Your Honor, Saudi Arabia doesn't dispute

18     that there is no evidence rising to the level of clear and

19     convincing evidence of bad faith by each Kreindler & Kreindler

20     attorney.  You can't impute bad faith, it is a particular

21     attorney-by-attorney determination that needs to be made.  In

22     the Walters court case --

23          THE COURT:  Well, that's not -- it depends on whether

24     the sanction is being imposed.  One, if the sanction is being

25     imposed on the firm you don't have to determine that every

MC85terA

1    single lawyer at the firm acted in bad faith.  I assume that's

2    not what you are arguing.

3         MR. SPIRO:  Well, I think under the Court's inherent

4    authority, if the Court is going to make a finding of a

5    violation, you need to determine that there was bad faith, and

6    under the Walters case --

7         THE COURT:  Well, bad faith by Mr. Fawcett.

8         MR. SPIRO:  Well, Mr. Fawcett (a) was not an attorney

9    at the firm, he was a consultant; and (b) it doesn't impute his

10   knowledge to Mr. Pounian, Ms. Benett, Mr. Kreindler.

11        THE COURT:  But why do I have to determine whether

12   Ms. Benett had bad faith?  The two issues that seem to be that

13   are most important that seem to concern me, so you can focus on

14   those, one is the evidence that Magistrate Judge Netburn used

15   to reach the conclusion that there was complicity between

16   Mr. Kreindler and Mr. Fawcett, and maybe Mr. Isikoff, and maybe

17   others at the firm, that this was a -- that they were involved

18   in this bad faith effort to leak confidential material that

19   they knew should not have been leaked.  That's the first

20   question, it seems.

21        The second question that concerns me is that what was

22   the nature of their -- did the law firm meet its

23   responsibilities in the nature of its investigation?  Was this

24   a good faith investigation reasonably calculated to uncover the

25   culprit?  And, on the scale of things did they do everything

MC85terA

1    they could to find out?  Or did they do the minimum and go

2    through the motions?  And if at one end I characterize doing,

3    meeting responsibilities not just as lawyers in this

4    litigation, not just as officers of the court, but also as head

5    of the Plaintiffs Executive Committee because they would have

6    had a higher responsibility, as far as I'm concerned, than just

7    a bunch of other lawyers who happen to have an interest in this

8    case because they're in charge and the Court is relying upon

9    them to make sure that this litigation -- complex litigation --

10   proceeds efficiently.  And I must -- look.  I will be candid

11   with you.  My disappointment that we are here discussing this

12   issue is great.  This was not the law firm's finest hour.  OK?

13   Let's be honest about this, this is, you know, to find out that

14   somebody at the law firm had leaked this information and then

15   the only reason that it's uncovered is because Mr. Fawcett

16   panics at the last minute when he is supposed to sign the

17   affidavit that's a lie to mislead the Court to say he had

18   nothing to do with it, he, at least at that point, realizes

19   that it would be a serious transgression if he made that

20   representation under oath to this Court.

21          So, I am analyzing, OK, one, what does the direct and

22   circumstantial evidence point to and what standard does it

23   meet?  And, two, what was the nature of the investigation?

24   Quite frankly, to put it in further context for you, this is

25   the scenario that I have and unfortunately I have the benefit

MC85terA

1  of a little hindsight that obviously is unfair with regard to

2  those lawyers at the firm that I know and respect who are in

3  charge of doing an investigation.  But, as soon as they were

4  tasked with doing this investigation, let's think about how

5  this investigation should have begun.  The first question is,

6  which law firm has a relationship with this reporter?  That

7  would be the reasonable first question to ask.  And then, the

8  second question would be -- and I'm just picking these as

9  examples -- a second question would be, OK, if the Kreindler

10  firm is the firm that has a relationship with this reporter who

11  obviously got this information inappropriately, the question

12  is, who knows this reporter at the firm?  Who is friends with

13  this reporter at the firm?  Who has a personal relationship

14  with this person at the firm?  That would narrow it down to

15  Mr. Kreindler, Mr. Fawcett.  OK?  Is there any evidence that

16  they had any communications between them at and about around

17  this time?  Well, ultimately, it wouldn't take a whole lot to

18  find out then -- although it wasn't found out until later --

19  yes, there is evidence of numerous communications between those

20  three participants.

21      The third thing is Mr. Kreindler's position is it

22  absolutely wasn't me.  So, what does that do for him, at least,

23  not necessarily for everybody else?  That makes Mr. Fawcett the

24  prime suspect.  OK?  That's not rocket science to figure that

25  out.  Mr. Fawcett was the prime suspect.

MC85terA

1          So, the question should have been, OK, what can we do

2     to determine, first of all, whether Mr. Kreindler or

3     Mr. Fawcett had a motive and an opportunity.  And the evidence,

4     direct and circumstantial points in their direction, what can

5     we do to either prove that or disprove that?  I think we would

6     all agree that if you were doing an investigation, if I tasked

7     you to do an investigation for this Court you would do more,

8     significantly more, than simply going to Mr. Fawcett and asking

9     Mr. Fawcett did he do it.  OK?  And that, in my mind, I still

10    have some problems with that because it's like the bell rings

11    at the bank that somebody just robbed a bank.  There is a guy

12    standing outside who has a mask, a gun, and a bag of money.  I

13    say, Do an investigation, figure out who robbed the bank.  The

14    main thing you do in an investigation is you go over to the guy

15    and you ask him, Did you rob the bank?  Do you know anything

16    about the bank being robbed?  And he says no.  And I say OK,

17    fine.  Bye.

18         It's hard for me to say that what was done by the firm

19    was the maximum that they could have done to uncover the

20    culprit or the minimum that they could have done simply to

21    protect the firm's interest at the expense of the litigants in

22    this case and the other parties in this case.

23         So, when you say the facts are important, the facts

24    are important, and I'm trying to figure out how it wasn't

25    obvious at the beginning that the prime suspect was Mr. Fawcett

MC85terA

1    so the appropriate conduct would be to immediately see if there

2    is any information that is consistent or inconsistent with him

3    being the culprit, figuring out whether or not they could prove

4    or disprove, arming themselves in such an investigation with

5    that information and then posing specific questions to him that

6    you know that you can independently verify or not verify the

7    answers that you might give?  I mean, I'm not saying stuff you

8    don't know and that you are not experienced to do and that you

9    probably would say to me, yeah, that's the way I would conduct

10   an investigation if we were trying to find the culprit.  But,

11   after -- I don't see anything -- two things that are a problem

12   and I still have to review it, there is a lot that I have been

13   looking at.  I don't see anything that was done, one.  I don't

14   see anything that indicates that anyone thought that if it's

15   anybody at the firm it's probably Fawcett and so let's try to

16   exculpate him or incriminate him one way or the other.  OK?

17   And I don't see any real -- quite frankly, I don't even know,

18   from the affidavits that I got from everyone else, including

19   Mr. Kreindler, I have no idea what he was asked specifically,

20   what answers he gave, what the Q & A was.  He wasn't

21   interrogated.  I don't -- even when -- well, no.  I will back

22   up.

23          There is nothing -- and I do think this is a weakness

24   in the way the investigation was conducted because I think it

25   was conducted in a manner that was even unfair to those parties

MC85terA

1    and even unfair to Mr. Kreindler because he is in a situation

2    where he wants to say, look, it wasn't me, I didn't know

3    anything about it, I didn't do anything about it.  And my

4    single question is what evidence is there for me to look at

5    that corroborates your position that you had nothing to do with

6    it that demonstrates I don't have to just rely on your denial,

7    that I should expect, out of a fulsome investigation, that you

8    would give me some facts, evidence, that is either going to be

9    consistent with or inconsistent with that fact.  Quite frankly,

10   Magistrate Judge Netburn pointed out significant evidence that

11   is inconsistent with a claim that he had nothing to do with it

12   and it was inconsistent with the claim that Fawcett had nothing

13   to do with it.

14          The fact, as I say, when you look at the basic facts

15   of who has the relationship with the reporter, how could he

16   have gotten this information, which firm is likely to have

17   given him this information, which people at the firm have a

18   relationship with him, which people at the firm spoke to him at

19   that period of time.  And I have very little evidence about

20   what was discussed in those -- I have no details about those

21   discussions.  You know, the vagueness of, well, OK,

22   Mr. Fawcett -- I can't really remember what was said and that's

23   pretty much what everybody says and, you know, that was his

24   position when he was lying and that's his position when he

25   fessed up.

MC85terA

```
 1              So, you know, all of that being said, if I am looking
 2     at this in the wrong way, if I am analyzing this in the wrong
 3     way, tell me, but those are the things I am looking for.  I am
 4     looking for what evidence negates the inference that points to
 5     these two individuals and why should I be satisfied that the
 6     minimal investigation that was done here, one, was appropriate
 7     to represent to the Court that a sufficient investigation was
 8     done to rule out anybody at the firm and we know that's not
 9     true because it was somebody at the firm.  And so, it is
10     troubling.  It is not about, well, is it -- should the
11     Kreindler lawyers get an award for their conduct here?  No,
12     they shouldn't get an award for their conduct here.  You know?
13     It was the firm's actions and the firm's personnel that allowed
14     this to occur and contributed significantly to not uncovering
15     this a lot sooner.
16              So, that's what I am concerned about.  That's what I
17     am trying to focus on.  So, is that a wrong way to look at
18     this?
19              MR. SPIRO:  No, your Honor.  We are prepared to
20     address those points as we move forward.
21              THE COURT:  All right.
22              MR. SPIRO:  If we may, your Honor, we have a binder of
23     documents that we would like to share with your Honor and
24     provide to the Kingdom of Saudi Arabia's counsel.
25              THE COURT:  All right.
```

MC85terA

1          MR. SPIRO:  Your Honor, Magistrate Judge Netburn's

2     opinion is really built on five bedrock findings and I think

3     those bedrock findings speak to the concerns that your Honor

4     has expressed and I would like to go through each of them, and

5     I think in the process of doing that we will address your

6     Honor's concerns.

7          Your Honor knows that Magistrate Judge Netburn found

8     that John Fawcett leaked the transcript as part of what she

9     termed Kreindler & Kreindler's longstanding litigation strategy

10    to pressure the Kingdom of Saudi Arabia to a settlement and he

11    did so with the knowledge, or at least tacit consent of lead

12    attorney James Kreindler.  And then she said that other

13    attorneys at the firm were, at best, willfully blind to the

14    leak as evidenced by their paltry investigation and knowingly

15    misleading statements to the Court.  We submit that that

16    conclusion was erroneous.

17         What were the five bed rock findings that she made?

18    First, she challenged what Mr. Fawcett said was his motive for

19    the leak; second, she found that the firm had a motive, namely

20    trying to engender adverse publicity for Saudi Arabia; third,

21    she challenged the quality of the firm's post-leak

22    investigation and your Honor has spoken very directly to that;

23    fourth, she questioned the appropriateness of the Kreindler

24    firm's response to the magistrate judge's orders during the

25    investigation; and then she identified two allegedly suspicious

MC85terA

1    phone calls on June 28th and July 22th.

2              So, let me start with the first finding.

3              THE COURT:  Let me put it in this context so you know

4    where I am focusing.

5              My first focus is what evidence did this investigation

6    produce or that you have as of today that demonstrates that

7    those inferences are unreasonable?

8              MR. SPIRO:  So, we start with the first finding that

9    the magistrate judge concluded that in leaking the transcript,

10   Mr. Fawcett's apparent motive was to protect the children of

11   Morocco and the --

12             THE COURT:  I don't want to get into the details.

13             There are two things I don't want to do.  One, I don't

14   want to spend a lot of time discussing what his motive was.

15             MR. SPIRO:  OK.

16             THE COURT:  His motive was to break the law.  OK?  He

17   knew what his responsibilities were and I don't care why he did

18   it.  Two, that -- the second point that you were making?  I'm

19   sorry.

20             MR. SPIRO:  The motive was fabricated.

21             THE COURT:  Yes.  I know what I was going to say.

22             I don't want it on this record -- discuss in any

23   further detail -- the confidential information that he leaked.

24   OK?  So let's stay away from that because I really don't

25   particularly care about Mr. Fawcett at this point.  He is not

MC85terA

1    the subject of this sanction and nobody -- I don't think there

2    is anybody here who is getting ready to stand up and defend

3    Mr. Fawcett's actions.

4              MR. SPIRO:  Your Honor, if you turn to the first,

5    actually the second tab in the binder --

6              THE COURT:  Yes.

7              MR. SPIRO:  -- you will see that is the declaration

8    that Mr. Fawcett drafted.  The magistrate judge found --

9              THE COURT:  The first draft or the last draft?

10             MR. SPIRO:  It was the first draft, your Honor.

11             THE COURT:  OK.

12             MR. SPIRO:  The magistrate judge found that he drafted

13   it himself in his own words and that he believed that it was

14   accurate.  That's in her opinion at page 26.

15             THE COURT:  OK.

16             MR. SPIRO:  So, what has happened is that that

17   declaration, it has been suggested, became a vehicle for the

18   Kreindler firm to make up an explanation for why Mr. Fawcett

19   did what he did.  I'm not going to get into the details of it.

20   But, I think if you look at Exhibit 2 and you see the

21   highlighting which we have done and then look at Exhibit 3

22   which then includes the highlighting that we have done, I think

23   you will see that the final declaration, Exhibit 3, is the

24   final declaration that was filed with the Court, it is

25   KSAX-56J.  That declaration essentially mirrors what

MC85terA

1    Mr. Fawcett said in his own words.

2              THE COURT:  Well, I'm not quite sure what you say -- I

3    know what inferences Magistrate Judge Netburn reached.  I'm not

4    sure what contrary inference that you say that I'm supposed to

5    reach based upon this document.

6              MR. SPIRO:  Oh.  For starters, Mr. Fawcett is very

7    clear that no one at Kreindler & Kreindler instructed him to

8    send the transcript to Michael Isikoff, who is the --

9              THE COURT:  You are not going to particularly argue at

10   this point that Magistrate Judge Netburn doesn't have a good

11   reason to not believe anything he has to say at this point.

12             MR. SPIRO:  Well, Magistrate Judge Netburn, in her

13   decision, repeatedly found that portions of his declarations

14   were truthful.

15             THE COURT:  I know, but you know -- look.  I have

16   respect for your abilities, you know what the rule is, you know

17   what I tell jurors with regard to witnesses, that if you find

18   that a witness has been untruthful in any aspect of that

19   testimony you can accept part of that testimony, you can reject

20   part of the testimony, or you can still accept all of the

21   testimony.  You can't argue that Magistrate Judge Netburn, if

22   he said, *oh, it was raining that day*, and you said, *well, that*

23   *was true*, that that means that she's supposed to believe

24   everything he says in his affidavit.

