N4JQwtcC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   IN RE:  TERRORIST ATTACKS ON
     SEPTEMBER 11, 2001
 4
                                        03 MDL 01570 (GBD)
 5                                          Oral Argument

 6   ------------------------------x
                                        New York, N.Y.
 7                                       April 19, 2023
                                        10:15 a.m.
 8   Before:
                         HON. GEORGE B. DANIELS
 9                                          District Judge

10                             APPEARANCES

11   ANDERSON KILL PC
          Attorneys for Plaintiff Consolidated Amended Complaint
12   BRUCE STRONG
     JERRY S. GOLDMAN
13   ALEXANDER GREENE

14   MOTLEY RICE LLC
          Attorneys for Plaintiff Consolidated Amended Complaint
15   ROBERT T. HAEFELE
     DONALD A. MIGLIORI
16
     COZEN O'CONNOR
17        Attorney for Plaintiff Consolidated Amended Complaint
     SEAN P. CARTER
18
     KREINDLER & KREINDLER
19        Attorneys for Ashton Plaintiffs
     JAMES P. KREINDLER
20   STEVEN R. POUNIAN
     MEGAN WOLFE BENETT
21   J. GAVIN SIMPSON

22   WHITE & CASE LLP
          Attorneys for Defendant Republic of Sudan
23   CHRISTOPHER M. CURRAN
     NICOLE ERB
24   CELIA ANNE McLAUGHLIN
     CLAIRE A. DeLELLE
25
```

N4JQwtcC

```
 1              (In open court; case called)
 2          LAW CLERK:  Will the parties please rise and make
 3   their appearances, beginning with the plaintiffs.
 4          MR. CARTER:  Good morning, your Honor.
 5          Sean Carter on behalf of the Plaintiffs Executive
 6   Committees.
 7          THE COURT:  Good morning, sir.
 8          MR. HAEFELE:  Good morning, your Honor.
 9          Robert Haefele from Motley Rice here for Plaintiffs
10   Executive Committees.
11          THE COURT:  Good morning.
12          MR. MIGLIORI:  Good morning, your Honor.
13          Donald Migliori for Plaintiffs Executive Committees.
14          MR. GOLDMAN:  Good morning.
15          Jerry Goldman, Anderson Kill for Plaintiffs Executive
16   Committees.  With me are Bruce Strong and Alexander Greene.
17          THE COURT:  Good morning.
18          MS. BENETT:  Good morning, your Honor.
19          Megan Benett on behalf of the Ashton Plaintiffs from
20   Kreindler & Kreindler.
21          MR. CURRAN:  Good morning, Judge Daniels.
22          Christopher Curran of White & Case on behalf of Sudan.
23   I'm joined by my law firm colleagues Ms. Erb, Ms. DeLelle and
24   Ms. McLaughlin.
25          We are also joined by two client representatives from
```

N4JQwtcC

1    the Embassy of Sudan to the United States, including Ambassador

2    Mohamed Abdalla Idris, who presented his credentials to

3    President Biden in the Fall as part of an exchange of

4    ambassadorships between the two countries.

5            THE COURT:  Good morning.  Welcome.

6            Given the nature of the objections, why don't we start

7    with the defense, and then we'll hear from the plaintiffs.

8            MR. CURRAN:  Very good, your Honor.

9            Christopher Curran again.  Does your Honor have a

10   preference as to whether I speak from here or the podium?

11           THE COURT:  Probably easier for the court reporter if

12   you speak from the podium.

13           MR. CURRAN:  Very good, your Honor.

14           Judge Daniels, first of all, thank you for granting us

15   oral argument.  We appreciate that.  And we intend to use the

16   opportunity to address causation, and specifically

17   jurisdictional causation.

18           And to be even more specific, as our objections and

19   the other briefing indicates, the main thrust of our causation

20   argument is that your Honor's decision in 2018 in what we call

21   the Ashton decision provides the analytical basis for the

22   dismissal of the complaint against Sudan.  And, in particular,

23   your Honor's treatment of the allegations against the Saudi

24   High Commission we think provided analysis and a law of the

25   case basis for a dismissal of all the claims against Sudan.

N4JQwtcC

1          So while I know you wrote that decision, and I won't

2     belabor it, but I would like to point out what I think are the

3     salient points in that decision because we see significant

4     parallels between the allegations against the Saudi High

5     Commission and the allegations that we're dealing with here

6     against Sudan.

7          Your Honor may remember -- and what I'm going to

8     summarize is from pages 646 and 647, for the most part, of your

9     2018 decision.  Your Honor may recall that the allegations

10    against the Saudi High Commission, which, of course, is an arm,

11    an agency or instrumentality, of the Saudi government.  So,

12    therefore, we're talking about the Foreign Sovereign Immunity

13    Act, the claims there.  The allegations were that the Saudi

14    High Commission provided al Qaeda with significant financial

15    and logistical support in the 1990s that enabled al Qaeda to

16    transform itself into a terrorist force capable of horrific

17    actions like the 9/11 attack.  Again, very similar to the type

18    of allegations we're dealing with here.