25             MR. SPIRO:  But Magistrate Judge Netburn did say that

MC85terA

1    he had drafted this document himself, in his own words, and
2    that he believed it was accurate.  That's in Magistrate Judge
3    Netburn's opinion.
4          THE COURT:  Well, I'm not sure that I can read from
5    that statement of Magistrate Judge Netburn that she was trying
6    to say to you that she has concluded that every single word of
7    what he put in his affidavit is accurate.
8          MR. SPIRO:  But the central point of his declaration
9    is that no one at the Kreindler firm instructed him to send the
10   transcript to Michael Isikoff, nor did anyone at the Kreindler
11   firm have any knowledge of his sending it to Mr. Isikoff.
12         THE COURT:  But your argument is that we should
13   believe that and I'm trying to understand, given the fact that
14   he is a clear liar -- that he lied to the people who he claimed
15   were the closest to him, that he put them in this situation --
16   that somehow we are supposed to believe him without some
17   corroborating evidence that supports something that he has to
18   say?  He said one set of facts before he submitted this
19   affidavit and swore that that was true, and that was a lie.
20   And now you say that he submits a written declaration where he
21   wants to take responsibility, so we should assume that that
22   means that not only is he guilty of what he is fessing up to,
23   what he says about other people to exonerate them must be
24   accepted by the magistrate judge.
25         MR. SPIRO:  It is not simply what he had to say.

MC85terA

```
 1              THE COURT:  OK.

 2              MR. SPIRO:  It is what every attorney and the

 3    Kreindler firm, who submitted a sworn statement and who

 4    testified under oath, said.

 5              THE COURT:  No.  Every attorney at the Kreindler firm

 6    said that no one at the firm disclosed this information.  That

 7    was their opinion.  I think that was the silver lining in

 8    almost everybody's affidavit.

 9              MR. SPIRO:  It is more than that.  It is Mr. Pounian

10    who said he specifically asked Mr. Fawcett whether he knew how

11    the --

12              THE COURT:  And he says that Mr. Fawcett lied.

13              MR. SPIRO:  That's right.

14              THE COURT:  OK.

15              MR. SPIRO:  That's right.

16              THE COURT:  OK.  So, as I say, you know how the rule

17    goes.  Was he lying then or was he lying now?

18              MR. SPIRO:  The point is Mr. Maloney asked and had the

19    same conversation that was told by Mr. Fawcett.

20              THE COURT:  What else did you expect Mr. Fawcett to

21    say at that point?

22              MR. SPIRO:  Well, whether Mr. Fawcett was being

23    truthful at that point -- and I believe that he was --

24              THE COURT:  Why?  Why do you believe that he is?  What

25    is the evidence?
```

MC85terA

1              MR. SPIRO:  There is no contrary evidence of the

2      Court's idea that the Kreindler firm knew anything about this

3      transcript sent to Michael Isikoff.

4              THE COURT:  What is the evidence that supports his

5      statement other than their denials?  What is the evidence that

6      supports his statement that they knew nothing.

7              MR. SPIRO:  Your Honor, if you go to tab 7 -- and this

8      is pretty small font and I apologize -- but this is the form

9      that we have it.  So, that is a July 16, 2021 e-mail from

10     Andrew Maloney to John Hartney.

11             THE COURT:  Right.

12             MR. SPIRO:  John Hartney is the IT director at the

13     Kreindler firm.

14             THE COURT:  Right.

15             MR. SPIRO:  Mr. Maloney was beginning his

16     investigation on the day before, July 15, the story is

17     published by Mr. Isikoff in Yahoo! News.

18             THE COURT:  Right.

19             MR. SPIRO:  And what does this say?  It says the

20     attached deposition transcript of Jarrah was sent to us on June

21     28.  The transcript is under a protective order, it is not to

22     be shared with clients or the public and only with people on

23     the 911 team who signed the confidentiality order, which

24     includes our consultants.

25             It goes on to say that Yahoo! News reporter, Michael

MC85terA

1    Isikoff, published an article purporting to quote from the

2    deposition transcript.  He did not reveal when or how he

3    obtained the transcript, but whoever gave it to him violated

4    the Court's protective order.

5            THE COURT:  Right.

6            MR. SPIRO:  And here is -- I think -- the key

7    paragraph.

8            THE COURT:  OK.

9            MR. SPIRO:  The PEC is investigating if any of the

10   plaintiff firms leaked the transcript to the media, or a

11   client, or other who may have leaked it.  Our experts are

12   permitted to see a copy and John F. -- obviously Mr. Fawcett --

13   sent a copy to consultant --

14           THE COURT:  Right.

15           MR. SPIRO:  And the consultant is blacked out, which

16   is fine -- but did not see any other -- and the word "see" may

17   be actually a typo and probably meant to say "send any other."

18           THE COURT:  Right.

19           MR. SPIRO:  And then Mr. Maloney goes on to ask that

20   Mr. Hartney do a search of outgoing e-mails.

21           THE COURT:  Right.

22           MR. SPIRO:  So, the only way -- the only way -- that

23   Mr. Maloney could have learned that Mr. Fawcett had sent a

24   transcript to the consultant but had not sent it to anyone else

25   was based on a conversation that Mr. Maloney had with

MC85terA

```
 1    Mr. Fawcett either on the 15th or 16th of July.

 2              THE COURT:  Well, what does that prove?

 3              MR. SPIRO:  It proves --

 4              THE COURT:  You can't argue it proves his innocence

 5    because we know he is guilty.

 6              MR. SPIRO:  Number one, that there was an effort made

 7    by Mr. Maloney to get --

 8              THE COURT:  First of all, my recollection is they

 9    didn't even have the complete e-mails at that point, they

10    didn't search all the e-mails, and they missed correspondence

11    contemporaneous with the leak between Isikoff and Fawcett, and

12    Kreindler and Fawcett.

13              MR. SPIRO:  But the e-mail tells us that Mr. Fawcett

14    told Mr. Maloney that the transcript had only been sent to the

15    consultant, it had not been sent by Mr. Fawcett anywhere else.

16              THE COURT:  See, the problem I have with that --

17              MR. SPIRO:  So, that is evidence --

18              THE COURT:  No, that's not evidence.  The problem I

19    have with that --

20              MR. SPIRO:  -- that the Kreindler firm did not know.

21              THE COURT:  The problem I have with that is that no

22    reasonable investigation would have relied solely on the

23    statement of the suspect.  OK?

24              MR. SPIRO:  So we didn't rely solely on the statement.

25              THE COURT:  On this you did.  Matter of fact, when I
```

MC85terA

1    read this, that was not what was emphasized to me.  What was

2    emphasized to me is that it's consistent with focusing in on,

3    in an aggressive way, Mr. Fawcett, because this is the only

4    evidence that anybody accessed that deposition.  Mr. Fawcett

5    and nobody else.  There was one other person that I think that

6    we read who accessed but this says he accessed it.  So, not

7    only do we know he has motive, he has opportunity.  This

8    doesn't exculpate anybody and it doesn't make a person who --

9    Mr. Maloney is trying to gather this information.  It doesn't

10   make it, give him any greater comfort that this guy didn't do

11   it because the fact is, anybody who did it who is smart enough

12   to do it would have downloaded it, would probably not try to

13   give it to him from the office, would probably try to give it

14   to the reporter some other way.  So, none of that is consistent

15   with his innocence.  And, again, it is hard for me to have this

16   debate about what is consistent with his innocence because we

17   know he is the guilty party.

18        MR. SPIRO:  The firm searched its e-mail.  It did not

19   find any evidence that Mr. Isikoff received the transcript --

20        THE COURT:  As a matter of fact, they didn't

21   adequately search the e-mails.  When they searched the e-mails

22   at this point in time they didn't find any of those e-mails

23   that were searched and found once the lawyers were hired after

24   September 27th.  And if you go back to --

25        MR. SPIRO:  That's not accurate, your Honor.  They

MC85terA

1      continued to conduct additional searches during --

2                  THE COURT:  On your Exhibit 1 --

3                  MR. SPIRO:  -- during August and September.

4                  THE COURT:  On your Exhibit 1, page 10, all of those

5      phone calls in that box, when were those phone calls

6      discovered?

7                  MR. SPIRO:  Those were phone calls that were --

8                  THE COURT:  When were they discovered?

9                  MR. SPIRO:  After September 27th.

10                 THE COURT:  That's what I just said.  A reasonable

11     investigation should have looked for this on January 17th.

12                 MR. SPIRO:  Those phone calls wouldn't tell us

13     anything.

14                 THE COURT:  It does tell us something.  It tells us

15     that Fawcett and Isikoff are having numerous conversations

16     around the time that it was leaked.

17                 MR. SPIRO:  Something else was going on during that

18     time and that --

19                 THE COURT:  Well, a lot else could have been going on

20     but that's not consistent with this.

21                 MR. SPIRO:  That is when Mr. Kreindler was going on

22     Mr. Isikoff's podcast so he went and recorded on July --

23                 THE COURT:  Wouldn't it have been --

24                 MR. SPIRO:  There were negotiations back and forth

25     between Mr. Fawcett and Mr. Isikoff about that, and between

MC85terA

1    Mr. Kreindler and Mr. Isikoff.

2              THE COURT:  Well, let's be honest here.

3              MR. SPIRO:  That wouldn't tell us anything.

4              THE COURT:  It doesn't tell you anything?

5              MR. SPIRO:  It does not, your Honor.

6              THE COURT:  It doesn't tell you that the only evidence

7    that you have of any contact with Isikoff, who got this

8    transcript, was contact with Mr. Kreindler and contact with

9    Mr. Fawcett?  Is there any other person at the law firm where

10   you have this kind of evidence that they had any contact

11   directly with Mr. Isikoff?

12             MR. SPIRO:  So, we went through probably 100,000 or

13   more e-mails.  There were searches done, this is post-September

14   27th, of phone records of the various partners at the firm.

15             THE COURT:  Right.

16             MR. SPIRO:  There were searches done of texts.

17             THE COURT:  Yes.

18             MR. SPIRO:  And not a single document reflected any

19   knowledge on the part of the Kreindler firm --

20             THE COURT:  Wait, wait, wait.  That's not my question.

21             MR. SPIRO:  -- as to what Mr. Fawcett had done.

22   Nothing.  There was nothing there.

23             THE COURT:  Let's be reasonable.  The most effective

24   advocacy is to be consistently reasonable.  You cannot tell me

25   that the fact that there are numerous phone calls and

MC85terA

1   communications between Mr. Isikoff, and particularly

2   Mr. Fawcett and Mr. Isikoff and Mr. Kreindler, you can't say to

3   me that that makes it less likely that they're involved rather

4   than more likely that they are involved.

5           MR. SPIRO:  So, what would have happened if

6   Mr. Maloney went to Mr. Fawcett and said, John, I see that

7   there are all these phone calls between you and Isikoff.

8   What's that about?  Then the short answer would be,

9   Mr. Kreindler had been on the podcast, Mr. Isikoff is doing a

10  followup story.

11          THE COURT:  But that wasn't his response.  He never

12  gave that response.

13          MR. SPIRO:  That would not be anything that would be

14  remarkable.

15          THE COURT:  No.  His response was always, even to this

16  day, I can't even remember what I talked to him about.  That's

17  his response.  His response doesn't give us any evidence that

18  they talked about a particular thing.  Matter of fact, he has

19  very vague recollection.  So does Mr. Kreindler, about what

20  those conversations were about.  So, you know, I have two

21  different images in my mind when I say run off and do an

22  investigation.  I have the image in my mind that they walked

23  into -- they walked by Mr. Fawcett's office, stick their head

24  in the door and say, *Hey, did you give this guy the transcript?*

25  *Do you know anything about it?  No, I don't.  OK, have a nice*

MC85terA

1    *day.  OK.*

2              Or, I have an image of Mr. Fawcett in a room being

3    questioned about his contacts, seeing if he is going to give

4    truthful answers consistent with the evidence that we already

5    have, following up questions, asking him detailed questions,

6    recording those questions and answers so that I can tell the

7    Court exactly what I asked him and exactly what he responded.

8              You know, this whole argument that, well, in substance

9    I told him this.  That's not even admissible evidence in a

10   trial.  That's not the kind of investigative information that

11   you want.  You want to know, OK, I have got a phone call here

12   from such and such a date.  Why did you call him?  What was the

13   subject matter of that call?  Who spoke first?  What did you

14   say?  What did he say?

15             MR. SPIRO:  Mr. Fawcett had easy answers to all of

16   those questions.

17             THE COURT:  No, he didn't, because he was never asked

18   those questions.

19             MR. SPIRO:  Mr. Fawcett spoke with Mr. Kreindler on

20   almost a daily basis, he spoke with other members of the 911

21   terror team on almost a daily basis.  The idea that he was

22   going to be able to necessarily be able to recall specifically

23   what happened on a particular day, in a particular

24   conversation, months after, is just not realistic.

25             The fact is what happened here is that Mr. Fawcett

MC85terA

1   took a thumb drive, put it in his computer, downloaded the

2   transcript, then used a different software package which

3   automatically disappeared e-mails after seven days.

4           THE COURT:  Is that a surprise that he did it in that

5   manner?

6           MR. SPIRO:  And there was no way that that was going

7   to be discovered.  It was done in a way to hide this from the

8   Kreindler firm.

9           That's what happened.

10          THE COURT:  You know, the fact is that I can't accept

11  that statement.  Why?  Because as soon as they put the

12  affidavit, the declaration in front of him, he fessed up.

13  Nobody interrogated him to get him to fess up.  They said sign

14  this, this is what you say is the truth, and we are going to

15  submit this to the Court.  And he calls hisself a criminal

16  lawyer.  All right?  He speaks to the lawyer -- who knows what

17  he speaks to the lawyer about -- it is not clear to me what he

18  spoke to the lawyer about, nobody asked him that or presented

19  that evidence to the Court.  His testimony about what he did

20  and what he talked about is inconsistent, but the fact is that

21  nobody ever confronted him, nobody ever said, you know what?

22  You know, it sort of looks like you might be the guy, you know,

23  so let's nail this down now.  These are the questions we have.

24          I mean, think about also the evidence that -- and I

25  assume that you uncovered, after September 27th, there is also

MC85terA

evidence that Mr. Kreindler had a conversation with Mr. Isikoff
in which Mr. Isikoff was trying to find out whether
Mr. Kreindler could get this information, get the information
and transcript out of, as they call it, the gag order.  Right?

MR. SPIRO:  Right.