19          In particular, as your Honor recounts in the opinion,

20    the allegations were that in the mid-1990s, roughly from '92 to

21    '96, talking about kind of the same timeframe as we're talking

22    about with Sudan, that the Saudi High Commission provides arms

23    and significant sums of money to al Qaeda in support of

24    al Qaeda's overall development and to support al Qaeda's

25    activities in Europe and Africa, in Bosnia, elsewhere in the

N4JQwtcC

1    Balkans, and in Somalia, among other places.

2              On top of that, as your Honor acknowledged, there were

3    specific allegations against the Saudi High Commission that

4    also dealt with support of al Qaeda's actions against the West

5    and the United States in particular.  And as your Honor

6    recounted, there were allegations that the Saudi High

7    Commission had al Qaeda operatives embedded in the Saudi High

8    Commission's employment, and that those embedded employees

9    helped al Qaeda carry out a portfolio of plots against the

10   West, including targeting of the U.S. Homeland.

11             There were allegations relating to not only the World

12   Trade Center, but also the USS Cole, the African embassies that

13   were bombed in 1998, and there were also allegations that could

14   be characterized as a landmark plot targeting buildings and

15   other locations in Washington D.C., there were some horrible

16   allegations about documentation relating to cropdusters and

17   chemical weapons and other alleged plans that the Saudi High

18   Commission was alleged to be supporting al Qaeda in developing.

19             Notwithstanding that type of allegation, the type of

20   allegations about generalized support and allegations about

21   targeting of the West, including the U.S. Homeland, your Honor

22   found that those allegations were insufficient to show

23   jurisdictional causation as to 9/11.  We believe that that

24   analysis was sound and should be applied here as well.

25             Your Honor is familiar with the allegations against

N4JQwtcC

1    Sudan.  Largely, they're focused on the 1990s and the period of

2    time up until May of 1996, when Osama bin Laden resided in

3    Sudan, and there are allegations about generalized support for

4    bin Laden and for al Qaeda during that period.  Those

5    allegations we think are comparable in their nature, and in

6    fact in some respects the wording of the allegations against

7    Sudan bears significant resemblance to the allegations against

8    the Saudi High Commission, the same type of language about

9    support that enabled al Qaeda to develop itself and to

10    transform itself into a serious force.  Those allegations Sudan

11    faces here as well.

12            Now, with respect to Sudan, there is even less of a

13    basis for such allegations to support causation, and that's

14    because, as the 9/11 Commission report details, Sudan

15    indisputably expelled bin Laden from Sudan in May of 1996.  And

16    as described in the 9/11 report, which is, of course,

17    incorporated by reference in the complaints at issue here, bin

18    Laden left Sudan destitute, without a base, in a worse position

19    than he had been before he arrived in Sudan.  He was incapable,

20    according to the 9/11 Commission report, of carrying out any

21    terrorist activity with al Qaeda for years afterwards until

22    1998, the embassy bombings being more than two years after bin

23    Laden left Sudan.

24            So we have not only insufficient allegations about

25    support during the 1990s, but we have this causal break as

N4JQwtcC

1    documented and corroborated by the 9/11 Commission report such

2    that it's hard to imagine that any of the alleged support Sudan

3    provided to bin Laden and al Qaeda in the Nineties could

4    support any notion of jurisdictional causation here.

5         Now, the complaints here do allege that there was

6    continuing support by Sudan for bin Laden and al Qaeda after

7    the expulsion of bin Laden in May of 1996, but we submit to

8    your Honor that those allegations, like the allegations against

9    the Saudi High Commission, are largely conclusory and certainly

10   insufficient in lacking a causal link with 9/11.

11        I was in the courtroom when your Honor heard argument

12   from the Saudi High Commission in the Kingdom back in January

13   of 2018, two months before your 2018 decision, and I know from

14   that oral argument and your exchange and colloquies with the

15   various counsel, you were very focused on what the allegations

16   in the complaints had to do with 9/11; how did that specific

17   allegation of support relate to and have some direct connection

18   with 9/11.  And as to the Saudi High Commission, of course, you

19   concluded that there was insufficient allegations of that kind

20   of linkage.  We suggest and submit that the same problem exists

21   here with respect to the allegations against Sudan.

22        Now, as your Honor's 2018 decision reflects, there are

23   some additional allegations against the Saudi High Commission

24   and other charities that your Honor deals with in pages 658 and

25   659 of your decision.  There, there were allegations that the

N4JQwtcC

Saudi High Commission and the other charities at issue provided

material support, not only generalized, but also to the 9/11

hijackers to go to Afghanistan for training.  And there were

allegations relating to passports and other visa support for

training camps in Afghanistan.  There still your Honor found

lacking a sufficient causal nexus between the allegations and

the carrying out of the 9/11 plot.

Now, your 2018 decision had that analysis and that

outcome that I described with Saudi High Commission, at the

same time, your Honor dealt with other -- with the Kingdom as a

defendant somewhat differently.  And with respect to Messrs.