THE COURT:  Now, I know in general that they had that
conversation but to this day I can't tell you after -- and
another thing, maybe you can explain it to me, I don't
understand and it doesn't prove anything by itself, but I don't
understand why Mr. Kreindler thought it was necessary to ask
Mr. Fawcett whether or not this was covered by the protective
order.  The lawyer is going to ask the grunt whether or not
this is protected by the protective order?  What is the
explanation for that conversation around the time that the
reporter is obviously asking him to see if you can get this
transcript out of the protective order?  And then, I don't even
have -- and you say, about the investigation I have to call my
Mr. Maloney, *You mean you didn't even ask him:  Well, did you
get back to Isikoff and tell Isikoff that, no, it can't happen?
Did you discuss it with Mr. Fawcett?  Obviously Fawcett knew
that you weren't going to give it to him.*  I don't have any of
that.

No one questioned any of these witnesses in any
detail.  Given the seriousness of these allegations about
people at the firm, it's tough for me to say that they did the

MC85terA

1      most that they could have done during this period of time.

2              MR. SPIRO:  Your Honor, I think you need to separate

3      what we now know from what was happening in real-time and I

4      think there is a real risk in basing your conclusion on

5      hindsight.

6              THE COURT:  No, no.  You had the benefit of hindsight.

7      You can tell me now what exactly was going on that indicates

8      that anybody -- I won't say anybody -- that Mr. Kreindler and

9      Mr. Fawcett, that Mr. Kreindler was not involved and

10     Mr. Fawcett's efforts were successful, by himself, to get this

11     information and give it to Isikoff when Isikoff was having

12     conversations with both Fawcett and Kreindler about whether or

13     not he could get this information.

14              And I still -- and maybe you can't answer the

15     question, but I have got no reasonable explanation, as they

16     say, why Kreindler is asking Fawcett whether or not he is

17     supposed to keep this secret.

18              MR. SPIRO:  I think the answer is that Mr. Fawcett had

19     been working with the Kreindler firm for almost 20 years.

20              THE COURT:  OK.

21              MR. SPIRO:  The firm had enormous trust and confidence

22     in him.

23              THE COURT:  So, how is his opinion somehow greater

24     than the lawyers'?

25              MR. SPIRO:  The question, Can we send it to the

MC85terA

1    reporter?  And when he was told that, no, there was a 30-day

2    hold, period, end of conversation.

3         THE COURT:  Are you telling me that --

4         MR. SPIRO:  Mr. Kreindler never said, John, go ahead

5    and send this transcript.

6         THE COURT:  So you are telling me that Mr. Kreindler

7    didn't know, had no idea before he asked and got that

8    information from Mr. Fawcett, that this was protected by the

9    protective order and there was no way he anybody could give

10   this?

11        MR. SPIRO:  Obviously he had a question in his mind --

12        THE COURT:  Well, why would he have a question in his

13   mind?  See, that's the part that Magistrate Judge Netburn

14   factors into her determinations.  So, I say to myself, well,

15   what is the evidence to the contrary?  Where am I supposed to

16   look to see that there is an innocent explanation that is

17   supported by facts rather than a reasonable explanation that it

18   makes absolutely no sense that he needs to consult with

19   Mr. Fawcett, who is not even a lawyer, after he has been in

20   this case for 10 years and signed the protective order himself,

21   personally, why he needs Mr. Fawcett's opinion about whether or

22   not he can give this -- and you know what it also indicates?

23   It indicates that they had some communication between them

24   about whether or not Isikoff is going to get this information.

25        MR. SPIRO:  Yes, and the conclusion was that it

MC85terA

1    couldn't be provided.

2              THE COURT:  Well, you say that was Mr. Kreindler's

3    conclusion.

4              MR. SPIRO:  He was asking to make sure that they're

5    proceeding appropriately.

6              THE COURT:  So why isn't he asking Mr. Maloney?  Why

7    isn't he asking any lawyers?

8              MR. SPIRO:  He was having a conversation with

9    Mr. Fawcett.  Mr. Fawcett was an integral part of this team.

10             THE COURT:  Mr. Fawcett's opinion about whether the

11    protective order covers this transcript is totally worthless.

12    Worthless.

13             MR. SPIRO:  So, your Honor, why in the world would

14    Mr. Kreindler, a very smart, experienced lawyer, undertake a

15    course of action where he would essentially authorize the

16    leaking of a transcript knowing that at the same time that's

17    going on he was going on the podcast of the reporter who was

18    doing this story?  Why would he do that?  He is not a stupid

19    man.  It just makes absolutely no sense.  He knew anyone would

20    understand that if that was leaked that the Kingdom of Saudi

21    Arabia would be all over the Kreindler firm hoping to push the

22    Kreindler firm out of this case.

23             THE COURT:  So, point to me something in this record

24    that points to an innocent explanation rather than a guilty

25    explanation.

MC85terA

1          MR. SPIRO:  Let's start with all of the sworn

2     statements, two sworn statements --

3          THE COURT:  No.  Put aside the sworn statement --

4          MR. SPIRO:  The testimony is that Mr. Fawcett --

5          THE COURT:  When I talk you don't talk.

6          Put aside people's statements.  You know and I know,

7     and Mr. Maloney even knows, that it would not have been a

8     sufficient investigation and it would not have been appropriate

9     to come to the Court and say we did a thorough investigation

10    and determined it was no one and the primary or sole part of

11    that investigation was simply asking the people at the firm did

12    they do it.

13         MR. SPIRO:  And, your Honor, I understand your

14    frustration with the investigation that Mr. Maloney conducted

15    but frustration is one thing --

16         THE COURT:  It wasn't Mr. Maloney alone.  I'm not

17    blaming just Mr. Maloney.  The law firm, Mr. Hartney, anybody

18    involved, I don't see where they were focused.  You see?  They

19    should have been focused.  And they clearly should have been

20    focused -- the first focus was on Mr. Kreindler and

21    Mr. Fawcett, even if that focus was, look, we have to -- you

22    know, Mr. Kreindler and Mr. Fawcett, we have got to exculpate

23    them right away, we have to get them out from under this so

24    let's dig under every rock and find any evidence of innocence

25    rather than, you know, the evidence of a consistent

MC85terA

1    communication with the reporter about whether or not he can get

2    a copy of the transcript.

3         MR. SPIRO:  But where is the evidence of bad faith on

4    the part of Mr. Maloney?  Where is the evidence of bad faith on

5    the part of Mr. Pounian?  Where is the evidence of bad faith on

6    the part of Mr. Hartney?  It is not there.  Your Honor can be

7    critical of the investigation that they did but they proceeded

8    in good faith.

9         THE COURT:  I have to evaluate that.  I am not

10   debating that with you, I am asking tough questions, and if you

11   can withstand my questions you are probably going to win but

12   they're tough questions.  I'm not here to try to argue with you

13   about Mr. Maloney's bad faith but I know that this was, on the

14   scale of an aggressive investigation and a pro forma

15   investigation, this was not on the side of an exhaustive

16   investigation.  And you even know that by the time you got in

17   here you got all kinds of evidence that nobody looked at that

18   they could have readily looked at.

19        So, I understand what you are saying.  I'm not to the

20   point, as far as this part of the conversation, I don't think,

21   on the bad faith issue.  We started this conversation on the

22   issue of you telling me and I was asking you, all right, I see

23   the things that -- I look at this through a different lens now,

24   I didn't make this decision, but I am looking at the things

25   that Magistrate Judge Netburn had in front of her when she made

MC85terA

1    certain conclusions:  One, about the credibility of certain

2    witnesses and statements; two, about the reasonable inferences

3    to be drawn from facts that could have or do have a reasonable

4    inculpatory inference and I'm trying to figure out what am I

5    missing and what did she miss with regard to the reasonable

6    exculpatory inference?  I don't see a whole lot of stuff here

7    that weighs on the side in a reasonable exculpatory explanation

8    for, as you say, either the guilty person, the admitted guilty

9    person -- Fawcett -- or the innocent person -- Kreindler.  So,

10   I have to say, well, wait a minute.  You want to argue to me

11   that the magistrate judge, the inferences she drew were

12   unreasonable inferences.  For me to assess that I have to

13   figure out what evidence is there that points to an innocent

14   inference.  And, you know, the only thing I can say is that the

15   only evidence that was uncovered during this investigation is

16   that everybody that they talked to -- and I had no evidence

17   that they asked him anything other than a one-sentence:  Did

18   you do it?  Everybody that they talked to claimed they didn't

19   do it and I don't -- you know, if your argument is that, well,

20   Magistrate Judge Netburn should have accepted that testimony

21   and the magistrate judge should have, even though she knew that

22   that testimony -- that the statements from Fawcett, the claims

23   of innocence were lies, that it was reasonable for everyone to

24   have accepted those lies without trying to test the veracity of

25   what he was saying, even though the spotlight should have been

MC85terA

1   on him from day one.

2              MR. SPIRO:  So, your Honor, the firm did conduct an

3   investigation.  Mr. Hartney looked at the Citrix Share, which

4   was a cloud-based storage thing to determine if the transcripts

5   had been downloaded for that.  In the other case media he went

6   and looked to see was there any evidence in the e-mail within

7   the firm of the transcript being sent to anyone, and there was

8   no evidence of that.

9              THE COURT:  But, wait a minute.  Stop.  Slow down.  I

10  want to address this.

11             One, when you say evidence that it had been

12  downloaded, there was evidence it was downloaded.  We know that

13  Fawcett downloaded it.  We know that because he gave it to

14  other people in the firm.

15             MR. SPIRO:  Correct.

16             THE COURT:  So, to argue that we had no evidence that

17  it would have been downloaded, no.  We have no evidence that

18  anybody else downloaded it and was the guilty party, could have

19  been the guilty, other than Fawcett because he did download it.

20  OK?  And the fact that when he downloaded it we don't know what

21  he did with it outside the firm -- I don't even know -- is

22  there any -- I know he sent it to a consultant or someone

23  else --

24             MR. SPIRO:  Which he was authorized to do.

25             THE COURT:  Right.  Did he send that, was that

MC85terA

1    discovered, did he send that on this network?

2        MR. SPIRO:  The day after the story was published --

3    the story was published on July 15 -- on July 16 there is an

4    e-mail that we looked at where Mr. Maloney essentially confirms

5    that he had spoken with Mr. Fawcett.  Mr. Fawcett said he had

6    sent the transcript to the consultant.

7        THE COURT:  I know, but how did he send that

8    transcript?  Was there any evidence that that transcript was

9    sent via the law firm network?  Or sent outside of the law firm

10   network?

11       MR. SPIRO:  I believe it was -- and I can confirm this

12   with my client, I believe it was sent through the e-mail

13   network.

14       THE COURT:  All right.  But, you see, the thing is

15   that neither I nor at one point Magistrate Judge Netburn should

16   be asking those questions at this point in time.  Those

17   questions should have been asked and should have been answered

18   right up front.  And, as I say, for you to say, well, we had an

19   affidavit saying nobody downloaded the transcript, well, that's

20   not what the affidavit says.  They said the only person that we

21   have evidence of downloading the transcript was Fawcett.  So,

22   he is not eliminated as a suspect and you had to put that in

23   conjunction with the other evidence that points to Fawcett.

24       MR. SPIRO:  The questions were asked of Mr. Fawcett on

25   July 15 or 16, immediately after the story came out.

MC85terA

1             THE COURT:  Right.

2             MR. SPIRO:  He was a long-standing trusted employee.

3             THE COURT:  Well, that trust was misplaced.  Let's not

4     act that like that.

5             MR. SPIRO:  And there was no other evidence suggesting

6     that he acted inappropriately with regard to the transcript.

7     It was entirely --

8             THE COURT:  I am going to ask this question and you

9     don't have to answer if you don't want to, but do you really

10    think that what was done in this case was likely to have

11    discovered the culprit?

12            MR. SPIRO:  I don't think anything could have been

13    done that would have discovered this.

14            THE COURT:  Something was done.  They stuck a

15    declaration in his face and he fessed up.  That's all that

16    needed to be done, apparently.

17            MR. SPIRO:  At the last minute, yes.

18            THE COURT:  Well, they could have -- wait a minute.

19            At the last minute?  Whose responsibility was that

20    that it was done at the last minute?  The fact is that that

21    could have been done in July, it could have been done in early

22    September, it could have been done long before September 27th.

23    And even when the motion was filed and there is conversation

24    about whether or not they're going to wait until the motion is

25    decided, it might make sense if you want to wait until the

MC85terA

```
 1    motion is decided before you submit the declarations.  But
 2    don't tell me it is consistent with an aggressive investigation
 3    if you say we are not even going to ask him to sign the
 4    declaration until after the Court orders us to do so.
 5            MR. SPIRO:  Your Honor, the Kreindler firm was in a
 6    difficult position --
 7            THE COURT:  They were.
 8            MR. SPIRO:  -- for the following reason:  They were
 9    counsel of record, they were the lead counsel in prosecuting
10    Saudi Arabia in connection with this case.
11            THE COURT:  Right.
12            MR. SPIRO:  They had serious concerns about what they
13    can or should disclose in the context of the investigation.
14            THE COURT:  But in this investigation --
15            MR. SPIRO:  Obviously, if they had to do it over
16    again, they would have done it differently.
17            THE COURT:  I don't know that.
18            MR. SPIRO:  But this is based on the facts and
19    information that they had at the time where they had no reason
20    to suspect that Mr. Fawcett was --
21            THE COURT:  But they had every reason to suspect
22    Mr. Fawcett.  He was the prime suspect.  Who else knows the
23    reporter?  Who else is talking to the reporter?  Who else had
24    communications with the reporter around that time?  Who else is
25    talking to Mr. Kreindler about whether or not that the reporter
```

MC85terA

1    can get the transcript?  You can't stand here and say they had

2    no reason to suspect Mr. Fawcett.

3         MR. SPIRO:  There were probably 90 or a hundred people

4    who received the transcript or who had access to the

5    transcript.

6         THE COURT:  And no Isikoff?  Nobody else had a

7    relationship with Isikoff.

8         MR. SPIRO:  Isikoff is a good investigative reporter,

9    he could reach out to and attempt to get the transcript from --

10        THE COURT:  He could.  And then you see?  That's a

11   good example if you say there was some contrary evidence, they

12   had a reasonable explanation, then you should have presented

13   that evidence to Magistrate Judge Netburn.  But nobody has

14   presented any evidence to her that he had some other source for

15   this transcript.  And we know that that's not what happened.  I

16   mean, I'm not -- it is hard for me to debate this in the

17   abstract with you when we know it was Fawcett and we know how

18   it -- you know, at least in general terms and not much detail

19   but we know how he did it and we know he was lying and we know

20   that it was not impossible to find that out because it,

21   ultimately, was found out and it was found out simply because

22   they put an affidavit -- the declaration in front of him that

23   is consistent with the lies that he was telling and they were

24   going to submit it to the Court and he decided, with or without

25   being counseled by attorneys, he decided that he could not do

MC85terA

1    that because he would only complicate the situation for

2    himself.  And he didn't fess up out of some altruistic decision

3    that he was going to do the right thing, he fessed up when they

4    forced him to fess up, when they put him in a situation that

5    was awkward for him to keep lying.  That was the only thing

6    that was done that made it awkward for him to continue to lie.