Thumairy and Bayoumi, you concluded that there were sufficient

allegations at least to warrant jurisdictional discovery.  And

to me it's interesting to compare or to juxtapose the lacking

allegations against the Saudi High Commission and those that

your Honor found sufficient, at least for purposes of

jurisdictional discovery, against Thumairy and Bayoumi, because

it's kind of like night and day between generalized notions of

support in the 1990s in Europe and Africa, and whereas, as to

the two individuals who were alleged to be agents or employees

of the kingdom, the allegations related to activities very

close in time and place to the 9/11 attacks, specifically

support in San Diego and Los Angeles for two of the hijackers

who carried out the 9/11 plot, helping acclimate them into the

United States, supporting them in settling in the United

N4JQwtcC

1    States, paying rent, according to the allegations, lining up

2    flight training, and other activities of support, other alleged

3    activities of support, that are close in time and proximity and

4    geographic proximity to 9/11.

5        So it seems to me that there was a principle analysis

6    that played out in your 2018 decision as to allegations that

7    were insufficient and allegations that were sufficient.  And

8    here Sudan is comfortably -- the allegations against Sudan are

9    comfortably on the side of insufficient, and I would submit

10    that the allegations against Sudan are more insufficient than

11    the allegations against the Saudi High Commission because of

12    the causal break that I described when bin Laden was expelled,

13    such that he left Sudan weaker than when he got there, and in

14    those circumstances, I don't know how the alleged support for

15    bin Laden and al Qaeda during the Nineties can be considered a

16    cause of 9/11 if he left weaker than he got there.

17        THE COURT:  So what is the fault you find in

18    Magistrate Judge Netburn's analysis that she describes she

19    thought were significant?

20        MR. CURRAN:  She did not sufficiently credit your

21    Honor's analysis in the 2018 decision.  In fact, even though

22    your Honor's 2018 decision was the focal point of our briefing,

23    the recommendation and report that the magistrate judge has

24    provided to your Honor gives short shrift to that decision.

25        In fact, I think it's no exaggeration to say it's only

N4JQwtcC

1    about a sentence or two devoted to that decision.  And, in

2    fact, the report and recommendation is similar to the

3    plaintiffs' briefs as to the Saudi High Commission and the

4    allegations that your Honor rejected as insufficient because we

5    see Magistrate Judge Netburn's report and recommendation

6    relying on the same type of allegations and the same

7    characterizations that were found insufficient by your Honor in

8    your 2018 decision.

9         THE COURT:  Well, she has a five-page section entitled

10   The Deaths and Injuries Caused by the September 11 Attacks Were

11   Reasonably Foreseeable Outcome of this Support.  It's more than

12   just a paragraph.  And she analyzes the facts that she says

13   compels those conclusions.

14        MR. CURRAN:  I agree that she addresses the

15   allegations, and that she does her own analysis as to their

16   sufficiency, but what she doesn't do is grapple with the

17   analysis of your Honor's 2018 decision.  And when I say that

18   she gave short shrift, I'm not talking about her treatment of

19   the allegations, I'm talking about her treatment of your

20   Honor's opinion and her failure to apply that law of the case

21   to the Sudan allegations.

22        THE COURT:  Well, I'm not quite sure how you say she

23   should have articulated that.

24        MR. CURRAN:  I think she should have said, "Yes, I see

25   concerning allegations about Sudan.  Yes, I'm concerned that

N4JQwtcC

1    they gave support to al Qaeda and bin Laden in the 1990s.  That

2    was reprehensible conduct.  But as the 2018 decision in *Ashton*

3    shows, such allegations, no matter how much we want to condemn

4    them, if true, those allegations are insufficient to show

5    causation of 9/11."  And she didn't do that.

6          Instead, Magistrate Judge Netburn accepted the

7    allegations as sufficiently damning that Sudan should be

8    required to continue in the suit, notwithstanding the more

9    careful, meticulous analysis in your Honor's decision.

10          She also didn't credit the 9/11 Commission report and

11    the causal break that I've described.  She was somewhat

12    dismissive of that even though we provided standard case law

13    showing that specific allegations in a complaint or

14    incorporated in a complaint by reference trump generalized

15    conclusory allegations.

16          THE COURT:  Well, she does have an analysis of the

17    2018 decision regarding Saudi Arabia.  There is a part of her

18    opinion that does analyze that and applies what she says are

19    those principles.

20          MR. CURRAN:  But I believe -- I think I'm right about

21    this, but as to pages 464 and -- as to pages 646 and 647, where

22    the Saudi High Commission allegations are described, I believe

23    there's one sentence and one cite to that passage in Magistrate

24    Judge Netburn's report and recommendation, notwithstanding that

25    that analysis was the centerpiece of our motion to dismiss and

N4JQwtcC

1   our reply brief in support of our motion to dismiss.