7              MR. SPIRO:  At the time the firm had no reason to

8    believe that he would want to go ahead and leak this

9    transcript.

10             THE COURT:  But that's true of everybody.  That's true

11   of the whole world.  That doesn't give them a reason not to be

12   aggressive and not to suspect everyone.  Give me an example of

13   who falls under that category of somebody they should have

14   suspected.

15             MR. SPIRO:  You know, you could ask a whole host of

16   other people as to why different people would have a whole host

17   of the motivations for wanting to leak it but, from Mr. Fawcett

18   and the firm's perspective leaking that transcript, as today

19   evidences, was a ridiculous thing to do.

20             THE COURT:  Right you are.

21             MR. SPIRO:  It was something that was going to bring

22   the wrath of the Court down on the Kreindler firm, it was going

23   to bring the wrath of the Court down on Mr. Fawcett.

24             THE COURT:  Right.  I feel sorry for the firm that

25   they're in this situation.

MC85terA

1           MR. SPIRO:  It made no sense.  So, the suggestion that

2    people would like and say it must be Fawcett, we can sit here

3    today and stand here today and say that.

4           THE COURT:  No, that's not true.  I can't accept that.

5           MR. SPIRO:  But, if it was Kreindler, it was a very,

6    very different perspective.

7           THE COURT:  The list of things that we have already

8    discussed plus the things we didn't discuss all point to either

9    Fawcett or Kreindler.  And if it wasn't Kreindler, it was

10   Fawcett.  So, you know, that argument could be made if there

11   had been no phone calls.  I don't think it could be made if he

12   didn't have a personal relationship with the reporter.  That

13   argument maybe couldn't be made if they didn't specifically

14   discuss whether he could get a copy of the transcript.  There

15   are a lot of arguments that could have been made if the facts

16   were different but the facts are not different.  It is not --

17   you know, you need a more persuasive argument than they should

18   have never, in their wildest dreams, thought it was Fawcett.

19   Fawcett was the primary suspect.  He should have been the

20   primary suspect.

21          MR. SPIRO:  But Fawcett, by his own admission, misled

22   the firm.

23          THE COURT:  Right.  And that's what crooks do.

24          MR. SPIRO:  He prevaricated his word, dissembled his

25   word.

MC85terA

1          THE COURT:  That's what criminals do.

2          MR. SPIRO:  And someone that you work with for almost

3     20 years, who you trust like a brother, that's not someone that

4     you ordinarily think --

5          THE COURT:  Then you are not in the position to do a

6     thorough and effective investigation if you are going to hold

7     back because of your personal relationship with the people you

8     are investigating.

9          MR. SPIRO:  But it also suggests, your Honor, that the

10    investigation was done in good faith and I think that is a very

11    critical point in terms of your Honor's analysis.

12         THE COURT:  All right.  Explain to me why -- and

13    again, I have to review Magistrate Judge Netburn's decision

14    more carefully -- but explain to me why, if being the firm

15    that's doing the primary investigation and being the lawyers

16    from the firm that's running the Plaintiffs Executive

17    Committee, explain to me why everybody else, in terms of their

18    representations to the Court did so immediately and the

19    Kreindler firm.

20         MR. SPIRO:  The Kreindler firm was unique in that they

21    were taking the lead in prosecuting this case.  They had one

22    consultant who was located in the Middle East who was the

23    source of valuable information?

24         THE COURT:  And you think they had, under those

25    circumstances --

MC85terA

1          MR. SPIRO:  And they were concerned about a security.

2          THE COURT:  You think they had, under those

3    circumstances, to put their own interest ahead of their

4    responsibilities as head of the committee and as officers of

5    the court?

6          MR. SPIRO:  Your Honor, the firm responded.  When the

7    Court set a deadline for submissions and declarations, the firm

8    responded and met each deadline that Magistrate Judge Netburn

9    set.

10          THE COURT:  Shouldn't the firm have been anxious to

11    uncover the culprit.

12          MR. SPIRO:  They were.  They were very anxious, which

13    is why the day of the news story the firm understood that it

14    needed to conduct an investigation and they conducted a good

15    faith investigation.

16          THE COURT:  All right.  And other than checking those

17    e-mails and some basic questions to those people who had

18    access, asking them to confess to whether they did it, what

19    else do you say was done that could have reasonably led to

20    uncovering -- possibly uncovering the culprit?

21          MR. SPIRO:  Obviously, with the value of hindsight,

22    had Mr. Fawcett been asked for a declaration and he then

23    refused, that would have been helpful but no one knew at the

24    time that that was going to be something that was

25    determinative.  In fact, Mr. Fawcett was in the loop with

MC85terA

1    regard to the investigative work that was being done.  You will

2    see one of the e-mails that was in the folder that your Honor

3    has reflects him actually being copied on the e-mail showing

4    what's being done.  And obviously, understanding that people

5    believed that the only person who got this transcript outside

6    of the firm was the consultant, he gets the e-mail and doesn't

7    say, folks, I have to tell you something, I'm responsible for

8    sending this transcript.  He told a lie to several people

9    within the firm and compounded it.

10            THE COURT:  That's what people do.  People lie.

11   That's what you expect them to do.  When you investigate

12   criminal conduct the first thing you expect is not that they're

13   going to break down and confess.  You are going to expect them

14   to lie.  So, you have to be in a position to conduct an

15   investigation in a way that you can catch them in that lie.  I

16   don't understand what was done other than, you know, *Did you do*

17   *it?  No.  OK.  Thanks.  Bye.*

18            MR. SPIRO:  I don't expect one of my law partners,

19   whom I have known for 20 or more years, whom I trust enormously

20   who I have been through wars with together, if he tells me

21   something --

22            THE COURT:  Right.

23            MR. SPIRO:    -- and said I didn't send that transcript

24   to Isikoff, I believe him and I don't necessarily treat him the

25   way I treat a stranger who needs to be cross-examined.

MC85terA

```
 1              THE COURT:  But what you just said -- think about what
 2       you just said.  If somebody stole your wallet at the firm and
 3       your first concept would be:  I can't imagine who would have
 4       done this.  Nobody would have done this.  And you were tasked
 5       with finding out who stole your wallet.  Would you avoid
 6       questioning those people who you were closest to?
 7              MR. SPIRO:  I would ask them, Do you know anything
 8       about it?
 9              THE COURT:  You would treat them differently than you
10       would treat everyone else?  The questions that you would ask of
11       witnesses and potential perpetrators, you would treat them
12       differently if they had not been ruled out by any evidence as
13       the perpetrator?
14              MR. SPIRO:  Yes.  If it is someone that I have known
15       for 20 years and know their personal integrity and have a high
16       opinion of it, I would absolutely treat them differently.
17              THE COURT:  Then you would not be in a good position
18       to make a good faith representation to the Court that you have
19       done a completely thorough investigation and ruled out
20       everybody at the firm.
21              MR. SPIRO:  I don't agree with that, your Honor.
22              THE COURT:  Why?  Just because you trust somebody at
23       the firm?  That's exactly what happened here.  Just because
24       they trusted Fawcett that it is still a thorough investigation
25       not to pursue him as a possible suspect?
```

MC85terA

1         MR. SPIRO:  Your Honor, it goes to the issue of

2   whether the investigation was conducted in good faith and there

3   is no doubt in my mind that this investigation was conducted by

4   Mr. Maloney in good faith.  Obviously we all sit here with the

5   benefit of hindsight and can point to things that maybe could

6   have been done differently, but the reality is that given the

7   information they had, the relationships that they had, and the

8   good faith belief that to take this firm and remove it from the

9   PEC based upon a good faith investigation, even if it were

10  flawed, is simply unfair, inappropriate, not certainly the

11  least draconian remedy under the circumstances, and we would

12  urge that your Honor reconsider that portion of the remedy here

13  so that the 911 victims, the families who are relying on the

14  Kreindler firm, can be assured that this case will continue to

15  be prosecuted aggressively and appropriately.

16        THE COURT:  Let's take a break and then I will hear

17  from Kingdom of Saudi Arabia.  We will take a 10-minute break.

18        (Recess)

19        THE COURT:  Mr. Rapawy?

20        MR. RAPAWY:  Thank you, Judge Daniels.  May it please

21  the Court:

22        Judge Netburn found that Kreindler & Kreindler,

23  through its supervising attorney James Kreindler and its

24  researcher John Fawcett, willfully violated the Court's order

25  by deliberately giving a confidential deposition transcript to

MC85terA

1    reporter Michael Isikoff as part of the firm's press-oriented

2    litigation strategy.  And, she also found that

3    Kreindler & Kreindler's other attorneys were -- I think the

4    phrase she used was, *at best, was willfully blind to*

5    *Kreindler's and Fawcett's violations*, and they obstructed the

6    Court's investigation and made a series and false and

7    misleading statements to conceal facts to the Court.  Those

8    findings were made after a two-day evidentiary and the record

9    here supports them.

10          I intend, your Honor, to begin with the factual

11   support for the findings and then to talk a little bit about

12   the law at the end, if that's acceptable, but I am happy to go

13   in whatever order your Honor prefers.

14          THE COURT:  Go ahead.

15          MR. RAPAWY:  So, as your Honor knows, we are here on

16   essentially clear error review of the factual findings, and you

17   have a detailed opinion before you in which Judge Netburn

18   carefully assembled the documentary evidence and also relied on

19   her personal observations of the witnesses and her long

20   familiarity with the case and the record.  And I do think

21   that's important here because I think the cold record can't

22   really fully convey things -- the impact of the things that

23   happened at the hearing like Mr. Kreindler bursting into tears

24   when he was discussing Mr. Fawcett, like Mr. Hartney admitting

25   on the stand that Ms. Benett told him that she did not want to

MC85terA

1   reveal certain information to the Court about how

2   Kreindler & Kreindler restricted access or, rather, didn't

3   restrict access to confidential information, about how

4   Ms. Benett, during her own testimony, made gratuitous attacks

5   on Musaed al Jarrah that went well beyond even what the

6   declaration she had edited for Mr. Fawcett said, and about

7   Mr. Fawcett's only inability to keep his story straight, in

8   particular, about the calls with Liz Crotty that I think were

9   part of the circumstantial evidence on which Judge Netburn

10  relied to determine that Fawcett did not act alone and could

11  not act without the knowledge, or at least tacit approval, of

12  Mr. Kreindler.

13          On that point, the question of a finding of knowledge

14  or tacit approval, I think that there is essentially three

15  pieces that I would draw the Court's attention to.  The first

16  is the inference that Judge Netburn reasonably drew from the

17  phone calls between and among Kreindler, Fawcett, and Isikoff

18  in late June and early July 2021, and then the calls and

19  messages between and among Mr. Kreindler and Mr. Fawcett and

20  Ms. Crotty on July 22nd, immediately after the Kreindler firm

21  became aware that they were going to -- that we were going to

22  take this issue to the Court.

23          Your Honor has already touched on the basic

24  implausibility of the story that Mr. Kreindler was asking

25  Mr. Fawcett whether the transcripts were still confidential,

MC85terA

1    but there was another implausible statement that Judge Netburn

2    also relied on about that series of phone exchanges and that

3    was that based on her observation of Mr. Kreindler and the way

4    he talked about Mr. Fawcett and her observation of Mr. Fawcett

5    and the way that he talked about Mr. Kreindler, she also

6    thought it was implausible that Mr. Fawcett would have told his

7    employer and friend this could not be released and then turn

8    around and release it without Mr. Kreindler's -- again, at

9    least tacit -- approval.  So, she did not find that

10   Mr. Kreindler necessarily said to Mr. Fawcett, go and send the

11   documents, but that it was -- she did find that, based on those

12   conversations, Mr. Kreindler was aware that Mr. Fawcett was

13   going to send those documents and that Mr. Fawcett understood

14   that he was acting with the authorization of his employer and

15   friend rather than betraying him.

16           And, similarly, with regard to the July 22nd phone

17   calls, Judge Netburn found that, first, that Mr. Fawcett gave

18   false testimony twice on the stand about his calls with

19   Ms. Crotty saying first it was purely about personal matters

20   and then, when he was confronted with evidence -- well, not

21   even evidence -- he was confronted with his own attorney's

22   assertion of privilege over those July 22nd calls, he then came

23   back after a break and said, well, they were about the Court's

24   order when, in fact, there was no court order pending at the

25   time, there was only our letter.  So, the inference that she

MC85terA

<table>
<tr><td>1</td><td>drew was that he had something to hide about those calls.  But,</td></tr>
</table>

1    drew was that he had something to hide about those calls.  But,

2    he didn't have anything to hide about his personal culpability

3    at this point.  If he had really betrayed Mr. Kreindler at that

4    time, really acted without his knowledge or approval, there was

5    no reason he couldn't have said, yes, I was worried about my

6    legal exposure and that that was why I talked to a lawyer.

7    But, if, on the other hand, he was tipped off that morning by

8    other members of the firm that it was time for him to consider

9    his own exposure because they knew or had good reason to

10   believe that something was going on, that he had done something

11   to cause him that deal of exposure, he would have had a very

12   clear motive to conceal that in order to protect the people who

13   I think she could reasonably infer he wanted to protect.

14          THE COURT:  Well, remind me of what exactly the

15   testimony ended up being when he changed his testimony.  What

16   was the nature -- and maybe I don't remember it because maybe

17   it is not there, but what do you say is in the nature of the

18   conversation that he testified about with Ms. Crotty?

19          MR. RAPAWY:  I'm sorry.  You want the after he revised

20   it, your Honor?

21          THE COURT:  Yes.

22          MR. RAPAWY:  OK.  After he revised it he said that he

23   called her because he had seen the Court's order and was

24   concerned about it.

25          THE COURT:  Concerned about it in what way?  Did he

MC85terA

1    say?

2         MR. RAPAWY:  I would refer, your Honor, let me see if

3    I have the transcript cites, your Honor.  This is all on page

4    480 of the transcript and he testified that he called her on

5    the morning of July 22nd, "after the Court's order had come

6    out," and that he was calling her "about the Court's order."  I

7    don't think he got much more specific than that but I think the

8    implication was that he had seen an order from Judge Netburn

9    that caused him to be concerned about his personal exposure and

10   the problem with that testimony is that she hadn't issued an

11   order when those calls were made.