2          THE COURT:  Well, I'm looking back at page -- I guess

3   page 19 of her opinion, the last full paragraph starts out, I

4   won't read it all, but it starts out with:  "These allegations

5   make Sudan different in kind from the charities and

6   non-government groups that have found to be causally

7   unconnected to the September 11 attacks."

8          And the next paragraph begins, "The differences are

9   stark."

10          MR. CURRAN:  Right.

11          THE COURT:  You don't see a stark difference?

12          MR. CURRAN:  I certainly do not see a stark

13   difference.  The paragraph you're referring to on page 19, your

14   Honor, is exactly what I'm talking about.  I submit to your

15   Honor that this paragraph gives short shift to your Honor's

16   analysis in 2018.  That's the problem with this report.

17          And, yes, she does assert that there are stark

18   differences, but that's conclusory.  That does not carry

19   through the analysis of the close parallels.  I mean, almost

20   word for word as to the same alleged activities that the Saudi

21   High Commission was alleged to be involved in, everything from

22   Bosnia to Somalia, to the embassy bombings and the USS Cole.

23   And maybe it makes sense to add another word about those,

24   right?  So there are court decisions concluding that Sudan was

25   responsible for the USS Cole and the embassy bombings.  Those

N4JQwtcC

 1   decisions, regrettably, were situations where Sudan did not

 2   appear to defend itself, but those cases had allegations quite

 3   in contrast to what we have here.  Those had allegations that

 4   Sudan not only gave generalized support to al Qaeda and bin

 5   Laden, but helped deliver weaponry out of its borders to

 6   neighboring countries for the commission of the attacks.

 7        So as to the embassy bombings, right, Sudan at the

 8   time shared a border with Kenya, and Tanzania indirectly, and

 9   the allegations as to the embassy bombing cases were that Sudan

10   allowed weaponry and bombs to be transported out of its country

11   to those neighboring countries for the commission of those

12   attacks.  We dispute those allegations, but Sudan didn't appear

13   to dispute them, and, therefore, those allegations were

14   accepted.

15        As to USS Cole, same thing, the allegations there in

16   front of Judge Doumar in Norfolk, Virginia were that Sudan

17   shipped weapons by diplomatic pouch across the Red Sea from

18   Sudan -- Sudan borders the Red Sea -- to Yemen, right across on

19   the Arabian Peninsula, and that assisted the carrying out of

20   the USS Cole bombing.

21        So in those situations, the allegations that were

22   accepted as true and supported liability have no parallel with

23   9/11.  There's no allegation that Sudan did anything to support

24   the carrying out of 9/11.  There's no allegation connecting

25   Sudan to the hijackers, any of them.  There's no allegations

1    connecting Sudan to the plots in the two years leading up to

2    9/11.  Nothing.

3         THE COURT:  Well, why isn't it a reasonable conclusion

4    that the material support being provided by the Sudan arguably

5    they should have reasonably anticipated that that support was

6    in furtherance of continuing plots to do damage to U.S.

7    property and to kill U.S. citizens?  You talk about the Cole

8    and the African Embassy bombings, but there was also a World

9    Trade Center bombing in '93.  And as early as '93 it was not

10   beyond the realm of possibility or anticipation that al Qaeda

11   might attempt to literally destroy the World Trade Center.

12        MR. CURRAN:  I understand that point.  Now, the 9/11

13   Commission concluded that al Qaeda was not behind the 1993

14   bombing, right?  So any linkage to support for al Qaeda in the

15   Nineties is disconnected from that.

16        As to just general principles of foreseeability,

17   maybe.  Maybe, if you're alleged to be supporting terrorists,

18   maybe you should envision they could strike anywhere, but

19   that's not enough.

20        THE COURT:  I think it's more specific than that.  It

21   wasn't envisioned that they could strike anywhere.  It was

22   envisioned that they intended to strike against U.S. citizens

23   and U.S. centers.

24        MR. CURRAN:  As your Honor knows, the test for

25   jurisdictional causation also requires as one of its elements

1   being a substantial factor in the commission of the attack.  So

2   notwithstanding principles of foreseeability, there still has

3   to be material support that substantially contributes to the

4   carrying out of the attack.

5          THE COURT:  And you don't think that Magistrate Judge

6   Netburn's analysis about the significance and importance of the

7   type of support that was being provided is an appropriate

8   analysis with regard to the significance of that support?

9          MR. CURRAN:  I agree with what you've just said.  Yes,

10  I do have that criticism of Magistrate Judge Netburn's report

11  and recommendation.  I don't think it does the same type of

12  meticulous consideration that your 2018 decision did where you

13  looked at the specific allegations and you asked in each case:

14  What does that have to do with 9/11?  What does that have to do

15  with 9/11?

16         And, as I said, we're not looking for a Good

17  Housekeeping seal of approval as to all of Sudan's conduct over

18  time.  We're here with respect to one specific case and one

19  specific terrorist attack, and the allegations against Sudan

20  fall way short of connecting Sudan to 9/11 in the same way

21  that, for example, the allegations against Bayoumi and Thumairy

22  do.