12        THE COURT:  But I'm not sure -- since no one followed

13   up on this question I'm not sure I understand what it is you

14   say that occurred in that conversation.

15        MR. RAPAWY:  Well, we think he was calling her because

16   he was concerned -- we told them at that point that we were

17   going to go to the Court and ask the Court to investigate.

18        THE COURT:  Right.

19        MR. RAPAWY:  And we think that what happened is they

20   all got on the phone that morning, and whether Mr. Pounian was

21   on the call or not there is dispute about whether there is

22   evidence to show that, but at least Mr. Kreindler and

23   Mr. Fawcett got on the phone and they talked about what they

24   were going to do about this investigative request.

25        THE COURT:  Are you sure we are all taking about the

MC85terA

1    same phone call?

2              MR. RAPAWY:  This is the July 22nd, 2021 series of

3    phone calls.

4              THE COURT:  OK.  Well, which phone call are we talking

5    about?  All three of them were supposedly on the call.

6              MR. RAPAWY:  There is two.  There is the one that --

7    I'm being handed -- just so I can get the exact time right.

8              So, at 11:18 a.m., Mr. Fawcett texts Ms. Crotty and

9    the content of that text is privileged and was withheld from us

10   and not produced to the Court, he asserted personal

11   attorney-client privilege over that text.  And then, at

12   9:17 a.m., we have there is a phone record that shows a

13   46-minute phone call from Mr. Fawcett to Mr. Kreindler.  And

14   then, at 10:41 a.m., there is a phone call from Mr. Fawcett to

15   Ms. Crotty that lasts 22 minutes.  And then, at 12:07 p.m.,

16   there is an e-mail from Mr. Fawcett to Ms. Crotty, the contents

17   of which are unknown, he asserted personal attorney-client

18   privilege over that and it was upheld.  At then, 12:56 p.m.,

19   there is another five-minute phone call from Mr. Fawcett to

20   Mr. Kreindler.  And this is all set out at page 17 of Judge

21   Netburn's opinion, your Honor.

22             So, the testimony at the hearing was that neither

23   Mr. Fawcett nor Mr. Kreindler could initially recall what their

24   conversation was about but they insisted it wasn't about the

25   leak.  And then, when Mr. Fawcett was asked about the contents

MC85terA

```
 1   of the call with Ms. Crotty and he was directed to give a
 2   general description of the subject matter, he initially
 3   testified, well, you know, it was about her recent run for
 4   district attorney and she hadn't been elected district attorney
 5   and they were discussing that and he insisted there was no
 6   discussion of the leak whatsoever.  And so, it was pointed out
 7   to him several times by my partner, Mr. Hansen, that that was
 8   inconsistent with his attorney's assertion of attorney-client
 9   privilege as to the general contents of that phone call and
10   that at that point the cross-examining went on to other topics,
11   it ended, there was a recess.  After the recess, Mr. Fawcett
12   comes back and says that he wants to correct his testimony and
13   then he -- and that's what he says that it was about, the
14   Court's order.  I think he actually said that directly in
15   response to questioning from Judge Netburn.
16          THE COURT:  What does that mean, it is about the
17   Court's order?
18          MR. RAPAWY:  I don't know, your Honor.  I mean that's
19   what you have got in the record.  But, I do think --
20          THE COURT:  Was Mr. Kreindler questioned about the
21   content of that phone call?
22          MR. RAPAWY:  Mr. Kreindler was questioned about the
23   content of the phone call from Mr. Fawcett to Mr. Kreindler,
24   yes, and he testified that he did not recall what it was about
25   but was sure that it also wasn't about the leak.
```

MC85terA

1          THE COURT:  Who was supposedly on that phone call?

2          MR. RAPAWY:  We know that Mr. Kreindler and

3     Mr. Fawcett were on the phone call and that after the hearing

4     there was an attempt to submit a declaration from Mr. Pounian

5     saying that he was also on the phone call and Judge Netburn

6     declined to accept the declaration.

7          THE COURT:  Is there any independent evidence that

8     those phone calls, that they were on those phone calls?

9          MR. RAPAWY:  The phone records show that -- so, the

10    phone records that were accepted at the hearing showed that

11    Mr. Fawcett and Mr. Kreindler were on the phone calls and also

12    that Mr. Fawcett had his phone call to Ms. Crotty.

13         THE COURT:  So, we are not -- I thought we were

14    talking about a phone call or phone calls in which at least

15    three or four people were on that phone call.

16         MR. RAPAWY:  So, we know there were two and then we

17    have the Pounian declaration that says there were three and

18    this is referring to the July 22nd phone call at 9:17 a.m.  The

19    Pounian declaration was not in the record, it was excluded.

20         THE COURT:  And that was a phone call -- who was on

21    that phone call?

22         MR. RAPAWY:  Mr. Fawcett, and Mr. Kreindler, and again

23    possibly Mr. Pounian, depending on the status of that

24    declaration.

25         THE COURT:  Is there any evidence that those three

MC85terA

1    people were on the phone call at that time?

2                MR. RAPAWY:  There are phone records.

3                THE COURT:  Do the phone records indicate that all

4    three of them were on that same phone call?

5                MR. RAPAWY:  So, Mr. Fawcett's phone records, which is

6    what went into evidence at the hearing, show him and

7    Mr. Kreindler.  Mr. Pounian submitted his declaration after the

8    fact and he submitted a phone record of his own that would show

9    that he was also on the phone call.  I don't think that the

10   time matches exactly but it was about that time and his

11   testimony was it was a conference call with all three of them

12   on it.

13               THE COURT:  And who supposedly made this phone call?

14               MR. RAPAWY:  The 9:17 phone call, Mr. Fawcett's

15   records show him as the sender so he was the one who initiated

16   the phone call to Mr. Kreindler, according to the records.

17               THE COURT:  What was the substance of the text

18   messages with Mr. Kreindler?

19               MR. RAPAWY:  The text messages, we don't know the

20   substance of it.  So, Mr. Fawcett's individual counsel asserted

21   privilege over the --

22               THE COURT:  There was no testimony about what was in

23   that text message?

24               MR. RAPAWY:  That is correct.

25               THE COURT:  Was Mr. Kreindler asked about whether or

MC85terA

1    not he knew what the conversation was about with Ms. Crotty?

2              MR. RAPAWY:  The discussion is at page 84 of the

3    transcript and I think he said he did not know about the call

4    to Ms. Crotty but I would --

5              THE COURT:  What is the content of the, if we know if

6    it is in evidence, of the content of the 12:07 e-mail?

7              MR. RAPAWY:  The 12:07 e-mail is not in evidence

8    because privilege was asserted over that as well.

9              THE COURT:  OK.  So, how many of these phone calls

10    were, did Mr. Fawcett assert a privilege and it was sustained?

11              MR. RAPAWY:  He asserted privilege over the contents

12    of the call with Ms. Crotty, that's the 10:41 a.m. call that

13    lasted 21 minutes and he was asked to give a general

14    description of the subject matter of the call and that's when

15    he said, the first time, that it was about her unsuccessful run

16    for DA.

17              With regard to the Mr. Kreindler's knowledge of the

18    call to Ms. Crotty, he testified -- this is on page 85 of the

19    transcript -- that he has "no idea why John called Ms. Crotty.

20    I don't think I have spoken to her for years."  And then, lower

21    on the same page:  "I have no idea why John called Ms. Crotty,

22    absolutely none."

23              THE COURT:  So, who is supposed to be on this

24    multi-conversation phone call?

25              MR. RAPAWY:  The 9:17 a.m. call is at least

MC85terA

1    Mr. Fawcett and Mr. Kreindler and possibly Mr. Pounian.  The

2    10:41 a.m. call is Mr. Fawcett and Ms. Crotty and I don't think

3    there is any reason to think anyone else was on that call.

4              THE COURT:  All right.

5              MR. RAPAWY:  Then there is the 12:56 p.m. call from

6    Mr. Fawcett back to Mr. Kreindler.  I think that one -- I don't

7    know that there is any evidence that anyone but the two of them

8    were on that call.  I don't believe there is.

9              Anyway, so the inference that, and if I may, your

10   Honor, the inference that Judge Netburn drew from that sequence

11   is she did not think it was plausible that Mr. Fawcett would be

12   able to deceive Mr. Kreindler in that way of having a call

13   about something else and then going and talking to his lawyer

14   about his personal exposure and then having another call with

15   Mr. Kreindler later that same day and just never dropping a

16   hint to Mr. Kreindler, *Actually, I did it, Jim, and I'm the*

17   *reason that the firm is going to be in trouble.*  She did not --

18             THE COURT:  So, what did Mr. Fawcett claim was the

19   nature of the phone call to Mr. Kreindler?

20             MR. RAPAWY:  He claimed that he did not remember but

21   that he was sure it was not about the leak.

22             THE COURT:  OK.  OK.  Go ahead.

23             MR. RAPAWY:  OK.  And the last point I want to make on

24   that is that Kreindler & Kreindler has complained that the

25   Pounian declaration should have come in.  We think Judge

MC85terA

1   Netburn acted within her discretion excluding it.  But, even if

2   it comes in -- and she made this point in her opinion -- it

3   said that they were discussing the e-mail from counsel for

4   Saudi Arabia -- in fact it was an e-mail from me -- in which we

5   said we were going to investigate the leak -- or ask the Court

6   to investigate the leak rather, I should say.  And so, even if

7   you accept what Mr. Pounian wanted to put in after the fact, it

8   would still contradict Mr. Kreindler and Mr. Fawcett's

9   testimony that the call wasn't about the leak.

10          THE COURT:  What was supposedly the relevance of the

11   offer of the Pounian affidavit?

12          MR. RAPAWY:  I believe they wanted to proffer it to

13   show that Mr. Fawcett did not confess to Mr. Kreindler on that

14   call that he was the guy who did it which, you know, an

15   inference that the evidence might otherwise support.

16          THE COURT:  Mr. Pounian, was he questioned about this?

17          MR. RAPAWY:  Mr. Pounian was not questioned about this

18   at the hearing.  We did not know at the time that there was any

19   reason to think he was on that call.  And we did ask

20   Mr. Kreindler about the call when he was on the stand and we

21   asked Mr. Fawcett about the call because we had the phone

22   records to show the two of them were on it.  Mr. Pounian's

23   phone records showing he was on the call, if I recall

24   correctly, your Honor -- and the record will confirm this if I

25   am right -- if I recall correctly it was his personal phone

MC85terA

records and therefore they were never produced to us so we had

no reason, at the hearing, to think he was.  But, counsel for

and Kreindler & Kreindler presumably could have asked him about

the call if they knew he had been on the call.  And it seems

like a reasonable thing for them to have known.  It was not

something we knew at the time.

THE COURT:  So he had testified earlier without

producing the phone record or he just testified after these

records?

MR. RAPAWY:  He testified at the hearing.  The phone

records that they wanted to put in were not previously produced

to us.  They were his personal phone records so I guess the

position was that they weren't within the firm's possession,

custody, or control.  We objected to the consideration of these

documents that hadn't been previously produced and hadn't been

introduced at the hearing.

THE COURT:  And he only testified once.

MR. RAPAWY:  He testified at the hearing under oath

and in his declaration, of course.

THE COURT:  I know, but you saw the declaration when?

MR. RAPAWY:  I'm sorry.  I may have been unclear, your

Honor.

We got two declarations of Mr. Pounian before the

hearing but not discussing the phone calls, those are the ones

in which he gave the denials.  And then, at the hearing, he was

MC85terA

1    crossed about those declarations.  And then, after the hearing,

2    they wanted to put in another declaration from him that

3    introduced additional information about his participation in

4    that phone call.

5         THE COURT:  And did he proffer what the phone call was

6    about?

7         MR. RAPAWY:  He proffered that the phone call was

8    about the discussion of the e-mail that we had sent the

9    previous day.

10        THE COURT:  And?

11        MR. RAPAWY:  And what they should do about it.

12        THE COURT:  Any more detail than that?  Who said what?

13        MR. RAPAWY:  I don't think the declaration goes into

14   who said what.  I don't have it in front of me.  But, it is

15   cited in Judge Netburn's opinion.

16        MR. SPIRO:  Your Honor, it is tab 11.

17        THE COURT:  Tab 11?

18        MR. SPIRO:  Yes.

19        MR. RAPAWY:  Great.

20        THE COURT:  I'm looking at tab 1, page 17.  Is that

21   the same?

22        MR. RAPAWY:  Oh.  The Pounian declaration that they

23   wanted to put in after the fact is at tab 11 of their binder so

24   that's -- you can look at it and see what it says.

25        THE COURT:  OK.

MC85terA

1          MR. RAPAWY:  He has something about who says -- not

2     about who said what but about general subject matter, in

3     paragraph 4.

4          THE COURT:  OK.

5          MR. RAPAWY:  So, your Honor can look at that and -- I

6     think it's properly --

7          THE COURT:  What I don't understand is which one of

8     these phone calls that he said he was on.

9          MR. RAPAWY:  That he, Mr. Pounian, said he was on?

10         THE COURT:  Yes.

11         MR. RAPAWY:  He said he was on the 9:17 phone call

12    that lasted for 46 minutes so it is the second call that is

13    listed in the table on page 17.

14         THE COURT:  OK.  And which phone call did Mr. Fawcett

15    assert a privilege?

16         MR. RAPAWY:  The privilege was asserted over the

17    10:41 a.m. phone call from Mr. Fawcett to Ms. Crotty so it

18    would not be in Mr. Pounian's affidavit.

19         THE COURT:  Go ahead.

20         MR. RAPAWY:  And then, just briefly, on the other

21    facts supporting the finding of knowledge or tacit approval, I

22    think that Judge Netburn was also entitled to draw some support

23    from her finding that Mr. Kreindler's really quite

24    extraordinary long-running public disparaging of the Court's

25    orders and he gave testimony that that was just criticism and

MC85terA

1    that everybody knew that they sought to comply with the orders

2    but I don't think that's the only evidence that could be drawn

3    from his describing these orders as disgusting gag orders that

4    we all hate.

5            And then, also, there was the 2017 previous violation

6    that involved Mr. Kreindler and Mr. Fawcett working together to

7    disclose confidential information to a reporter from the

8    Politico magazine which I think goes to sort of the method of

9    operations, if you will, and at least would have contributed to

10   the overall feeling that perhaps more questions should have

11   been asked of, frankly, both Mr. Kreindler and Mr. Fawcett when

12   the firm was purportedly trying it figure out what had gone on.