23         So, your Honor, the plaintiffs have repeatedly said

24  they respectfully disagree with your Honor's 2018 decision, and

25  I think that's an understandable position for the plaintiffs to

N4JQwtcC

1    be taking because, frankly, I think that reflects a recognition

2    that the analysis that your Honor carried out in 2018 would

3    require the dismissal of the complaint against Sudan.

4            So maybe with that, I'll sit and save some time to

5    respond to the plaintiffs.

6            THE COURT:  Thank you.

7            MR. CURRAN:  Thank you.

8            THE COURT:  Who wanted to be heard?  Yes, sir.

9            MR. CARTER:  Thank you, your Honor.  I'd like to join

10   Mr. Curran in thanking the Court for the opportunity to address

11   these issues today.

12           In a word, your Honor, each of the arguments that

13   Mr. Curran just surveyed for this Court are identical to

14   arguments Sudan has repeatedly unsuccessfully raised in front

15   of other federal courts in an effort to avoid accountability

16   for its decade-long campaign of state support for al Quada,

17   which commenced with the invitation of bin Laden to come to

18   Sudan to build a jihad organization to attack the United

19   States, an invitation that was extended by Sudan's most senior

20   leadership and that remained in place through September 11,

21   2001 according to a series of authoritative government reports

22   cited in the complaints and acknowledged by Judge Netburn in

23   her thorough report analyzing the jurisdictional question.

24           As I understood it listening to Mr. Curran, he has

25   effectively suggested a number of limitations as a matter of

jurisdictional causation.  He has suggested that there should

be a bright line temporal and geographic requirement for

establishing jurisdictional causation.  He has suggested that

there is a requirement that the support provided by the state

defendant have been deployed specifically for the attack in

question.  He has suggested that general support for a

terrorist organization no matter how expansive and no matter

how important to the terrorist organizations acquisition of its

global strike capabilities is irrelevant, and he has argued

that the departure of Osama bin Laden in 1996 from Sudan under

international pressure cuts the chain of causation despite the

fact that al Qaeda retained a presence in Sudan long after.

        All of those arguments, your Honor, have been raised

in front of other federal courts in relation to the embassy and

Cole bombing cases, and those federal courts have

systematically rejected each and every one of them.

        Now Mr. Curran focus significantly on your Honor's

2018 decision and alleges that Judge Netburn failed to

faithfully apply the jurisdictional causation test your Honor

articulated in that decision.  But, in fact, your Honor

acknowledged and found the jurisdictional causation test that

applies here is a matter of proximate cause requiring a

reasonable connection between the defendant's activities in

support of the organization and the resulting harm.  And that

involves a two-step analysis:  A substantial factor analysis;

1    that is, whether or not the support is a substantial factor in

2    the sequence of events giving rise to the injuries.  And,

3    second, whether or not the injuries are reasonably foreseeable.

4           Your Honor cited the decisions in *Kilburn* and *Owens*

5    and *Rux* in adopting that standard.  Those are the exact

6    decisions in which the courts rejected Sudan's plea for a

7    temporal and geographic limitation for a requirement of direct

8    support, and where it argued that the departure of

9    Osama bin Laden should break the chain of causation for

10   subsequent attacks.  And the courts in those cases rejected all

11   of those points.

12          Now, Mr. Curran attempts to analogize the claims,

13   allegations, and theories of jurisdiction against Sudan to

14   those that were presented as to the Saudi High Commission, and

15   in doing so, your Honor, he both greatly exaggerates the

16   allegations against the Saudi High Commission and severely

17   minimizes the nature of the allegations against Sudan.  He

18   talks about the Saudi High Commission having provided general

19   support, alleging that it helped to transform al Qaeda,

20   et cetera, et cetera.

21          I think we understand your Honor's decision to have

22   appreciated the allegations against Saudi High Commission or to

23   have concluded that the allegations against the Saudi High

24   Commission involve some funding, evidence suggesting that there

25   were al Qaeda members and sympathizers within the organization

N4JQwtcC

```
1   who celebrated the events of 9/11 and other attacks against the
2   United States.  There is nothing in those allegations that
3   remotely compares to the sustained campaign of state support
4   that the complaints describe with regard to Sudan and that
5   Judge Netburn carefully analyzed in reaching her conclusion
6   that Sudan support was both a substantial factor and
7   foreseeable.
8           Your Honor noted that the report includes a five-page
9   discussion of foreseeability.  The full discussion of the legal
10  standard with regard to jurisdictional causation, the
11  substantial factor and the foreseeability components actually
12  spans a much greater length of the report.  So it was a huge
13  component of Judge Netburn's thorough analysis.  And the simple
14  fact is, your Honor, that she got it right.