13   And then, further to that point, I think that she also was

14   entitled to rely on what she found was willful blindness on the

15   part of other attorneys because if Mr. Maloney, for example,

16   who knows how to run an investigation and testified that he

17   knows how to run an investigation, didn't run an investigation

18   here, I think it might not be enough on its own but it is a

19   reasonable supporting inference that he didn't want to ask the

20   questions because he was a little bit concerned about what he

21   might find out if he did.

22           Now, to go to the evidence that the investigation

23   was --

24           THE COURT:  Let me back up.  I'm not sure what

25   questions you are referring to.

MC85terA

1          MR. RAPAWY:  So, your Honor talked about the

2     insufficiency of the investigation before and I am going to

3     turn to that next and the point I was trying to make is that if

4     the investigation was insufficient, why was the investigation

5     insufficient?  One possible reason is that the attorneys at the

6     Kreindler firm generally had a fairly good idea of where the

7     leak came from and they did not want to generate proof that

8     would be disadvantageous to their firm.  And that would be

9     another reason to think, as Judge Netburn concluded, that

10    Mr. Fawcett did not act on his own and did not act without

11    Mr. Kreindler's authorization or mere tacit approval because if

12    he had, if he had really acted completely on his own, they had

13    every motive to establish that he was the one who did it and

14    that he acted on his own.

15         THE COURT:  Except I'm not sure I follow -- and I will

16    look closely on that part of her opinion -- but I'm not sure I

17    follow your logic that because Kreindler, you argue that

18    Kreindler had incentive to not do an investigation, that that

19    somehow spills over to Mr. Maloney or anybody else who was

20    involved in this.

21         MR. RAPAWY:  I would say it is one piece of evidence,

22    your Honor, but if you are not persuaded by it there is plenty

23    of other evidence.

24         THE COURT:  I am trying to figure out how powerful

25    that inference is.  You are saying it implies that Mr. Maloney

MC85terA

1    did what?

2              MR. RAPAWY:  That Mr. Maloney did a very superficial

3    investigation.

4              THE COURT:  Why?

5              MR. RAPAWY:  That it is not the investigation he could

6    have done, not because he likes doing superficial

7    investigations but because he was concerned that if he did a

8    thorough investigation, he might find something that would

9    damage Mr. Kreindler.

10             THE COURT:  Is there anything in this record that is

11   consistent with that?

12             MR. RAPAWY:  Only the insufficiency of the

13   investigation, your Honor.  That's what I am arguing from.

14   And, again, if you don't think that's a strong inference there

15   is plenty of other stuff.

16             THE COURT:  Well, as you were discussing earlier, what

17   is your position as to who needs to be culpable?

18             MR. RAPAWY:  So, our position is that there is a

19   sanction against the law firm and the law firm needs to be

20   culpable.  And to be culpable, the law firm, like any entity

21   that isn't a natural person, has to act through its agents.

22             THE COURT:  OK.

23             MR. RAPAWY:  I do think that the Kreindler & Kreindler

24   could be held to have willfully violated the Court's orders

25   based just on what Mr. Fawcett did.  Even if Mr. Kreindler

MC85terA

1    didn't know.  I think we argued to Judge Netburn on that there

2    would be a basis to hold them, just on that basis.

3            THE COURT:  I'm not sure if she did or did not hold

4    them.

5            MR. RAPAWY:  She went further and she found that

6    Mr. Kreindler knew or gave tacit approval.  And so, I think

7    that is an extremely defensible finding, we argued that, too,

8    and I think there is a lot of evidence to support.  But if you

9    are asking who needs to be culpable, what is the legal

10   standard; I think one agent acting willfully at the firm.

11           THE COURT:  Which agent is that other than the

12   evidence you argue that supports that conclusion with regard to

13   Kreindler and with regard to Fawcett?

14           MR. RAPAWY:  It would be Kreindler and Fawcett.  So, I

15   guess my answer to your question is I think she could have done

16   this based on either a finding as to Mr. Fawcett or a finding

17   as to Mr. Kreindler.

18           THE COURT:  Again, let me go back to what we were

19   discussing before that I was discussing with Mr. Spiro.  Are

20   you making that argument in the context of this illegal

21   disclosure or are you making that argument in the context of

22   the investigation?

23           MR. RAPAWY:  I think that she -- that argument when

24   you say that argument, your Honor --

25           THE COURT:  Well, you say that they're culpable, that

MC85terA

1    Kreindler and Fawcett alone can be culpable to hold the firm

2    culpable and I am trying to understand whether you are saying

3    that based on the inference to be drawn about the nature of the

4    investigation or the inference to be drawn about who was

5    involved in the disclosure.

6              MR. RAPAWY:  I see, your Honor.

7              Let me put it this way.  For the disclosure itself,

8    leaving the investigation aside, I think there are findings of

9    culpability and they are supported by the record as to

10    Mr. Fawcett and Mr. Kreindler.  For the investigation and the

11    misstatements that were made to the Court in the course of the

12    investigation -- which I would like to get into a little more

13    detail in a minute -- I think there are findings of culpability

14    as to Mr. Kreindler, Mr. Maloney, Ms. Benett, and Mr. Pounian,

15    because they all put in these declarations and there were

16    things in those declarations that should not have been said to

17    the Court.

18              THE COURT:  OK.

19              MR. RAPAWY:  And I think that with regard to holding

20    the law firm responsible, any of its attorneys who were

21    involved would have been sufficient but, in fact, there is

22    basis to support a finding of culpability as to all of the

23    attorneys who were involved.

24              THE COURT:  Well, before you move on to that there is

25    an issue that I have yet to resolve.  I understand your request

MC85terA

1    with regard to the sanction of attorneys fees against the firm

2    but, technically, with regard to removal from the committee,

3    the firm is not a member of the committee, there are

4    individuals that are members of the committee.  So, this is not

5    about -- I believe my recollection is that there are three or

6    four people who are from the Kreindler firm.  I have reviewed

7    Judge Casey's original order, and you can tell me whether this

8    is still correct, it says the Court designates, in relevant

9    part it says James P. Kreindler, of Kreindler & Kreindler, as

10   co-chair of the Plaintiffs Executive Committee for personal

11   injury and death claims.  It says the Court designates Justin

12   T. Green to the committee.  And it says the Court designates

13   Mark Moller to the committee.  Those are the three lawyers who

14   are members of the committee.  I don't see any designation of

15   the firm itself as a member of the committee.

16            MR. RAPAWY:  I see, your Honor.

17            So, I would say to that certainly your Honor is

18   certainly correct that the order designates individual

19   attorneys.  Many of the duties that the firm performs in this

20   litigation, frequently Mr. Maloney, Ms. Benett, Mr. Pounian

21   signed letters on behalf of Kreindler & Kreindler as a member

22   of the Plaintiffs Executive Committee.  And I believe that

23   there was a request pending at the time that the -- shortly

24   before the hearing to have -- I believe it was Ms. Benett and

25   Mr. Pounian added, formally, to the committee.

MC85terA

1      THE COURT:  Yes.

2      MR. RAPAWY:  Which Judge Netburn denied in her order.

3      THE COURT:  Yes, she denied that.

4      MR. RAPAWY:  But, if you look at the July 27th letter,

5  the letter that is signed to the Court from the Plaintiffs

6  Executive Committees in which they said that their

7  investigation was complete.  That is signed by Mr. Pounian and

8  then Ms. Benett and Mr. Maloney are also on the letter,

9  Mr. Kreindler wasn't, it actually came up at the hearing.

10      THE COURT:  They're technically not members of the

11  committee.

12      MR. RAPAWY:  They're technically not members of the

13  committee but they frequently act on behalf of the committee,

14  and the FBI protective order allows them access to confidential

15  material because they are members or they were members of a

16  firm that was on the executive committee.  So, there is a sense

17  in which, although the individuals obviously hold the seats on

18  the committee, the firm acts as a -- member is the wrong word

19  but the firm, we frequently interact with them in the course of

20  the litigation and they write us e-mails that say this is from

21  the PECs and so on and so forth.  So, your Honor can give that

22  whatever weight you like.

23      The way I read Judge Netburn's order is that based on

24  the conduct of the firm in the investigation, she does not

25  think that the lawyers who were acting for

MC85terA

1   Kreindler & Kreindler in this litigation have demonstrated that
2   anyone from that firm should continue to be on the executive
3   committee.  Now, it is true that there are some individuals who
4   currently hold those seats who are not involved in this
5   particular episode, Mr. Green, for example, and there is no
6   sanction individually as to Mr. Green, certainly, but the -- I
7   don't think that prevents her from finding that as a just order
8   in response to the firm's conduct and the conduct of the
9   attorneys who were authorized to act for the firm in this
10  matter, including Mr. Kreindler personally, that no members of
11  the firm should be on the committee anymore.
12          As your Honor pointed out before, you don't need to
13  sanction anybody to take them off the committee.  In this case
14  the removal from the committee was imposed as a just order of
15  sanction under Rule 37(b)(2)(A).  I would also say at no point
16  did Kreindler & Kreindler suggest, oh well, you should take
17  Mr. Kreindler off the committee but you should leave Mr. Green
18  and others on.  There was never an argument made to Judge
19  Netburn.
20          So, your Honor obviously has a great deal of
21  discretion about what goes on in this litigation but I did want
22  to make that point of about why she did what she did.  the firm
23  presented itself as a firm and the position they took and take
24  before your Honor is that nobody at the firm did anything
25  wrong.

MC85terA

1          So, I would like to go on to the evidentiary basis for

2     finding that the investigation was insufficient and I think

3     your Honor already went over that in some detail in your

4     questioning so I will try not to repeat ground that's already

5     been covered.  I did want to make a few points.  One is that

6     Judge Netburn found that there was not even a direct question

7     as to Mr. Fawcett about whether he was the one who leaked and I

8     think she had a reasonable basis to do that because when he

9     prepared that draft declaration that was shown to you before

10     and then Mr. Pounian and Ms. Benett edited that declaration,

11     they wanted to add language saying that he had told

12     Kreindler & Kreindler that he was not responsible for the leak

13     and he struck that out in redline.  And I think that it is

14     reasonable for Judge Netburn to infer from that contemporaneous

15     documentary evidence -- and it is certainly not clear error --

16     that in fact that's not a question that was ever asked of him.

17     And we have gone, in our briefing, in more detail into sort of

18     the colloquy when he said he was asked in substance but then,

19     when he was asked whether he specifically recalled being asked

20     by Mr. Kreindler, Mr. Pounian, by Ms. Benett, by Mr. Maloney,

21     he answered he did not recall that with regard to each of them.

22          I also want to touch briefly on the question of what

23     could have been found with a more thorough investigation, and

24     your Honor made the point that, of course, one thing that could

25     have been done was get him on the record, make him sign a

MC85terA

1    declaration.  But another thing that could have been done was

2    to search his personal devices and that would have turned up

3    the texts between him and Mr. Isikoff, including -- and I will

4    refer your Honor to our Exhibits 82 and 150 which are in the

5    record, including the text on July 5th in which Isikoff asks

6    Fawcett did Thumairy also invoke the Vienna Convention.  And

7    that text is a pretty good piece of evidence that, by July 5th,

8    Mr. Fawcett and Mr. Isikoff were already discussing the

9    substance of somebody else who invoked the Vienna Convention or

10   on his behalf or -- really Saudi Arabia is the entity that

11   invokes the Vienna Convention, but they're talking about it in

12   shorthand.  The point being, it would have been pretty obvious

13   to ask a follow-up question at that point:  Why are you talking

14   about the contents of the Thumairy deposition with Isikoff?  It

15   is confidential.  And did you send him anything else?  And

16   then, if you look at our Exhibit 150 which is another text

17   message that we got only after the Kreindler firm retained

18   outside counsel, that's the one in which Mr. Fawcett writes to

19   Mr. Isikoff and says there is a witch hunt on for the source of

20   your al Jarrah story.  That may not be a direct quote but he

21   definitely uses the phrase witch hunt.

22          Then, if you see that, do you go and ask, *Why is it*

23   *you are talking to this guy about the investigation and what*

24   *other conversations have you had with him that are relevant?*

25   And even if you thought it was reasonable before seeing those

MC85terA

1   texts to ask him a simple yes or no question, if it was even

2   asked, *Did you do it?* had you done that follow up and looked at

3   personal devices you would have found -- Mr. Maloney would have

4   found and Mr. Hartney would have found, working with him,

5   substantial reason to ask Mr. Fawcett different and more

6   detailed questions that could have uncovered the result.  So, I

7   would contest the idea that there is nothing more they could

8   have done.

9          Now, they point out that other firms, including our

10  own, did not search the personal devices of everybody who could

11  have possibly been involved and that's true.  But, the argument

12  is there was a substantial reason to drill down on

13  Mr. Fawcett's involvement in a way that would have included

14  searches of his personal devices, would have included something

15  closer to formal interview, and would have involved any one of

16  a number of investigative steps that could have revealed this

17  months before it actually came out.

18         I also want to touch on some of the misleading

19  statements that were made to the Court in the context of the

20  investigation and the reporting about the investigation and

21  that would include the statement in the July 27th letter that

22  they already completed their investigation and were confident

23  about the source of the leak even though Mr. Hartney admitted

24  during his testimony he could not have said that with

25  confidence at that time because he hadn't finished running the

MC85terA

1    searches of one particular server, because he hadn't finished

2    running the search that were necessary to see who had even

3    downloaded the transcript.

4            Then, you also have, in Mr. Hartney's later

5    declaration, the one submitted on September 27th in response to

6    the Court's order, the misleading information -- misleading

7    language I should say -- that was included about who had access

8    to the firm, or to the information at the firm, or who was

9    allowed access and they went through a number of series of

10   different ways to phrase it, but --

11           THE COURT:  I'm not sure I understood that argument

12   but I'm not sure that would have made a difference.

13           MR. RAPAWY:  At that point it wouldn't have made a

14   difference as to finding Mr. Fawcett.  At that point it was a

15   question -- I guess I maybe switched topic a little bit and

16   moved to candor with the Court as opposed to what the

17   investigation could have done, if not, to find Mr. Fawcett.

18           I think the point was that Mr. Hartney testified that

19   he had told Ms. Benett this particular language, he didn't

20   think it was truthful, because anybody at the firm could access

21   these documents.  And she said that she drafted the language

22   carefully and it went in, with her carefully drafted language,

23   that the witness who signed it had warned her it wasn't

24   truthful.