15          Again, with regard to Sudan's plea for some
16  requirement of temporal proximity, the Court in Owens said,
17  "Imprecision as to the temporal proximity of Sudan's actions to
18  and their causal connection with the terrorist attack is not
19  fatal for purposes of jurisdictional causation.  If facts
20  demonstrate a reasonable connection or proximate cause,
21  temporal remoteness between Sudan's material support and the
22  embassy bombings was irrelevant."
23          "Further," the court in Owens said, "we do not believe
24  Sudan broke the chain of proximate causation by disassociating
25  itself with al Qaeda in or after 1996," and there the Court
```

1    cited government reports and expert testimony that the

2    relationship endured.

3            Further, the court found that even if Sudan were

4    correct as a factual matter, severing ties with al Qaeda would

5    not preclude a finding that its material support remained a

6    substantial factor in the embassy bombings.

7            The *Owens* court also considered and rejected Sudan's

8    selective quotation of the 9/11 Commission statement that he

9    left Sudan weakened.  And on that point Mr. Curran suggested

10   that he left weakened than he had ever been.  That is not what

11   the 9/11 Commission found.  The 9/11 Commission recognized that

12   the period in which al Qaeda resided in Sudan from 1991 to 1996

13   transformed the organization and set it on a path to be able to

14   function as a sophisticated international terrorist

15   organization on its own.

16           It may have been weaker the day he left than it was

17   the day before, but as numerous courts have recognized, he

18   retained all of the capabilities that Sudan had delivered to

19   al Qaeda in the ensuing years, along with the resources that

20   Sudan continued to provide to the organization, which included

21   safe haven logistics and other forms of support.

22           *Rux* as well, your Honor, makes clear that there is no

23   need to chart a direct and unbroken factual line.  What

24   matters, as the report found, is whether the support

25   substantially contributed to the organization's operating

1    capacity as terrorist capabilities.  And that appears on the

2    report at page 9, your Honor, and cites *Owens*, *Kilburn* and

3    *Force v. Iran*.

4            THE COURT:  I'm not sure over what period of time and

5    whether or not how expansive your argument is that any previous

6    support to al Qaeda makes Sudan responsible for any future

7    terrorist acts of the Sudan -- I mean, of al Qaeda.  Or where

8    do you say that either the time period or the foreseeability of

9    a particular incident, what role that should play in the

10   analysis.

11           MR. CARTER:  Your Honor, I think the context matters,

12   the nature of the support matters, and in certain cases, sure,

13   the amount of time could matter.

14           Here, Mr. Curran acknowledged the courts have received

15   evidence and concluded, for example, that Sudan was responsible

16   for the Cole bombings in October of 2000.  Your Honor, the 9/11

17   plot was ongoing and active in October of 2000.  Several of the

18   hijackers were here already.  It was in motion at the very same

19   time the Court properly held that Sudan was responsible for the

20   Cole bombing.

21           And in terms of the origins of this, your Honor, and

22   the complaints include particular allegations to this effect,

23   Khalid Sheikh Mohammed came to Sudan in late 1995 or so and met

24   with al Qaeda's military chief, Mohammed Atef, in the safe

25   haven in Sudan for purposes of having an initial meeting about

1    partnering with al Qaeda on a series of sophisticated plots he

2    had been developing.

3            The reason Khalid Sheikh Mohammed went to al Qaeda per

4    the 9/11 Commission is because he recognized so-called Planes

5    Operation, which became 9/11, couldn't be carried out without

6    the resources of a sophisticated terrorist organization, and

7    bin Laden and al Qaeda had exactly what he needed.  They had it

8    when he met with bin Laden in 1996 to present the Planes

9    Operation in the first instance precisely because Sudan had

10   delivered those capabilities to al Qaeda.  And, your Honor,

11   just to perhaps focus on some particulars, Judge Netburn

12   correctly and in keeping with findings of CIA assessments,

13   concluded that the very existence of al Qaeda as an

14   organization was the result of Sudan's intervention and

15   assistance at a critical moment when the al Qaeda members had

16   nowhere to go following the conclusion of the Afghan jihad.

17   Sudan then deployed its state resources over the course of many

18   years at every level to deliver to al Qaeda the precise

19   capabilities it needed to be able to attack the West for that

20   specific purpose.  These included counterintelligence training

21   that was delivered through Sudan's intelligence services,

22   assistance with the conduct of terrorist attacks, brokering

23   relationships between al Qaeda and other more sophisticated

24   terrorist organizations like Hezbollah, brokering a

25   relationship between and among Sudan, al Qaeda and Iran,

N4JQwtcC

1  through which Iran delivered its capabilities and knowledge to

2  al Qaeda for purposes of carrying out attacks of the West.  It

3  provided the resources necessary to build al Qaeda's membership

4  from a handful of members to thousands in a number of years

5  which the 9/11 Commission acknowledged was essential to being

6  able to carry out a sophisticated attack.  During the period in

7  Sudan, al Qaeda began evaluating vulnerabilities of the civil

8  aviation system for attacks, which is knowledge that it used

9  for purposes of 9/11, and it provided safe harbor for the first

10  meeting with al Qaeda.