25           So, that doesn't go to the investigation but it does

MC85terA

1    go -- the investigation, because by that point they knew it was

2    Fawcett, but it does go to degree of candor to the Court that I

3    think is important for a firm that is going to hold itself out

4    as leading this case on behalf of the 911 families and to then

5    be granted a title by the Court, and at least Mr. Kreindler was

6    granted a title by the Court that gives him the opportunity to

7    hold himself out in that way.

8        Then also in the Hartney declaration you have the

9    other misstatement that there was no evidence of downloading or

10   printing.  And he admitted in his testimony and I refer your

11   Honor to pages 145 and 146 of the transcript, that there would

12   never have been any evidence of downloading and tracking off

13   the system because they didn't have the ability to track that.

14   So, Judge Netburn found that to be misleading as well.

15       Then, in the Fawcett declaration, you have language

16   about how only portions of the transcript was sent when in fact

17   the entire transcript was sent.  And, Mr. Pounian added that

18   language.

19       You have the whole back and forth about the personal

20   motive.  Your Honor can read his draft declaration for yourself

21   but I read it and I don't see anything in there that suggests

22   that he was acting based on a personal motive or personal

23   interest and that language does show up in the final version, I

24   think, after it gets edited by Ms. Benett and Mr. Pounian.  And

25   I think Judge Netburn reasonably took that as a not entirely

MC85terA

1    candid attempt to distance the firm from the actions of this

2    individual and make it appear that he had acted on his own for

3    his own motives unrelated to the firm's strategy.

4            And then there are also additional findings about

5    failure to produce communications attached to the Kreindler

6    declaration and the failure to search for or produce

7    Mr. Fawcett's communications with Isikoff even after it was

8    revealed he was the source of the leak until outside counsel

9    was retained.

10           And then I think Judge Netburn was also entitled, in

11   just viewing this matter as a whole, to look at what she

12   referred to as repeated attempts to use the Court's

13   investigation as a forum for getting derogatory information out

14   about Mr. al Jarrah and about the Kingdom of Saudi Arabia in

15   general, and in that context, in particular, Ms. Benett's

16   testimony which went beyond what was in the declarations, and

17   to the declaration they tried to submit after the fact from

18   Mr. Weidener, which Judge Netburn ordered sealed on her own

19   motion because it contained what she determined would be

20   gratuitous and irrelevant material that was directed at

21   Mr. Jarrah.

22           Those are the points I wanted to hit on the facts,

23   your Honor and if your Honor has further questions about the

24   factual findings I'm happy to address them.

25           THE COURT:  I have some questions with regard to

MC85terA

1  Mr. Kreindler's affidavit and I wasn't -- given the care that

2  was exercised to make sure the language was appropriate in the

3  affidavits, there are certain questions that I don't think were

4  answered in the affidavit and I was trying to figure out

5  whether or not there is any such representation with regard to

6  these issues if I can find my question.  (pause)

7        Well, I can't find what I am looking for but I do

8  have, I believe, the Kreindler declaration.  Oh, no.  Let's

9  see.  I'm looking at Mr. Fawcett's declaration and

10  Mr. Fawcett's declaration says, at paragraph 8, the September

11  30th declaration, it says:  After I sent Isikoff the Jarrah

12  transcript, I believe I had a second phone call with him about

13  the timing of his article discussing Jarrah.  I was worried

14  that if he published an article around the same time as he

15  aired the podcast with Jim Kreindler, people would assume that

16  Jim Kreindler had given Isikoff the information about Jarrah --

17  and this is the relevant portion -- even though I knew that Jim

18  hadn't done so, didn't know I had done it, and hadn't

19  encouraged me to do it or suggested that I do it.

20        What I don't see in either one, and maybe it is in the

21  testimony, but what I don't see in either Mr. Fawcett's

22  declaration or Mr. Kreindler's declaration is an answer or an

23  affirmative statement about the following question:  Neither

24  affidavit answers the question, and maybe this is simply in the

25  drafting or maybe it's not something that can affirmatively be

MC85terA

1    stated, but nothing I saw answered this question:  Did

2    Mr. Kreindler know that Fawcett intended to tell Isikoff what

3    was in the deposition?  I don't see an answer to that question.

4    I don't see a representation about that.

5              Two.  Did Mr. Kreindler know that Mr. Fawcett had

6    discussed the content of the deposition with Mr. Isikoff?

7              Three.  Did Mr. Kreindler know that Mr. Fawcett

8    intended to give a copy of the deposition transcript to

9    Mr. Isikoff and did Isikoff request a copy of the deposition

10   transcript from Mr. Kreindler or Mr. Fawcett?

11             And did -- I guess two other questions.  Did

12   Mr. Kreindler ever discuss with Mr. Isikoff where Mr. Isikoff

13   got the transcript?

14             And, finally, did Mr. Isikoff tell Mr. Kreindler that

15   he was aware of the contents of the deposition or that he had

16   had a copy of the transcript after he received it, or after he

17   was given the information?  Because it appears to me, given the

18   sequence of communication, that -- and I am only inferring this

19   from the testimony -- that Mr. Fawcett first told Mr. Isikoff

20   what was in the transcript and then, at some subsequent date or

21   time, gave him a copy of that transcript.

22             So, I don't see anywhere that those questions that I

23   just posed were answered in anyone's declaration, either

24   Mr. Fawcett or Mr. Kreindler, or anyone else in the

25   declaration.

MC85terA

1          Is there an answer to any of those questions in these

2    declarations or in the testimony?

3          MR. RAPAWY:  So, in the declarations, your Honor,

4    that's a long list of questions, your Honor, and I will do my

5    best.

6          in the declarations I think you are correct that they

7    are somewhat vague about exactly when -- Mr. Kreindler's

8    declaration contains a statement that:  For the first time

9    today he learned the information set forth in the declaration

10   of John Fawcett.

11         THE COURT:  Right.

12         MR. RAPAWY:  But that's kind of general and it doesn't

13   tell you --

14         THE COURT:  The declaration of John Fawcett does not

15   answer these questions, as I saw it.

16         MR. RAPAWY:  Yes.  So, to the extent there is a denial

17   of prior knowledge, I think that's the closest he gets to it,

18   but --

19         THE COURT:  Well, prior knowledge of what?

20         MR. RAPAWY:  That was my point, your Honor.  It is a

21   denial of prior knowledge of the information in the September

22   27th declaration of John Fawcett.

23         THE COURT:  John Fawcett does not say that he didn't

24   discuss with Mr. Kreindler that he intended to give the

25   transcript.  It says he didn't direct him, it says he didn't --

MC85terA

now, both sides addressed this in their answers to these

questions, that I don't -- and I think I did have one more

question, I don't see anywhere where it says -- and this is a

little unrelated, but I can't find who told Isikoff and, when

that happened, who told Isikoff he couldn't have the

transcript.

MR. RAPAWY:  I don't think we have any evidence in the

record that Isikoff was ever told he couldn't have the

transcript.

THE COURT:  Well, Isikoff had asked -- was asking

Mr. Kreindler whether Mr. Kreindler could get the transcript or

the deposition outside of the protective order.  The evidence

that had been given is that Mr. Kreindler asked Mr. Fawcett

whether or not this could be given to Mr. Isikoff and then

there is some communication and I don't know, I forget whether

it is written or otherwise, there is some communication that

says that it was -- they were unsuccessful in getting it

outside of the protective order and that they determined that

he couldn't have it but I don't have anything, communicating

that to me.

MR. RAPAWY:  Right.

So, you have Mr. Kreindler's testimony that he asked

Mr. Fawcett about the declaration.  I don't think you have

it -- but the transcript will say -- but I don't think that you

have evidence that that was communicated back to Mr. Fawcett as

MC85terA

1    a refusal.

2          Now, there was the podcast discussion and there is a

3    great deal of discussion of the protective order in the podcast

4    discussion, and Mr. Kreindler did say in the podcast discussion

5    that there was a lot of important evidence that he couldn't

6    share with Mr. Isikoff and the sort of general statement of

7    that.  But, in terms of a specific request of the Jarrah

8    transcript -- Mr. Spiro will correct me if this is in the

9    record, I'm sure -- but I don't think there was evidence that

10   he was told that.

11         MR. SPIRO:  Your Honor, if you look at Exhibit 5, I

12   think that may shed some light.

13         THE COURT:  Exhibit 5?

14         MR. SPIRO:  Tab 5.

15         THE COURT:  Of what?

16         MR. SPIRO:  Of the thin binder.  It is an e-mail

17   exchange between Mr. Isikoff and Mr. Kreindler where

18   Mr. Isikoff asks Mr. Kreindler:  Where do you stand on your

19   request to DOJ to lift the state secret privilege and gag

20   order?

21         THE COURT:  OK.  And his response is?

22         MR. SPIRO:  And this is on July 13th:  Still working

23   on motion, too many chefs.

24         THE COURT:  Right.  So there is no definitive response

25   to whether or not he has got an answer yet.

MC85terA

1          MR. SPIRO:  Right.

2          THE COURT:  Is there any record indicating that there

3    was a response by Mr. Kreindler to Mr. Isikoff?

4          MR. SPIRO:  The next thing we have, your Honor, is

5    just Mr. Isikoff responding:  OK.  Aiming to write something

6    for Thursday or Friday, so if any update by then let me know.

7    And Mr. Kreindler writes:  Will do.

8          Obviously our view is that this reflects that

9    Mr. Kreindler was completely unaware that by this point, which

10   was July 13, Mr. Isikoff already had the Jarrah transcript.

11         THE COURT:  Well, I'm not sure that I can reach that

12   conclusion.  It tells me that at that point Mr. Isikoff doesn't

13   have the -- if he uses this information he will be using it in

14   violation of the protective order.  It doesn't tell me whether

15   or not he did or didn't, or when he did or didn't.  It just

16   tells me that, look, he would prefer to have it not covered by

17   the protective order when he issues it.  He obviously already

18   has it and he is trying to see whether or not when he issues it

19   it is still going to be under the protective order that people

20   can complain about.  I'm not sure that tells me one way or the

21   other who was involved and who is not involved.

22         I don't have complete conversations and followups with

23   regards to these questions, and for Mr. Fawcett to submit an

24   affidavit saying that Mr. Kreindler didn't give him, give

25   Isikoff the information about Jarrah and that he didn't know

MC85terA

1    that Fawcett had in fact done so and he hadn't encouraged him

2    to do it or suggested that he do it, doesn't tell me anything

3    about his knowledge at the time or the discussions they had

4    which would have been about whether or not -- which would have

5    led Mr. Kreindler to know that, without saying so, that the

6    next step was going to be that Fawcett was going to give this

7    transcript to him.  He doesn't deny that he knew that Fawcett

8    intended to do that.

9           MR. RAPAWY:  I do think, your Honor, that there is --

10   that that and some of the other statements in the Fawcett

11   declaration can be read as hedging a little bit on the sort of

12   tacit approval question.  Well, you know, Mr. Kreindler doesn't

13   know that I sent it because I never told him those words but

14   that's not inconsistent with a discussion at some point in the

15   June 28th to July 3rd period where they're having the calls

16   right before the leak happens in which Mr. Kreindler indicates

17   to Mr. Fawcett that it certainly would be a great thing if

18   Mr. Isikoff could somehow get this transcript without ever

19   saying the words "go ahead and break the Court's order."

20          But, you know, and that I think is the type of

21   communication that Judge Netburn was envisioning when she made

22   her finding of knowledge or at least tacit approval.

23          So, I would like to take a minute or two to talk about

24   the legal issue and the Rule 37 issue.  There is basically two

25   points I would like to make here.  The first is the question of

MC85terA

1    whether this was properly preserved.  And you have heard that

2    they claim that Mr. Spiro claimed they did not have proper

3    notice, that this was going to be invoked again, that this

4    particular rule was going to be invoked against them.  But our

5    July 27th letter motion specifically asked the Court to invoke

6    Rule 37(b), that's ECF no. 6981 at pages 3 to 4.  And then, on

7    August 12th -- and this was before Mr. Spiro got involved --

8    Judge Netburn issued an order and she granted our order for

9    investigation.  That's ECF no. 7011 at page 3.

10           So, I think that at that point they had fair notice

11   that one of the things that might possibly happen to them was a

12   Rule 37 sanction.  It wasn't the only thing that might possibly

13   happen to them but that would be one thing that the person who

14   was ultimately found or entity was ultimately found responsible

15   for this leak might have to face, it would be Rule 37

16   sanctions.  And then, of course, the specific possibility that

17   the Court might invoke its authority to possibly remove

18   attorneys from the PECs was given on August 4th.

19           So, if you read those together, they had a pretty good

20   sense that if they wanted to make the argument, *actually, you*

21   *can't do anything to us at all under 37(b)(2)(A)*, they should

22   do that in their post-hearing submissions.

23           And it said in the reply, I believe, that our letter

24   doesn't constitute notice under the Second Circuit precedent

25   but I would refer the Court to page 35 of Judge Netburn's

MC85terA

opinion and to the two Second Circuit cases that are cited on

that page, *Margo v. Weiss* and the *International Ore Case*.

Those cases, they happen to involve Rule 11 sanctions but they,

I believe, stand fairly for the proposition that if there is a

motion for sanctions, you are on notice that sanctions might be

imposed, can be given by the motion, and your opportunity to be

heard is in your response to that motion.  They had many

opportunities to respond to our letter and say, Rule 37?  What

are you talking about?  Rule 37 doesn't even apply to us.  But

they never did that until after there was a rule.

THE COURT:  So, what do you say was the appropriate

standard of proof and what standard of proof did Magistrate

Judge Netburn say she knew?

MR. RAPAWY:  Our position is Rule 37(b)(2)(A) is

appropriate, that the just orders provision of that is broad

enough to encompass a sanction against the law firm that the

Court finds to be just, including the sanction of removing all

of its attorneys from the Plaintiffs Executive Committees in

this case.  And our position is that that finding need only be

made by a preponderance of the evidence and that clear and

convincing evidence is not required.

Now, we did argue with Judge Netburn in the

alternative, that she should use her inherent powers and/or she

should certify the facts to you for a finding of contempt.  And

she declined to do those things because she found that Rule 37

MC85terA

1    sanctions were enough and that she didn't need to go further.

2    So, I think it would have been an extremely relevant thing for

3    Kreindler & Kreindler to say, actually, we are going to contest

4    whether Rule 37 sanctions are available because had they said

5    that to Judge Netburn, she likely would have gone into a

6    considerably more detailed analysis in her opinion on whether

7    the record would support an imposition of, or finding of bad

8    faith by clear and convincing evidence.