11          In addition, your Honor, the report found, the CIA

12  found the complaints include factual allegations that Sudan

13  brokered this critical tripartite agreement among Sudan, Iran

14  and al Qaeda.  It was pursuant to that very agreement put in

15  place by Sudan that Iran was delivering assistance to al Qaeda

16  on 9/11, including the very assistance your Honor recognized

17  resulting in position of liability for 9/11 on Iran.  That is

18  part and parcel of Sudan's assistance.  It is part and parcel

19  of the specific conspiracy entered into by entering into an

20  agreement with al Qaeda and Iran to carry out those activities.

21  Your Honor, all of those support the Court's -- Judge Netburn's

22  finding that the assistance provided by Sudan was a substantial

23  factor in the attacks.

24          It also is satisfied by virtue of the allegations and

25  factual allegations that Judge Netburn also found sufficient

N4JQwtcC

1    indicating that Sudan entered into an agreement with al Qaeda

2    for purposes of pursuing a conspiracy to wage attacks against

3    the United States in particular.  That conspiracy remained

4    ongoing on 9/11.  There is no dispute that the September 11

5    attacks were the cause of plaintiffs injuries, and as a

6    co-conspirator, those attacks are attributable to Sudan as

7    well.  So there are multiple grounds for concluding here that

8    Sudan's activities satisfy any causation test that could

9    possibly be applied.

10            If your Honor has any additional questions, I'm happy

11    to answer them.

12            THE COURT:  No.  Thank you.

13            MR. CARTER:  Thank you, your Honor.

14            MR. CURRAN:  Your Honor, in no particular order, I

15    have a number of points in response.

16            First as to Iran, I have recently read your Honor's

17    decision in the *Havlish* case.  I believe there your Honor found

18    that Iran provided material support close in time with

19    foreknowledge of the 9/11 attack.  So any attempt to draw a

20    parallel of allegations against Iran and your Honor's findings

21    there in the default setting and the allegations against Sudan

22    here are baseless.

23            As to Mr. Carter's charge that I mischaracterized the

24    allegations against the Saudi High Commission, I didn't attempt

25    to characterize those allegations at all.  I was just trying to

N4JQwtcC

1    recite what your Honor recited in the 2018 decision.  And there

2    again, I just refer the Court to pages 646 and 647 and pages

3    658 and 659.  I don't think any embellishment is necessary to

4    make clear the parallels between the allegations against the

5    Saudi High Commission and those against Sudan.

6            In fact, I would submit that Mr. Carter was trying to

7    minimize the allegations against the Saudi High Commission,

8    ignoring allegations such as -- and I'm quoting from your

9    opinion -- "SHC and similar organizations allegedly provided

10   funding and other forms of material support to al Qaeda during

11   the 1990s that enabled it to acquire the global strike

12   capabilities employed with devastating effect on September 11,

13   2001."

14           So, again, that could be -- that's basically a

15   paraphrase of the allegations against Sudan, and your Honor

16   found those allegations to be insufficient.

17           The reality is Mr. Carter spent a lot of time talking

18   about other cases and other matters, but I was -- I was

19   listening to see if he was going to identify any allegations in

20   the complaints at issue against Sudan that showed a reasonable

21   connection between Sudan and 9/11.  I heard nothing on that.

22           As to the embassy bombings and the Cole, I did touch

23   upon this in my opening comments, but what's interesting is the

24   complaints here actually acknowledge the differences there.  In

25   fact, it's the complaint submitted by Kreindler & Kreindler

N4JQwtcC

1   that has at paragraphs 88 through 96, allegations showing that

2   in the case of the embassy bombings there's a quote from the

3   *Owens* case that the allegation there were that Sudan allowed

4   al Qaeda operatives to travel over the Sudan-Kenya border

5   without restriction and permitted the passage of weapons and

6   money to supply al Qaeda's cell in Kenya.

7           As I said in my opening comments, the factual

8   allegations are very different.  There, the factual allegations

9   are that Sudan did something concrete that supported the

10  incident that they were being held responsible for.  The same

11  with USS Cole.  This is also recounted in the plaintiff's own

12  complaint that there the Court was dealing with allegations

13  that four crates of weapons and explosives on a farm in Sudan

14  owned by bin Laden were sent from Port Sudan to Yemen where the

15  Cole was bombed.

16          We've got no parallel allegations like that here.  So

17  while Mr. Carter I guess likes to rely on the embassy bombings

18  and the Cole as instances to show how bad Sudan is.  In

19  reality, any sort of proper analysis shows that those are

20  completely different circumstances with different factual

21  allegations.

22          Mr. Carter also said that the 9/11 Commission report

23  talked about plotting for 9/11 in Sudan.  No.  No.  No.  No.