9            I think there is lots of stuff about this

10   investigation, even leaving aside the disclosure, lots of stuff

11   about the investigation that is to be recapped that could

12   support a finding of bad faith if the Court were inclined to

13   make one.  I think that the question, they claim that we

14   haven't said that clear and convincing evidence supports the

15   findings, well, our position is preponderance of the evidence

16   is enough.  We certainly said to her in our findings of fact

17   and conclusions of law that there is also enough for a clear

18   and convincing evidence finding if the Court were to apply that

19   standard.  We absolutely made that argument to the judge.  But,

20   in defending her ruling, I think she had authority under

21   37(b)(2)(A) and I think she had every right to make her

22   findings by a preponderance of the evidence.

23           So, I would defend the order upon the grounds on which

24   it was given without, even for a moment, suggesting that there

25   wouldn't have been authority to issue sanctions on other

MC85terA

1    grounds and even under a more rigorous evidentiary standard.

2              I guess in saying -- the other thing I wanted to

3    address very briefly, your Honor, because I know we have been

4    here for a while was the *Apex Oil* case.  If you look at

5    pages -- so *Apex Oil*, as your Honor observed earlier, was

6    interpreting former Rule 37(c) and that rule has language

7    stating that "if a party fails to admit" in response to an RFA,

8    then the requesting partly can "apply to the Court for an order

9    requiring the other party to pay monetary sanctions."  And that

10   second piece of language, the order requiring the other party

11   to pay language, is what the Second Circuit relied on in *Apex*

12   *Oil*.  It says, well, you can require the party to pay.  It

13   doesn't say that you can require the attorney to pay.  That's

14   different from saying that if a party violates a protective

15   order -- and these protective orders are certainly binding on

16   the parties, the plaintiffs, the Kingdom, everybody else -- if

17   a party, it was determined, violates that order and the Court

18   then, under Rule 37(b)(2)(A), can issue further just orders,

19   that those further just orders can't include a sanction on the

20   law firm through which the parties -- here the Ashton

21   plaintiffs -- violate the order.

22             Then, turning very briefly to the sort of

23   discretionary exercise of the sanctions, I think that if your

24   Honor finds that either the violation itself or the

25   investigation that factual findings are supported on either of

MC85terA

1    those issues and certainly on both, then the conclusion that

2    representations from Kreindler & Kreindler on behalf of all

3    plaintiffs in this litigation should no longer be made because

4    the attorney should not be serving on the Plaintiffs Executive

5    Committee is extremely reasonable and sensible and, frankly,

6    restrained compared to some of the things that can happen to

7    firms whose employees and attorneys make misleading and false

8    statements to the Courts.

9            With that, I would urge your Honor to overrule the

10   objections in their entirety and uphold Judge Netburn's careful

11   and well-considered order.

12           THE COURT:  Thank you.

13           Did you want to have any further argument, Mr. Spiro?

14           MR. SPIRO:  Can I have five minutes, your Honor?  Just

15   to consult with my client.

16           THE COURT:  Sure.  I want to see if we can wind up for

17   lunch.

18           (Recess)

19           THE COURT:  Yes, Mr. Spiro.

20           MR. SPIRO:  Thank you, your Honor.

21           Your Honor asked a series of questions concerning what

22   communications occurred between Mr. Kreindler and Mr. Fawcett

23   or between Mr. Kreindler and Mr. Isikoff, and I would just like

24   to direct your attention to some questions and answers of

25   Mr. Kreindler at 129 of the hearing transcript:

MC85terA

"Q  Did you order or direct Mr. Fawcett to send the copy of the
Jarrah transcript to Mr. Isikoff?

"A  No.

"Q  Did you know that Mr. Fawcett was going to send the Jarrah
transcript to Mr. Isikoff?

"A  No.

"Q  Did you know at any time prior to September 27 that
Mr. Fawcett had sent the transcript to Mr. Isikoff?

"A  No.  I had no idea at all until I heard that afternoon.

"Q  Did you ever have any reason to suspect that Mr. Fawcett
would send the Jarrah transcript to Mr. Isikoff?

"A  None whatsoever."

          Your Honor, Mr. Kreindler is here in court.  If you
have any further questions he is available to testify --

          THE COURT:  No, that's helpful.  I didn't find that
and that's buried in the transcript so those are the answers to
most of my questions.  I appreciate it.

          MR. SPIRO:  And, your Honor, I would just add that
during the time period in the beginning of July when
Mr. Isikoff was interested in writing a story, there were
discussions between Mr. Fawcett and Mr. Kreindler about, well,
what can we share with Mr. Isikoff?  And the decision was,
well, we can send him a privilege log from the FBI which has
been publicly filed.

          THE COURT:  Right.

MC85terA

1          MR. SPIRO:  And that's what Mr. Kreindler authorized

2     Mr. Fawcett to do and Mr. Fawcett, in fact, sent the privilege

3     log to Mr. Isikoff.  Again, that reflects an entirely innocent

4     state of mind on the part of Mr. Kreindler.

5          So, we don't believe that there is evidence -- any

6     evidence -- reflecting that Mr. Kreindler knew what Mr. Fawcett

7     was up to with Mr. Isikoff and I would ask your Honor to make

8     sure that when the Court considers the evidence, that it

9     consider it from the framework and the lens that it's not the

10    Kreindler's firm's burden to prove its innocence, although I

11    think it was innocent in this situation.  It was Saudi Arabia's

12    burden to show evidence rising to the level of bad faith by

13    each attorney.  The *Walters* case, which I mentioned earlier,

14    clearly reflects that you cannot impute bad faith but, instead,

15    the Court needs to make an attorney-by-attorney determination

16    with regard to whether or not there is evidence of bad faith by

17    clear and convincing evidence.

18          The contemporaneous documents, your Honor, show that

19    the investigation was conducted in good faith.  The

20    investigation was begun even before being directed by the Court

21    to do so.  Mr. Fawcett was asked directly about that and he

22    lied.  I know there is some testimony that's been referenced

23    about whether Mr. Fawcett was asked directly, but when you look

24    at the overall testimony, I think Mr. Fawcett was very clear

25    that he prevaricated, he dissembled, he misled, and we know

MC85terA

1    from Mr. Pounian and from Mr. Maloney that he was asked

2    directly whether he had leaked the transcript and he lied about

3    it.

4            All of the employee and lawyer e-mails were searched

5    and to the extent that there could be a review of people who

6    looked at the transcript, that was done.

7            So, critical to this is that we not allow the

8    information we have now to color our determination as to

9    whether or not the law firm proceeded in good faith.  We

10   submit, your Honor, that this is a classic case where hindsight

11   tells us much more than in the fog that was the period of July

12   15, 16 and forward of 2021 that the firm faced and Mr. Maloney

13   did the best he could under very, very difficult circumstances.

14           THE COURT:  I have one further question.

15           MR. SPIRO:  Please.

16           THE COURT:  Is there some reason that there is no

17   evidence in this case of any communication between

18   Mr. Kreindler and Mr. Isikoff after Mr. Kreindler realized that

19   Isikoff, his close friend, received and utilized a copy of the

20   document under the protective order?

21           MR. SPIRO:  I'm not sure I would characterize

22   Mr. Isikoff as a close friend of Mr. Kreindler.

23           THE COURT:  I take that back.

24           MR. SPIRO:  But I think the answer is --

25           THE COURT:  Would he have been upset about that?

MC85terA

```
1            MR. SPIRO:  I think he understood that to ask the
2       reporter for a source of information is not going to result in
3       getting that information.  Obviously --
4            THE COURT:  He didn't express any outrage about being
5       able to utilize this information, the very information that he
6       told him that he couldn't provide to him and he is now under a
7       cloud of suspicion as to whether or not he was responsible for
8       it?
9            MR. SPIRO:  He clearly expressed that unhappiness and
10      annoyance and anger over the circumstance but --
11           THE COURT:  Is that in the record somewhere?
12           MR. SPIRO:  It is not in the record, your Honor, but
13      it is certainly something that would have been a natural
14      reaction for Mr. Kreindler to have.
15           Bear with me one second?
16           THE COURT:  Yes.
17           (Pause)
18           MR. SPIRO:  Yes.  So this is Mr. Kreindler's testimony
19      on page 130, line 18:
20      "Q  Did anyone on the PEC side ask you, given your relationship
21      with Mr. Isikoff, to reach out to him to find out how he got
22      the transcript?
23      "A  No.  That never came up.  And we all expect that if he was
24      ever asked, I'm not going to reveal my sources."
25           Your Honor, with regard to the issue of personal
```

MC85terA

1    devices, which I know counsel for Saudi Arabia raised, the fact

2    is that no firm asked for people to turn in the personal

3    devices, the Kellogg Hansen firm did not ask their folks to

4    turn in their personal devices, nor did the other members of

5    the PEC.  So, to impose that on the Kreindler firm was not a

6    reasonable ask.  It would have been, I think, a significant

7    invasion of privacy for the Kreindler firm to turn to its

8    lawyers and consultants and say you need to turn over your

9    phones.  In any event, what would that have disclosed?

10            So, there were two signal messages that counsel for

11   Saudi Arabia referenced to.  Neither of them suggested that the

12   deposition transcript -- the Jarrah transcript -- had been

13   disclosed.  At most, one was a text about whether a particular

14   witness had also cited the Vienna Convention but that only

15   would say that it would be like someone saying, Did the person

16   assert the attorney-client privilege?  It was not the kind of

17   thing that necessarily suggests that the reporter had learned

18   that information from reading the transcript.  And, in any

19   event, this line of investigation assumes that John Fawcett

20   would have turned around and just turned over the phone, turned

21   over the signal messages without deleting them and we all

22   understand now, given his use of an automatic e-mail deleting

23   program, that that's not what his modus operandi was.  He would

24   have, frankly, in our view, hidden those signal messages as he

25   had hidden the e-mail that he used to send the Jarrah

MC85terA

1    transcript to Mr. Isikoff in the first place.  So, we think

2    that argument is a bit of a red herring that was being

3    presented.

4            There were many other points made by Saudi Arabia's

5    counsel.  In the interest of time I will not go point by point.

6    We do have responses to each, I think they are in our papers

7    already.

8            I just want to come back to Rule 37 because

9    Rule 37(c), which *Apex Oil* dealt with, has the same language

10   with regard to party as is found in 37(b).  So, while 37(b)

11   deals with disobedience of Court orders and 37(c) deals with

12   request to admit, the fact of the matter is they both focus on

13   party conduct and there is no reasonable basis to conclude that

14   the word "party" in Rule 37(b) has a different meaning than in

15   37(c).  And, we have not found any cases in this circuit where

16   37(b) has been used as a basis for sanctioning a law firm.

17   But, beyond that, in this case, 37(b), there is no party

18   involvement here whatsoever.  The cases that the magistrate

19   judge relied on were all cases where there was some party

20   involvement here, there was zero involvement, it was the

21   conduct of a consultant for a law firm that was at issue, not

22   any individual -- not a client or even any individual lawyers

23   so 37(b) just doesn't apply.

24           With regard to the issue of waiver, why wasn't the

25   argument raised?  I just would point to -- the July 27, 2021

MC85terA

1    letter motion that counsel alluded to was a request for

2    discovery, it was not part of the sanctions hearing, it was not

3    part of what Judge Netburn termed a contempt hearing.  This was

4    in July and it really just was the initial request by Saudi

5    Arabia for discovery.  So, the fact that they cited Rule 37 as

6    support for discovery has nothing at all to do whether Rule 37

7    ultimately was the appropriate rule to use or to be relied on

8    with regard to any lawyer sanctions.

9          So, again, there is nothing in a Court order issued by

10   Judge Netburn to suggest she was relying on Rule 37.  In fact,

11   the opposite, all the indications were that she was relying on

12   the Court's contempt power on 636 of the Federal Magistrate's

13   Act, Section 636 as the basis for proceeding forward, that she

14   intended to make recommendations to your Honor as to the

15   appropriate sanction, but for whatever reason she shifted here

16   and applied Rule 37 using a preponderance of the evidence

17   standard rather than the clear and convincing evidence

18   standard.

19          So, your Honor, the *Schoenberg* case in the Second

20   Circuit which we cite in our papers, I think, is an indication

21   that the sort of notice here was clearly inadequate, but

22   particularly to the extent that it's being used by Saudi Arabia

23   as a basis that there was a waiver of our Rule 37 argument,

24   that simply does not work.

25          We have addressed in the motion for a stay why the

MC85terA

1  status quo ought to be preserved.  We respectfully ask that

2  your Honor Rule at the earliest possible time with regard to

3  whether the Kreindler firm can continue on the PEC.  There is

4  much significance going on in the litigation we go through in

5  some level of detail in our reply submissions in support of our

6  motion for stay, what's involved, and to take the Kreindler

7  firm off the PEC at this point is going to negatively affect

8  the prosecution in the case.  It simply is not the same for the

9  Kreindler firm to be another law firm in the case, it needs to

10  be part of the leadership team so that our client and the

11  firm's clients can be effectively represented, that this case

12  against Saudi Arabia can be prosecuted, and the case can move

13  forward in an efficient and effective way.

14          THE COURT:  Well, part of the problem that I am

15  struggling with on that issue is that none of the other lawyers

16  from the other law firms are supporting you on that point.  No

17  one else thinks that you are so critical that they can't move

18  on and move past this and effectively represent the plaintiffs

19  in this case.  So -- and it is difficult for me, at this

20  point -- I am looking more carefully at the papers, to

21  articulate what you say the prejudice is to you or your clients

22  because the other lawyers are taking, at this point in the

23  interim, a leadership role and feel that they are totally

24  capable of effectively doing that.

25          MR. SPIRO:  Respectfully, with regard to the other

MC85terA

1    members of the PEC, they have not been the people who have

2    interviewed the witnesses, reviewed the documents, taken the

3    critical depositions of the Saudi Arabia witnesses.  We have

4    been responsible for six of the seven expert reports.  I mean,

5    this is a case that the Kreindler firm has put together and

6    they worked with other members of the PEC, occasionally there

7    have been disagreements, but the point is that those

8    disagreements get sorted out and the Court gets presented with

9    arguments that advance the best interests of the families whose

10   interests, I think, all the lawyers are seeking to protect

11   here.

12          So, your Honor, we understand that each firm has their

13   distinctive perspective but none of the firms that have come in

14   and said, *Well, we're OK with the PEC as formulated,* have

15   challenged in any kind of detail the factual averments that we

16   have made which support the Kreindler firm continuing on on the

17   PEC and which reflect the significant contributions and

18   significant work that the Kreindler firm has done in putting

19   together the case against Saudi Arabia.

20          THE COURT:  Thank you.

21          MR. SPIRO:  Thank you, your Honor.

22          THE COURT:  Thank you, ladies and gentlemen.  I will

23   get back to you very quickly.

24                              o0o

25