24  No.  The 9/11 Commission report says at pages 148 and 149 that

25  "Khalid Sheikh Mohammed approached bin Laden with the idea for

N4JQwtcC

9/11 after bin Laden left Sudan in 1996," and that bin Laden
did not give the green light for the 9/11 operation until
sometime in late 1998 or 1999.  So I don't know how Mr. Carter
could say that about the 9/11 report.

By the way, that 9/11 report, Mr. Carter also said
that I mischaracterized that.  Here I'm going to quote very
carefully.  And this quote appears on page 8 of our objections
to your Honor.  The 9/11 report said that bin Laden "Was in his
weakest -- when he was expelled from Sudan in May of 1996, "Was
in his weakest position since his early days in the war against
the Soviet union" and "the government of Sudan seized
everything bin Laden had possessed there."

It also said that when bin Laden left, he was
"significantly weakened" and "with practically nothing" because
"the Sudanese government expropriated all of his assets."

It goes on to say that bin Laden after the expulsion
"relied on the Taliban until he was able to reinvigorate his
fundraising efforts by drawing on ties to wealthy Saudi
officials that he had established during the Afghan War in the
1988s."

So thanks for belaboring me or indulging me, as maybe
I belabored that, your Honor, but the allegations here against
Sudan are simply lacking in any sort of concrete connection
linking Sudan to 9/11.  It's true that Mr. Carter and his
colleagues, I guess, are making maybe an effective guilt by

N4JQwtcC

1    association or guilt by other bad acts allegations.  But that's

2    not sufficient.  That's not sufficient for statutes that

3    require caused by.  And your Honor acknowledged that in the

4    2018 decision.  That this is not a character assessment.  This

5    is a lawsuit based on a specific attack and the question is,

6    are the factual allegations in the complaints sufficient to

7    show causation?  Did Sudan cause 9/11?  On the allegations

8    here, no way.

9              Thank you, your Honor.

10             THE COURT:  Thank you very much.

11             MR. CARTER:  Your Honor, may I briefly?

12             THE COURT:  Yes.

13             MR. CARTER:  Your Honor, we were quoting other cases

14    because those other cases received evidence, heard the same

15    arguments from Sudan, and declined to credit them for very good

16    reasons.

17             And just to offer one example, your Honor, the

18    decision in *Owens* at 864 F.3d 751 considered specifically this

19    issue of the alleged break in the causal chain as a result of

20    bin Laden leaving in 1996, as I said.  First the court found,

21    "We do not believe Sudan broke the chain of proximate causation

22    by completely disassociating itself from al Qaeda in or after

23    1996."  And the Court goes on to cite the classified CIA

24    President's daily brief indicating that al Qaeda retained a

25    presence and support from Sudan after that point, as well as

N4JQwtcC

1    testimony from experts who appeared before the Court and

2    offered expert testimony on the point.

3            The Court further found that Sudan counters by

4    selectively quoting the 9/11 Commission report stating

5    "bin Laden left Sudan significantly weakened.  Perhaps so if

6    viewed in isolation.  But bin Laden's expulsion did not undo

7    the support Sudan provided in the previous years."  And it goes

8    on to explain all of the various ways in which Sudan deployed

9    the resources of a state actor, uniquely available to a state

10   actor to provide al Qaeda with the very capabilities it needed

11   to carry out 9/11.

12           With regard to the 9/11 Commission, I was referring to

13   an initial meeting between Khalid Sheikh Mohammed and Mohammed

14   Atef, as I said, which occurred in the 1995 period of time.  I

15   don't disagree that Khalid Sheikh Mohammed presented the Planes

16   Operation to bin Laden in 1996 right after he left Sudan and

17   precisely because Khalid Sheikh Mohammed assessed that the

18   bin Laden's organization had the resources needed to carry out

19   that plot.

20           Again, Mr. Curran suggests that the support provided

21   by Iran is just wholly irrelevant here.  It existed

22   specifically because it was part of the support that Sudan put

23   in place for al Qaeda.  Sudan overcame the traditional barriers

24   between cooperation of a Sunni terrorist organization and a

25   Shiite theocratic state to put in place a program of support by

N4JQwtcC

1    Iran that remained ongoing in the immediate lead-up to 9/11 and

2    was specifically used.

3         Now we've discussed at some length, and the report

4    discusses at some length, all of the capabilities that al Qaeda

5    required for 9/11 that existed precisely because they were

6    delivered by Sudan.  That's what Judge Netburn found, that the

7    capabilities existed because of Sudan, and they were deployed

8    for 9/11.  That is a very direct relationship between what

9    Sudan did and the ability of bin Laden's organization to carry

10   out the attacks.

11        Thank you, your Honor.

12        THE COURT:  Thank you.

13        Did anyone else want to be heard?

14        All right.  Well, I need to -- obviously, I've read a

15   lot of papers, but I need to delve more deeply into the

16   complaint and some of the previous cases cited.  So I have been

17   spending a great deal of time on 9/11 over the last six months

18   or so, and I will continue to do so, and I will get back to you

19   on this as quickly as I can.  Thank you all very much.

20        (Adjourned)

21

22

23

24

25