```
1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  IN RE:  TERRORIST ATTACKS ON
   SEPTEMBER 11, 2001,
4

5
                                    03 MD 1570 (GBD)
6

7                                   Conference
   ------------------------------x
8                                   New York, N.Y.
                                    July 17, 2024
9                                   2:05 p.m.

10  Before:

11                 HON. GEORGE B. DANIELS,

12                                    District Judge

13                      APPEARANCES

14  COZEN O'CONNOR
         Attorneys for Plaintiffs' Executive Committee
15       and Federal Insurance
    BY:  SEAN P. CARTER
16
    MOTLEY RICE
17       Attorneys for Plaintiffs' Executive Committee for
         Personal Injury and Death Claims
18       and the Burnett Plaintiffs
    BY:  ROBERT T. HAEFELE
19
    KREINDLER & KREINDLER LLP
20       Attorneys for the Ashton Plaintiffs
    BY:  GAVIN SIMPSON
21       STEVEN R. POUNIAN
         MEGAN WOLFE BENETT
22
    ANDERSON KILL
23       Attorneys for Plaintiffs' Executive Committee
         and the O'Neill Plaintiffs
24  BY:  JERRY S. GOLDMAN

25
```

1                              APPEARANCES (cont'd)

2     KELLOGG HANSEN TODD FIGEL & FREDERICK, P.L.L.C.
           Attorneys for Defendant Kingdom of Saudi Arabia
3     BY:  GREGORY G. RAPAWY
           ANDREW C. SHEN
4          MATTHEW M. DUFFY
           MICHAEL K. KELLOGG
5
      MOLO LAMKEN LLP
6          Attorneys for Defendant Dallah Avco
      BY:  ROBERT K. KRY
7          ERIC R. NITZ

8     DAMIAN WILLIAMS
           United States Attorney for the
9          Southern District of New York
      SARAH S. NORMAND
10    JENNIFER JUDE
           Assistant United States Attorneys
11
      LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
12         Attorneys for Defendants Muslim World League and
           International Islamic Relief Organization
13    BY:  AISHA E. R. BEMBRY

14

15

16    Also Present:  Mustapha Ndanusa

17

18

19

20

21

22

23

24

25

1                    (Case called)

2                    THE COURT:  I have everyone's appearance here, so we

3     don't have to go through that.

4                    I wanted to personally address with the parties and

5     related interested parties the issue of sealing and/or

6     redactions and/or unsealing.

7                    There are several applications that have been made.  I

8     have reviewed those myself personally.  And I'd like to, in

9     anticipation of what we have as scheduled, oral argument in two

10    weeks, I'd like to try to at least give you some guidance and

11    get some guidance from you with regard to how we are going to

12    proceed with regard to these matters and how these issues shall

13    affect the consideration of the motions.

14                   I guess I'd like to first start out indicating where I

15    think things -- what issues I think important for me to address

16    and where I think things are.

17                   I have broken it down this way, and I'd like to

18    discuss it in pretty much this order.  There are FBI redactions

19    and further redactions, I believe, or submissions that are

20    supposed to come from the FBI, and most of their redactions are

21    based on privacy concerns.  My understanding is that, from the

22    parties, I don't believe that the FBI redactions, particularly

23    so far, the nature of the redactions and the redactions on the

24    briefs, I don't believe that the parties have stated a

25    particular objection to those.  I'll hear it if there are.

1          Let me just first say that today I'm proceeding on the

2    assumption that the documents at issue are presumptively

3    judicial documents that are with the presumption of public

4    access to the documents, unless there are countervailing

5    factors, based on specific findings, demonstrating that closure

6    is essential to preserve higher values is narrowly tailored to

7    serve that interest.

8          I believe that most of the FBI redactions have to do

9    with personal information with regard to witnesses, the type of

10   information being identifying information of name, address,

11   passport numbers, Social Security numbers that might divulge

12   information about contact information and identification of

13   witnesses who gave statements to the FBI.

14         I believe that the nature of what I have seen

15   reflects, in me, a conclusion that those are addressed to the

16   concerns -- safety concerns and/or concerns regarding

17   harassment of witnesses or potential witnesses or danger, even

18   physical danger, to possible people who have been interviewed

19   by the FBI, and that information is not yet public.  It seems

20   on the surface that those concerns and the limited nature of

21   those redactions -- let me just back up.

22         My understanding is, it is not the position of the FBI

23   that those records of the FBI be under seal, continue to be

24   under seal.  the position of the FBI is that certain redactions

25   of that type of information should occur, and I think that,

1    obviously, redactions is a more narrowly tailored response and

2    would be a full sealing of those documents.

3        Let me first ask, who is representing the FBI?  At

4    this point let me just ask where you are.  I know you're still

5    in the process of reviewing the averments and the other

6    underlying facts to make some submission by the 31st.  Have I

7    missed something or mischaracterized what the FBI's position is

8    with regard to sealing, redactions or disclosures of FBI

9    interviews?

10       MS. NORMAND:  In general, I think you've accurately

11   stated our position, your Honor.  The FBI doesn't take a

12   position ultimately on the unsealing of the vast majority of

13   the redactions that the Court has apparently looked at in the

14   in camera set.  We have identified those as materials that are

15   currently subject to the Privacy Act and the FBI protective

16   order for the Court to consider as whether they should be

17   unsealed.

18       There is one category of information not only in the

19   briefs and averment, but that also run throughout the exhibits

20   which are quite voluminous, as your Honor knows, and that is

21   phone numbers, complete phone numbers, and street addresses and

22   other types of PII that would be identifying and also

23   potentially invite unwarranted contacts by members of the

24   public or the press and potentially could rise to the level of

25   harassment, given the issues in the case and the nature of the

1    case.

2           As to those, the FBI does believe, for the reasons

3    stated in our letter, that there are not only very, very

4    significant privacy interests, but also a substantial law

5    enforcement interest in avoiding wholesale public disclosure of

6    that kind of PII.  We are willing to unredact and lift

7    redactions, particularly when it comes to briefs and averments

8    and phone charts and the like, the last four digits, so that

9    the parties can make their argument in a public way about

10   connectivity between individuals and the like, but, generally

11   speaking, we believe that kind of personal PII type information

12   should remain redacted throughout.

13          Your Honor did make a point of noting the limited

14   nature of the FBI's redactions.  If I could, we have printed

15   out the in-camera set, and it basically is two of these binders

16   of four or so inches of material.  And throughout that

17   material -- these are the averments that have not yet been

18   filed on the public record but which the FBI has reviewed, and

19   my understanding is, the Kingdom of Saudi Arabia has also added

20   its proposed redactions.

21          From the FBI's perspective, these documents could be

22   filed on the public record today or within the next few days

23   with some additional third-party information redacted as a

24   result of some of the applications from third parties that have

25   been received in the last week.

1              There is an enormous amount of material that the FBI

2    has completed review of that could be filed in very short order

3    with the limited redactions that your Honor has noted across

4    the averments.  That would provide the press and the public

5    with a substantial amount of information that's currently under

6    seal while the various reviews have been pending that I think

7    would illuminate the public record quite substantially.

8              THE COURT:  As of today I was given an indication that

9    you were still engaged in that review.  Do you still anticipate

10   further submission by the 31st?  And what type of review and

11   submission are you anticipating?

12             MS. NORMAND:  Thank you, your Honor.  The FBI is

13   currently engaged in reviewing the remaining exhibits.  With

14   the exception of certain exhibits for which the FBI have

15   requested additional information from the plaintiff, from the

16   plaintiffs, the FBI, I think, was on track to complete its

17   review of the exhibits by roughly July 26, which is the Friday

18   before the argument.

19             I will say that last night we received from the PEC

20   counsel additional exhibits that number over 1300 pages that

21   need to be reviewed.  These include Exhibit 700, which I

22   understand to be a reply averment of sorts.  That material does

23   raise very difficult redaction review questions for a few

24   reasons.

25             The plaintiffs have or the PEC counsel, rather, have

1    identified in one of those documents, which is about 1300

2    pages, FBI Bates numbers that are -- that appear in the

3    document.  However, they haven't identified the corresponding

4    information from those FBI documents that is in the averment,

5    and, therefore, the FBI is going to have to go through quite a

6    painstaking review to not just look at the FBI pages that are

7    cited but to identify the specific names and other PII that

8    come from those cited pages that appear in the document.  So

9    it's quite a time-intensive analysis.

10           THE COURT:  How long would you anticipate it would

11   take to do that?

12           MS. NORMAND:  Realistically, your Honor, I think it

13   would be very difficult for the FBI to complete that process

14   and the remaining exhibits by the 31st.  If the FBI were to

15   turn its attention 100 percent to the sureply exhibits in that

16   averment in particular, which is about 400 pages, then

17   potentially that could be done by the 31st, if it then wasn't

18   focusing on the remaining exhibits.

19           I think it would be difficult to complete it all,

20   given what we received from the PEC last night by the 31st, but

21   if the parties work together to identify priorities, I think it

22   would be possible to complete the averment and certain priority

23   exhibits by the 31st.  We certainly stand ready to use our

24   resources to assist the Court to proceed with the argument, if

25   possible.

1          THE COURT:  Let me hear from the defense because --

2     let me start there.  Who is representing defendants this

3     morning?

4          MR. RAPAWY:  Gregory Rapawy, your Honor, for the

5     Kingdom of Saudi Arabia.  I believe Mr. Kry is going to speak

6     on behalf of Dallah Avco as well.

7          THE COURT:  I guess my first question to you is, are

8     you in agreement with the production of the redacted documents

9     that the FBI is currently prepared to submit in that form?

10         MR. RAPAWY:  So the versions that were submitted to

11    chambers on Friday, your Honor, include both our proposed

12    redactions to the FBI's proposed redactions --

13         THE COURT:  You say the version.  The version of what,

14    the briefs?

15         MR. RAPAWY:  The briefs and the averments.  We have

16    also identified, where appropriate, redactions to other

17    exhibits as well, so we have completed our review of the entire

18    document set.

19         THE COURT:  Do you have any disagreement at this point

20    with the FBI?

21         MR. RAPAWY:  We take no position on the FBI's

22    redactions.

23         THE COURT:  You are not opposing what they are

24    proposing.

25         MR. RAPAWY:  To be clear, your Honor, we have

1   additional redactions for our confidential information, but we

2   don't oppose their redactions.

3           THE COURT:  I first wanted to address -- that's what I

4   expected you to say from my review of the documents.  I just

5   want to make sure we don't need to spend a lot of time on that

6   if that's the case.

7           At this point you take no position with regard to

8   whether or not those documents in the form that they have been

9   redacted to at this point be made public?

10          MR. RAPAWY:  That is correct, your Honor.

11          THE COURT:  Let me hear from the plaintiffs.

12          MR. CARTER:  Good afternoon, your Honor, Sean Carter

13  from Cozen O'Connor on behalf of the plaintiffs.  I will be

14  turning over aspects of this to some of my cocounsel because it

15  sort of crosscuts over a few issues.

16          The first thing, your Honor, is, to clarify, the

17  plaintiffs have opposed the scope of redactions that the FBI

18  has proposed in the documents on the basis of the Privacy Act.

19  And I believe in the letters, and I heard Ms. Normand say

20  today, that the FBI is actually taking no position as to

21  whether the Privacy Act redactions meet the relevant standards

22  for sealing under *Lugosch*.  The *Lugosch* First Amendment right

23  of access is attached here as a statute.  The Privacy Act

24  cannot simply overcome that right of access on its own, so

25  there has to be a further inquiry to determine whether there is

1   any compelling privacy interests or higher value that would

2   justify the sealing of these materials.

3           THE COURT:  What is the nature of the redactions that

4   you are opposing?

5           MR. CARTER:  Sure, your Honor.

6           To give you an example, throughout all of the FBI

7   documents, the FBI has rather mechanically employed Privacy Act

8   redactions to the names of all U.S. persons who are mentioned

9   in this.  Many of those are not mere witnesses, but, rather,

10  individuals who are directly implicated in the provision of the

11  support network for the hijackers.

12          THE COURT:  Other than their names, what is it that

13  you have a disagreement with the FBI on how they have redacted

14  those materials?

15          MR. CARTER:  It's certainly their names, your Honor.

16  It's also in certain cases we have a modest disagreement with

17  the phone numbers.  We believe that the appropriate approach to

18  the phone numbers would be to leave the area code and the last

19  four digits so that there is a sense of where the person is

20  operating from.

21          THE COURT:  I read that, but I am not sure I

22  understand what you want to do with that additional information

23  or you want the public to do with that additional information.

24          MR. CARTER:  I think it's relevant in understanding

25  where folks are located at various times when they are engaging

1  in activity that's relevant --

2          THE COURT:  Don't you already make reference in other

3  places as to where the relevant individuals that you claim

4  would be determinative of this motion?  Don't you already

5  identify that elsewhere, without the use of identifying a name

6  to put with a particular entity?

7          MR. CARTER:  I'm sorry.  There are two issues.

8          With regard to the phone number, your Honor, I think

9  our view is basically that the redaction of the three numbers

10  between the area code and the last four protects from any

11  potential intrusion of the nature the FBI has raised.

12         THE COURT:  I am not sure why I should accept that.  I

13  mean, it seems to me that it's not particularly difficult, if

14  I'm given the last four digits of a phone number and given an

15  area code, to find out what the next three numbers happen to

16  be.

17         MR. CARTER:  I don't know.  These are

18  20-something-year-old phone numbers, your Honor.  They are

19  probably landlines that are no longer in use in most cases.  I

20  don't think it will be a very simple exercise.

21         With regard to the names that your Honor raised,

22  again, I think the FBI has acknowledged in its letters that you

23  have a number of individuals here, they have identified 22, who

24  cover the vast majority of the redactions who are at sort of

25  the very center of the presentation of the events and

1   circumstances leading to the provision of support to the

2   hijackers and virtually all of whom are already in the public

3   domain.

4        THE COURT:  Why do you need their documents if it's

5   already in the public domain?  What's the usefulness that

6   outweighs the dangers that might arise with regard to

7   identifying these people as being interviewed by the FBI?  I

8   understand your argument, and I read that part of your

9   argument, but it begs the question, why do you need this?

10       MR. CARTER:  Your Honor, in many cases the fact that

11  they were interviewed by the FBI is out there already in public

12  filings.

13       THE COURT:  Then why do you need it from the FBI?

14       MR. CARTER:  Because the content of their statements

15  is directly relevant to the presentation of the claims and

16  events that are set forth in the averment.  There is no way to

17  show the Court that a particular statement was made by a

18  particular witness.

19       THE COURT:  Let me correct what you just said.  If

20  that's a basic premise, then I think we can overcome that very

21  quickly.  This has nothing to do with presenting that evidence

22  to me.  So the argument is not that it's going to be more

23  useful to me in making my decision.  I have the information.  I

24  know what the information is.  I have the unredacted copies of

25  the information.  This has nothing to do with being able to

1    succeed or fail on this motion.

2         It has to do with whether or not it makes sense to

3    disclose that information to the general public at this stage

4    of the proceedings without some restrictions.  You can't

5    convince me that somehow I'm better off in my decision making

6    because this is made public to others when I already have it

7    sitting in front of me.

8         MR. CARTER:  Sure, your Honor.  I think there are

9    three things.

10        The first is, obviously, this is an issue of the

11   public's access to the information.  And the public cannot

12   adequately inform itself about the claims and arguments being

13   made in this litigation without access to the statements that

14   were made by witnesses, which, for instance, contravene

15   testimony that Saudi Arabia has introduced into the record.

16   There is no way to know that the witness that they claim has

17   denied involvement in this said something directly contrary to

18   that to the FBI without seeing that person's name and statement

19   and being aware of the statement.

20        THE COURT:  You have somewhat conflicting arguments

21   because you say that information is already out there.

22        MR. CARTER:  No.  What I said, your Honor, is that the

23   fact that these folks have been interviewed by the FBI, which

24   is the interest that the FBI referenced in a very general way,

25   is often out there.  They are identified as people who were

1    involved.  They are identified as people who have been

2    interviewed by the FBI.  The particular content of their

3    statements to the FBI are not known.  That's what is at issue

4    in terms of the public access.

5         The public access issues here, your Honor, go beyond

6    just the media because the protective orders in this case have

7    had the effect of denying the plaintiffs themselves of access

8    to this information.  So the plaintiffs in the case do not have

9    access to the evidence that has been submitted in support of

10   their claims, and they deserve an opportunity --

11        THE COURT:  I am not sure I understand your argument.

12   You've been denied what?

13        MR. CARTER:  What I'm saying, your Honor, is that the

14   actual plaintiffs, the named plaintiffs, the 9/11 community,

15   the families, do not have access to this information

16   themselves.

17        THE COURT:  The individual clients.

18        MR. CARTER:  The individual clients.  It's a unique

19   context in which it's both the public seeking access to the

20   media and the families who are prosecuting the claims seeking

21   access so they can better understand their own case.

22        In terms of just the courtroom process that your Honor

23   mentioned, we understand that your Honor has access to the

24   materials.  But in the context of a public argument, we would

25   be extremely restrained if we couldn't make reference in full

1   to the content of evidence of record that directly responds to

2   arguments the Kingdom is making in an open-court proceeding.

3       THE COURT:  The only thing that you'd be restrained by

4   is the identification of the witness who was interviewed by the

5   FBI, not -- you're not restricted in your access to that

6   information.  You're arguing that most of that information can

7   be gleaned from other sources.

8       MR. CARTER:  I don't know that we would be able to say

9   that this particular witness admitted the following to the FBI.

10  This particular witness told the FBI that a particular

11  individual was assigned by another to go and provide assistance

12  to hijackers.

13      THE COURT:  But you have already made those arguments.

14  You made those arguments in your papers.  I understand and

15  respect the public's right to know, but I don't understand the

16  argument that somehow you are disadvantaged because you can't

17  cite a particular individual as being an FBI interviewee.

18      MR. CARTER:  Your Honor, at the end of the day, the

19  public right of access is the core here.  It's the First

20  Amendment right of access and the right of the public to

21  understand and have access to that evidence and to understand

22  what those witnesses said in testimony that's directly relevant

23  to the events that are being litigated in adjudicated by the

24  Court.

25      THE COURT:  But my concern is that, particularly given

1    the massive nature of these issues, my concern is that to give

2    you simply a blanket yes, tell everybody who the FBI

3    interviewed, doesn't seem the most effective and prudent way to

4    address what are legitimate safety and privacy concerns of

5    those witnesses at this stage of the proceeding.

6            MR. CARTER:  Your Honor, in response I would note that

7    we are frustrated that we find ourselves in this situation

8    today because we believe that the manner in which the FBI has

9    gone about its redactions has been divorced from the

10   public-access standards.

11           And I think your Honor probably saw in the letters

12   that the FBI has acknowledged that the analysis of unsealing

13   should take into consideration in its view the relevance and

14   role that the individual people play within the claims that are

15   presented in the averments and the briefs.

16           And in many cases the people we are talking about are

17   very central figures, and the Kingdom itself has introduced

18   testimony already where they acknowledge that they were

19   interviewed by the FBI.

20           So there is no risk of harming their privacy interests

21   by disclosing that they were interviewed by the FBI.  It's

22   already out there.  So the only question is whether or not the

23   public is going to have access to what they said.

24           THE COURT:  I understand your argument in the

25   abstract, and obviously it's not appropriate in this public

1    setting to discuss this in much greater detail.  But my review

2    of your submissions don't give me any specifics about who this

3    argument is supposed to apply to and why it's a particularly

4    compelling argument in a particular case.

5            It's just a blanket, oh, well, the FBI doesn't --

6    wants to keep the names of their informants secret.  They are

7    willing to give the information publicly that they receive,

8    absent some identities of certain individuals and the contact

9    information with regard to those individuals.

10           I am not sure that, given where we are and what stage

11   we are at, why that is -- I am not sure why that is a

12   compelling interest that you have.  I understand there may be

13   an argument and a compelling interest that the press has and

14   the general public as a recipient of that, but what I'm looking

15   for through all of this, in all of these issues, and we will

16   move on and come back to this, is a good reason why anyone

17   wants me to do what they want me to do.  The only reason that I

18   hear you saying is that you want the public to know who the FBI

19   interviewed.

20           MR. CARTER:  Your Honor, I think, in fairness, what we

21   are saying is, under the *Lugosch* First Amendment standards, the

22   FBI has not done anything to make the compelling interests

23   showing in the way that the case law requires.  They have not

24   proffered any sort of schedule of their sealing requests and on

25   an individualized basis said that the particular equities

1    involved with this disclosure would raise a compelling interest

2    sufficient to overcome the public right of access.

3           They have made a generalized argument that the Privacy

4    Act has required them to redact it, and they have taken the

5    view that they take no position as to whether or not the

6    information at issue should be unsealed.

7           THE COURT:  As they always say, the most effective

8    advocacy is to be consistently reasonable.

9           I understand, if we were standing here arguing about

10   the FBI's position, because their position was, we don't want

11   to give you nothing, we don't want the public to hear anything,

12   we don't want them to see anything, we think everything should

13   remain sealed, and nothing should be released to the public.

14   That's not the position they are taking.

15          The position that they are taking is the position

16   that, look, we are ready, willing, and able to provide the

17   information that we received from witnesses.  The only thing

18   that we ask, the narrowly tailored thing that we ask is that we

19   not have to disclose the names and addresses, phone numbers of

20   these witnesses.

21          Why is that an unreasonable request?  Why is your

22   request at this stage of the proceeding?  Maybe later in these

23   proceedings there will come a time when that should be made

24   public, but I am not sure I understand the reason, other than

25   what others would argue is the reason, is that you just want to

1  litigate this publicly, as opposed to in this courtroom, and

2  that you are not really prejudiced significantly by this

3  information, that limited narrowly tailored information about

4  the identification and location and contact information for

5  these FBI witnesses, that your argument is simply that, oh,

6  well -- and I have to state it this way, that I have to decide

7  whether those interests are countervailing interests that

8  outweigh at this stage the interests in the public simply

9  knowing what the name of the witness is and what block they

10  live on.

11            MR. CARTER:  Your Honor, I am going to turn it over to

12  one of my cocounsel briefly because there are a few legal

13  issues your Honor raised there that I want him to respond to.

14            But just very briefly, I think the reason that we

15  think that this comes into the public domain is because we

16  believe that there is no showing that could be made as to most

17  of the redactions that would satisfy the *Lugosch* standards.

18            In terms of the particular people involved, we engaged

19  the FBI during this process and pointed them directly to a

20  whole host of individuals who were implicated central to the

21  activities at issue and already out there as having been

22  interviewed by the FBI and witnesses in the case.  And we said:

23  Walk away from these for sure.  Their letter says:  Sealing may

24  not be appropriate as to some of these names.  So they have

25  acknowledged that we have a good point.

```
 1              THE COURT:  That argument is simply an argument that
 2    they should not -- it's that same argument that you made
 3    previously while the information is already out there.  If the
 4    information is already out there, why are we arguing about why
 5    it has to come from the FBI?
 6              MR. CARTER:  Your Honor, I am going to turn it over,
 7    but, again, because it's an acknowledgement that the Lugosch
 8    standard isn't met, but let me turn it over.
 9              THE COURT:  All right.
10              MR. HAEFELE:  Good afternoon, your Honor, Robert
11    Haefele for the Plaintiff's Executive Committee.
12              I want to start where Mr. Carter left off and maybe
13    back up half a step.  It sounds in a few instances, some of the
14    comments from your Honor, that there is a bit of a reversal of
15    what the burden is here.  The public right of access here is
16    premised not on the common-law standard but on the First
17    Amendment right-of-access framework that is set out in Lugosch.
18    Some of the comments your Honor made suggested that you were
19    applying the common-law approach, as opposed to the First
20    Amendment approach.
21              THE COURT:  No, I was not.  As a matter of fact, I
22    think that they both apply, but the higher standard is the
23    First Amendment approach, and that's the one that I'm
24    struggling with.
25              MR. HAEFELE:  Thank you, your Honor.
```

 1          Just to focus, your Honor mentioned something about

 2   looking at countervailing interests, and that would be

 3   something that would be principal to the common-law interests,

 4   common-law framework and not with regard to the First Amendment

 5   framework.

 6          THE COURT:  But your argument is that, well, in this

 7   high-profile case, politically and internationally charged,

 8   where we know that there have been acts of violence and even

 9   threats of violence against individuals, even during this

10   litigation, that somehow that's not good enough to say, well, I

11   don't want -- I think the record reflects that I should not put

12   these other individuals at greater risk by identifying them as

13   FBI witnesses.

14          MR. HAEFELE:  I think on a generalized notion, where

15   there are hypothetical suggestions of those sorts of concerns,

16   perhaps it's not enough.

17          THE COURT:  It's more than hypothetical, wouldn't you

18   say?

19          MR. HAEFELE:  No, your Honor.  Not on the specific

20   witness by witness, name --

21          THE COURT:  Not on the specific witness by witness,

22   but with regard to the nature of this case, the public interest

23   in this case, the violence that is involved in this case, and

24   the subsequent threats of violence since -- while this case has

25   been going on.  You say, yeah, I can't tie that to witness B.,

1   but I am not sure how I'm otherwise supposed to protect witness

2   B.

3           MR. HAEFELE:  Your Honor, it may help us if we take a

4   step back and we assess what the actual relative burdens are,

5   what the FBI has to show, and what the Court is in a position

6   to have to find.

7           In order for the Court to continue restraining access

8   here, first, the FBI has the burden -- the FBI has the burden,

9   not the plaintiffs, to show or demonstrate compelling reasons

10   to overcome the existing strong prosecution of public access.

11   Part of that is finding that these documents are judicial

12   documents, which your Honor has already recognized is the case.

13           In this instance, the public access is what the court

14   cases talk about as being as its apogee, at its zenith, at its

15   height, because the documents are being submitted in connection

16   with dispositive motions.  The FBI has to show that it had

17   specific -- the FBI showing has to support your Honor's

18   specific on-the-record findings that the restraints to public

19   access are essential to preserve some higher values, not broad

20   generalizations, which is what the FBI has shown.  They have

21   shown broad generalizations that they asked the Court to apply

22   across the board to all these witnesses.  In fact, the FBI has

23   not -- with two small exceptions, the FBI has not actually put

24   before the Court any designated redactions.  They have shown

25   broad statements as to what their notional ideas would be of

1    what the plaintiffs should impose as redactions.

2            THE COURT:  You don't think that I can conclude that

3    those are logical and reasonable conclusions to draw from the

4    nature of this case?

5            MR. HAEFELE:  Since the case law requires specific

6    findings as to each of the documents and each of the

7    redactions, no, your Honor, you can't.

8            THE COURT:  It depends on your definition of specific

9    findings.

10           MR. HAEFELE:  I suppose it does.

11           THE COURT:  I don't think any cases said that you have

12   to be so specific as to identify this particular person and

13   their privacy interests.

14           MR. HAEFELE:  I believe the cases talk about it

15   document by document, and I suggested a redaction-by-redaction

16   indication as to not only why this redaction -- your Honor

17   can't be in a position to determine how narrowly tailored they

18   have proposed the redactions, which is the next requirement.

19   You are not in a position to determine whether they are

20   narrowly tailored enough unless your Honor is able to look at

21   what the proposed redactions are.  You need to know who the

22   person is, you need to know why this redaction is supported by

23   what compelling reason --

24           THE COURT:  You don't give me any assistance in that

25   regard either.  You don't say to me, Judge, look how

1    unreasonably they are applying this rule and how unreasonably

2    they are asking the Court to seal or redact the record.  It's

3    not your burden.  But it would be useful for me in my inquiry

4    if you were to say to me, in response, look at John Doe.  Who

5    cares about John Doe.  You shouldn't be concerned about John

6    Doe in protecting his identity and his location because John

7    Doe is -- John Doe is someone who doesn't need that protection.

8    You are right.  Your advantage in this argument is not the

9    evidence that you -- counter evidence that you presented to me,

10    but it's simply the presumption that you want me to apply that

11    is not your burden to do that.  It's their burden to do the

12    opposite.

13           But I can't articulate why you believe that the

14    concerns that they have about the safety, the harassment of

15    witnesses that they have interviewed is not a specific

16    legitimate concern.

17           MR. HAEFELE:  Your Honor highlights the reason why the

18    plaintiffs are right here.  The FBI has the burden.  There is a

19    presumption, and that presumption has to be overcome by

20    compelling reasons.  It's their burden to come up with those

21    compelling reasons.

22           THE COURT:  But it's easier for them to come up with

23    the compelling reasons if you had nothing further to add on the

24    other side.

25           MR. HAEFELE:  Your Honor, they haven't given us what

```
 1    the redactions are that we are supposed to respond to.

 2              THE COURT:  They have.

 3              MR. HAEFELE:  They have not.

 4              THE COURT:  You mean they have not given you the

 5    redactions.  You know exactly what they -- they have already

 6    submitted their redactions with regard to the briefs.  They

 7    already -- they have a binder of material to give you, and I

 8    don't know if you have not seen it already, the binder of

 9    material to give you with regard to the averments, those

10    volumes of averments and what you submitted.

11              MR. HAEFELE:  Your Honor I think you're under the

12    notion that the FBI has given us the evidence with the

13    redactions proposed.  They have not.  Beyond the broad

14    categories that they have identified for your Honor in the

15    brief, they have not given us a schedule of what the

16    redactions --

17              THE COURT:  I know.  Correct me if I'm wrong.  I'm

18    trying to keep up.  But don't we already have on file publicly

19    redacted briefs, that both you have proposed certain redactions

20    and the FBI has proposed certain redactions.

21              MR. HAEFELE:  Your Honor, I don't think we have

22    proposed redactions.  The FBI --

23              THE COURT:  Not you.  I'm sorry.

24              MR. HAEFELE:  The FBI and the Kingdom have proposed

25    redactions --
```

1          THE COURT:  You know what they want redacted.  This

2     isn't a debate over whether or not you don't have a clue as to

3     what kind of stuff they want to redact and whose name they want

4     to redact.  You know what the unredacted briefs are and you

5     know what the redacted briefs are.  So I am not sure where you

6     say you were at a disadvantage.

7          MR. HAEFELE:  Your Honor, what the public is entitled

8     to and what the plaintiffs are entitled to present in court is

9     the evidence.  It's not about necessarily -- what's redacted

10    out of the briefs and out of the averments comes from citations

11    to the evidence.  That is presumably where the real

12    designations of redactions ought to be.

13         THE COURT:  Your position is, just so we can utilize

14    our time effectively, your position is that there should be

15    full disclosure and there should be no continued sealing and no

16    redactions.  That's your position.

17         MR. HAEFELE:  I think, your Honor, given that the FBI

18    has not articulated --

19         THE COURT:  I am not just talking about just the FBI.

20    I am talking about your position with regard to all of these

21    sealing issues and redaction issues your position is that you

22    oppose any sealing or any redaction.

23         MR. HAEFELE:  No, your Honor.

24         THE COURT:  I am at a loss because I have looked

25    through the papers, and I can't tell you which redactions or

```
 1    sealings that you have agreed to.
 2              MR. HAEFELE:  The reason I said no, your Honor, is our
 3    position is that the Lugosch standards need to be met.
 4              THE COURT:  Say that again.
 5              MR. HAEFELE:  Our position is that the Lugosch
 6    standards need to be meant in order for there --
 7              THE COURT:  I know.  But I'm not talking about the
 8    standard.  I am talking about what your position is with regard
 9    to sealing and redactions and your position, based on the case
10    law, is that there should be no sealing that continues, that
11    all the things that are submitted under seal should be unsealed
12    without redactions.  That's your position.
13              MR. HAEFELE:  No, your Honor.
14              THE COURT:  That's not your position.
15              MR. HAEFELE:  Our position is that in order for there
16    to be any sealing, the party who is proposing the sealing needs
17    to meet the Lugosch standard.
18              THE COURT:  Your position is, it hasn't happened, so
19    there should be no sealing, right?  I'm not debating the reason
20    for it.  Your position is, there should be no sealing.  On this
21    record, this record does not support any sealing and on this
22    record, this record does not support any redaction.
23              MR. HAEFELE:  I think our position is that no party
24    has yet met the Lugosch standards.
25              THE COURT:  You're not answering the question that I
```

 1    asked, because my question was a yes-or-no question.

 2         MR. HAEFELE:  Your Honor, Mr. Carter --

 3         THE COURT:  I don't want to misstate or be unfair to

 4    what your argument is.  Am I misstating your position when I

 5    say your position is, Judge, you should not -- you should

 6    not -- you should unseal all of this information and you should

 7    not allow for any redactions by the FBI or anyone else?  Does

 8    that misstate your position?

 9         MR. HAEFELE:  We have been willing to work with the

10    parties who are proposing redactions.  Mr. Carter was here a

11    few moments ago and recognized that in some circumstances, for

12    example, the telephone numbers, we had proposed certain

13    redactions --

14         THE COURT:  You believe that there is a basis in law

15    to redact the telephone numbers, that they have made a proper

16    showing for that, but they have not made a proper showing for

17    the names.  Is that your position?

18         MR. HAEFELE:  I am not sure that we would acknowledge

19    that they have met the *Lugosch* standards.

20         THE COURT:  I am not sure you would either.  I don't

21    think you would.

22         MR. HAEFELE:  Honestly, in order to move the

23    litigation forward, the plaintiffs may agree to that sort of

24    redaction.  The public or the media may step in and say they

25    don't accept that, and they may fight for that information

 1  under the First Amendment standard.

 2          But you asked if there was certain information that

 3  we, as the plaintiffs, could live with to move forward for

 4  redactions, and that's one instance.

 5          THE COURT:  I don't see that in your papers, that

 6  you -- your position in your papers on this issue, in your

 7  letter, is that you don't believe that they should be allowed

 8  to continue to seal these documents or to redact --

 9          MR. HAEFELE:  Your Honor, I think on the telephone

10  numbers we did include that.

11          THE COURT:  You are right.  I did read that.  Well,

12  you can see part of it.  I think, again, they want -- they

13  said, drop the last four digits.  You didn't say, I agree to

14  that.  You said, well, we want to at least have the area code.

15  That's not the same position.  Those positions are inconsistent

16  with each other because that's not an agreement.

17          MR. HAEFELE:  Your Honor, given that the last part of

18  the *Lugosch* standard under the First Amendment is that it needs

19  to be narrowly tailored to address the higher interests that

20  the FBI has identified, we understood that the narrowed

21  tailoring would include allowing the area code and the last

22  four digits and it would satisfy the issue that was flagged by

23  the FBI.

24          THE COURT:  I understand that position, but the sides

25  have not come to terms on that issue.  They want to do one

1  thing, and you don't want them to do it, and you want to do

2  something else, and they don't want you to do it.  I don't

3  think I'm mischaracterizing your position.  I'm not judging

4  your position.  I just want to be clear about what your

5  position is.

6        Your position with regard to the FBI's redactions,

7  that the FBI should -- they have not made a sufficient showing

8  that this Court should allow them to make any of those

9  redactions.  I don't want to misstate what you said.

10        MR. HAEFELE:  Other than the acceptance of the

11  telephone numbers and our willingness to work with them to meet

12  the *Lugosch* standards, yes, your Honor.

13        THE COURT:  Willingness to work with them doesn't do

14  much for me until you guys work it out.

15        MR. HAEFELE:  Your Honor, we are here because the FBI

16  has not done this already.  They had the burden to do it.  We

17  worked with them in a meet and confer.  We told them that these

18  were the standards.  We emphasized that these standards needed

19  to be met.  And we tried to work with them to do that, and we

20  continue to be willing to do that.

21        THE COURT:  There is no debate over the standard.  I

22  think the standard is clear.  The question is, if there is

23  something short of no redactions, is there a position that is

24  reasonable and respects the public's right to have access to

25  this information?

1          MR. HAEFELE:  I think there is a middle ground, your

2    Honor, and it would require some work on both parties to do it.

3          THE COURT:  We are running out of time to do that.

4          MR. HAEFELE:  I agree, your Honor, that there is --

5    time is of the essence in terms of getting it done, and I am

6    not sure that your Honor would be able to get it done to meet

7    the *Lugosch* standards.  That's really where we are.  The Court

8    has to meet the *Lugosch* standards.  The parties need to meet

9    the *Lugosch* standards in order to get this information out into

10   the public access or to seal it.

11         THE COURT:  Let me just make sure that I can

12   crystallize your position generally.

13         The defense position is that -- we know what the FBI's

14   position is.  They want to do these redactions.  The defense

15   position is, they would like to continue sealing 177 documents,

16   and they would like to redact 56 other documents.

17         Your position with regard to that is, to the extent

18   that there is a significant amount of information, which is not

19   in the 177 documents that they are asking you to keep sealed,

20   and they are not part of the 56 documents that they want

21   redacted, that there is a vast amount of information that

22   neither side is arguing should be kept secret.  If it's not

23   among the 177 -- and there are some other minor things with the

24   Al-Rajhi Bank and DA's redaction.  But the universe of

25   documents that the defense wants sealed is a finite number of

1    documents, which is 177 documents and redacting 56.  You can

2    give me a better idea.  What would you say that leaves in terms

3    of percentage of documents that either side -- that you are

4    asking to be made public and they have not asked to keep them

5    under seal?

6            MR. HAEFELE:  Your Honor, you have slid into talking

7    about the Kingdom's documents.  I don't know the numbers that

8    you've articulated in terms of the numbers of documents.

9            THE COURT:  I'm just taking you from their submission

10   to me, which I assume you have, that they asked to keep sealed

11   177 documents and to redact 56 others.  That's their

12   application.

13           MR. HAEFELE:  Your Honor, what I was going to say is,

14   I came up to address issues related to the FBI, and you have

15   slid into -- one of my other colleagues is here to address the

16   FBI --

17           THE COURT:  Let me address that.

18           MR. HAEFELE:  If I could just summarize real quick.

19   You wanted to know what recommendation -- I think you wanted to

20   know what recommended approach that the plaintiffs would

21   recommend to get through the FBI documents.  We do have

22   recommendations, if your Honor is interested in hearing it.

23           THE COURT:  I'm not interested in hearing it unless

24   the two of you can agree to it.  Otherwise, it doesn't do me a

25   lot of good.  I'm right back in this chair trying to figure out

 1   whose side --

 2          MR. HAEFELE:  Your Honor could direct the parties to

 3   do this, but we are happy to work with the FBI --

 4          THE COURT:  I'd be happy to direct the parties to do

 5   whatever agreement that you can come up with.

 6          MR. HAEFELE:  Thank you, your Honor.

 7          THE COURT:  The defense has been patient, and, quite

 8   frankly, they have the answer to my question more so.  Then

 9   I'll hear from --

10          MR. HAEFELE:  I am trying to figure out whether or not

11   you wanted to address the Kingdom's documents issues that you

12   started to address or whether or not you wanted to turn it

13   over -- Mr. Kry is here for Dallah Avco.

14          THE COURT:  No.  I thought you were arguing on behalf

15   of the document.  I have Dallah Avco's proposed -- we will get

16   to you.

17          I guess what I want answered by someone, I don't care

18   which side, is that the documents that are at issue with regard

19   to whether they should continue to be sealed or should be made

20   public are, the FBI's redactions are in dispute and the defense

21   request to keep sealed 177 documents of the total number of

22   documents and to redact 56 documents of the total number of

23   documents.  Doesn't that leave a vast array of documents that

24   neither side is asking that they not be made public?

25          (Continued on next page)

1          MR. HAEFELE:  Your Honor, I'll turn it over to address

2    that to Mr. Simpson.

3          THE COURT:  All right.  Go ahead.

4          I'll give you the time after this.

5          Am I correct in that?  I'm just trying to factually

6    make sure I'm proceeding on the true facts.

7          MR. SIMPSON:  Yes, your Honor.  Gavin Simpson.

8          THE COURT:  How many documents in total do you think

9    there are that could be released to the public?

10         MR. SIMPSON:  Your Honor, Gavin Simpson, for the

11   Ashton plaintiffs.

12         Firstly, I want to clarify that the FBI's position is

13   not that it meets the *Lugosch* standard for keeping sealed

14   judicial documents.  Rather, the FBI has relied upon a

15   protective order in this case at ECF No. 4255 which permitted

16   the release of certain documents subject to redactions,

17   including Privacy Act redactions, for the purposes of

18   discovery.  Your Honor, we are now at a quintessentially

19   *Lugosch* posture where we are faced with dispositive motions and

20   an upcoming determinative hearing, public oral argument on

21   those dispositive motions.

22         The FBI's letter purports that the plaintiffs need to

23   show justifications for the unsealing, but, in fact, the

24   opposite is the case.  As a matter of law, as your Honor has

25   rightly recognized, these judicial documents should be subject

1          to public access under *Lugosch*.

2                    THE COURT:  I have no disagreement with you on that.

3                    MR. SIMPSON:  Only under instances where the FBI can

4          make its compelling showing should the Court adjudicate as to

5          whether a higher interest can be found and whether narrowly

6          tailored redactions can be made.  The FBI does not purport to

7          make that showing, and indeed, your Honor, in meet-and-confer

8          discussions, the FBI has accepted that, in many instances, it

9          does not meet that burden.

10                   As to the questions of threat that you raised, the

11         arguments made thus far on the record are generalized

12         conclusory arguments as to threat.  We have speculative

13         submissions from several nonparty witnesses that they may be

14         subject to such wrongs as harassment should their names be

15         released, but that, too, does not meet the standard we require.

16                   THE COURT:  You don't think that that's a reasonable

17         conclusion?

18                   MR. SIMPSON:  Your Honor, I do not.  I look at the

19         law, and I see that, in fact, it requires a much higher

20         interest, a much higher showing of particularized threats.

21         Speculation is not sufficient.

22                   THE COURT:  OK.  No, I understand that.  I don't want

23         to go over old ground.  We just discussed that.  I'm more

24         concerned about (1) giving me the broader picture.

25                   What percentage of the documents, in your view, is the

1    defense asking to remain under seal?

2         MR. SIMPSON:  Well, your Honor, the defense —— and in

3    instance, I'll refer to the Kingdom of Saudi Arabia, whose

4    brief is before you —— they have employed a range of tactics to

5    seek to slash vast swaths of judicial documents from the

6    record.  The top line numbers that you cited, the 177 documents

7    that they seek to keep entirely under seal and the 56 documents

8    that they seek to redact, are but a fraction of the documents

9    that they purport should not be properly before you and not be

10   properly part of the reviewable record at oral argument.

11   Plaintiffs strenuously object to the means by which that ——

12        THE COURT:  So what's the answer to my question?

13        MR. SIMPSON:  The answer is, in fact, hundreds of

14   documents are at issue here, your Honor.

15        THE COURT:  Well, no, I'm trying to understand.  There

16   are 177 documents that they're asking to be kept under seal.

17   So that must mean that there is a number of documents that

18   they're not asking to be kept under seal.  What is, in your

19   best estimate, the number of those documents?

20        MR. SIMPSON:  You're referring, your Honor, to a

21   number that they have averred with respect to their exhibits?

22        THE COURT:  Yes.

23        MR. SIMPSON:  Saudi Arabia's exhibits only comprise

24   243 exhibits before this Court.  So when you put in context the

25   numbers that you've just given as to 177 under seal and 56

1   redacted, you'll see that, in fact, it's almost the entirety of

2   their evidentiary submissions that they're seeking to keep

3   under seal in one form or another.  Furthermore, your Honor,

4   the sealing is merely one part of Saudi Arabia's strategy to

5   remove judicial documents from the record.

6          THE COURT:  So if they were to get their request of

7   the sealing of 177 documents and redaction of 56 other

8   documents, what number of documents would not be included in

9   that?

10         MR. SIMPSON:  If they were to get the request as

11  articulated in their brief, your Honor, then hundreds of

12  documents would be lost from the reviewable public record.

13         THE COURT:  No, that's not ── my question is the

14  opposite.

15         MR. SIMPSON:  What would remain would, in fact, be a

16  minority of the requested exhibits.

17         THE COURT:  Meaning what?

18         MR. SIMPSON:  They've talked about a realm of

19  documents over 2,000.  In fact, their submissions purport to

20  slash away, in one form or another, more than 1,000 of those

21  documents.

22         THE COURT:  So you don't think it's accurate for them

23  to describe that their request is only as to 177 documents?

24         MR. SIMPSON:  They describe that as their sealing

25  request, your Honor.

1          THE COURT:  Right.

2          MR. SIMPSON:  In their brief, they then persist in an

3     exercise in trying to characterize vast swaths of the judicial

4     documents that plaintiffs have submitted for this Court's

5     consideration as failing to meet the standard of judicial

6     documents.  And in fact, by doing so —— and I reference the

7     exhibits to my colleague counsel, Mr. Rapaway's declaration

8     submitted with their brief —— they have designated hundreds of

9     documents under their own arbitrary and conclusory categories,

10    which include not properly cited or uncited, based on rules

11    that they have, quite frankly, invented, your Honor.  There is

12    no judicial basis, there is no legal support, for the

13    categories that Saudi Arabia has come up with.  It has

14    attempted by stealth to effectively steal and deny public

15    access to vast swaths of judicial documents that plaintiffs

16    have submitted for your Honor's consideration.

17         THE COURT:  Let me hear directly from them, and I'll

18    let you ——

19         MR. SIMPSON:  Thank you, your Honor.

20         MR. RAPAWAY:  Thank you, your Honor.

21         It will not surprise you that I disagree with

22    Mr. Simpson's characterization of our position.

23         So we are seeking, as it says in the letter, to seal

24    177 documents and to redact ——

25         THE COURT:  Out of how many?

 1              MR. RAPAWAY:  What's that?

 2              THE COURT:  Out of how many?

 3              MR. RAPAWAY:  Our count is 2,442.  And that is, your

 4    Honor, counting all documents that they have submitted and we

 5    have submitted in support of or in opposition to the motion.

 6              THE COURT:  You said the total number of documents is

 7    what?  2,000?

 8              MR. RAPAWAY:  2,400 — I'm sorry, 2,449.  I misspoke,

 9    2,449.

10              THE COURT:  So this 2,400 or so documents, is it

11    really accurate to say that you're only asking to seal 177 of

12    those?

13              MR. RAPAWAY:  We take the position that a large number

14    of the documents are not properly before the Court.

15              THE COURT:  OK.

16              MR. RAPAWAY:  But they're not my documents, and I

17    haven't moved to seal them.

18              THE COURT:  I'm talking about the motion that's

19    pending before me on this sealing.  You're asking at this stage

20    to seal 177 of the 2,400 documents?

21              MR. RAPAWAY:  That is our request for relief, your

22    Honor.

23              THE COURT:  And to redact 56 of those 2,400 documents?

24              MR. RAPAWAY:  Yes, yes.

25              THE COURT:  OK.  All right.

 1          MR. RAPAWAY:  Mostly briefs, some expert reports, some

 2   — documents almost entirely that mention the sealed documents

 3   are the documents we've sought to redact.

 4          THE COURT:  Does that mean — I'm sure it doesn't mean

 5   — that with regard to the 2,400 documents minus the 177

 6   documents, that your position is that those can properly be

 7   disclosed publicly?

 8          MR. RAPAWAY:  We have no objection to disclosing those

 9   documents, your Honor.

10          THE COURT:  Well, that's why I don't understand.

11          MR. RAPAWAY:  Right.  But —

12          THE COURT:  Wait.  Stop so I can understand, because

13   it seems like you're talking past each other and not just

14   talking past me.

15          I don't get from these papers that you have 2,400

16   documents and that you only want to seal 177 of those 2,400,

17   and the rest of those documents, minus the 2,400, you're

18   perfectly happy for those to be disclosed to the public.

19          MR. RAPAWAY:  They're not our documents, your Honor,

20   and we haven't moved to seal or redact them.  We take no

21   position on whether they can be —

22          THE COURT:  Whose documents are they?

23          MR. RAPAWAY:  The vast majority of them are FBI

24   documents.

25          THE COURT:  OK.

 1          MR. RAPAWAY:  And that's as a result of the

 2   Plaintiffs' Exhibit 2, which consists of the entire FBI

 3   production post-executive order.

 4          THE COURT:  What percentage of your documents that you

 5   have produced that you are asking to remain under seal?

 6          MR. RAPAWAY:  That we have produced?  There are

 7   thousands.  That are actually in the record, you know, we did

 8   not — I don't think we calculated that number.  We were

 9   calculating as a percentage of the overall documents.

10          THE COURT:  Well, you calculated some number because

11   you said in your papers that you wanted to seal 177 documents.

12          MR. RAPAWAY:  Yes, no —

13          THE COURT:  Is that the entirety of the documents that

14   you produced?

15          MR. RAPAWAY:  No, of course not, your Honor.

16          THE COURT:  So what other documents are you not moving

17   to seal?

18          MR. RAPAWAY:  I will ask one of my colleagues to hand

19   up, if they can, the number, or I'll get back to your Honor on

20   that.  I didn't calculate the number of documents that we are

21   moving to seal with the denominator being the total number of

22   Saudi Arabia's documents that are in the motion record.

23          THE COURT:  All right.  Are there any documents that

24   you produced that you're not moving to seal?

25          MR. RAPAWAY:  Yes.

 1              THE COURT:  OK.  What is the volume of those

 2   documents?  What kind of documents are those?

 3              MR. RAPAWAY:  The documents —— so we produced

 4   documents from a number of different sources, your Honor.

 5              THE COURT:  Right.

 6              MR. RAPAWAY:  One was there were a lot of documents

 7   that came from the PCA, the Presidency of Civil Aviation, where

 8   Omar al Bayoumi was employed.  We have not treated those

 9   documents —— we have not requested sealing of those documents.

10   There are a lot of documents ——

11              THE COURT:  Those documents are currently under seal.

12              MR. RAPAWAY:  Pending —— yes, because we haven't got

13   court ——

14              THE COURT:  So is there any reason to not unseal those

15   documents?

16              MR. RAPAWAY:  No.

17              THE COURT:  OK.  That's what I'm trying to figure out,

18   what I need to spend my nights on.

19              MR. RAPAWAY:  I'm trying to be as clear as I can for

20   your Honor, and if I fall short, just ——

21              THE COURT:  That's helpful.  I'm trying to understand

22   what you're fighting about and what you're not fighting about.

23              MR. RAPAWAY:  Right.  We're not fighting about ——

24              THE COURT:  Particularly, keep it in the context of ——

25   I understand the arguments made on behalf of the public, but

1    your interest as parties are different than the public

2    interest.

3            MR. RAPAWAY:  Certainly, your Honor.  So we produced a

4    large quantity of documents from the Ministry of Islamic

5    Affairs, and as a class, we are not moving to keep those under

6    seal.  I believe some of those are subject to —— are within the

7    28 documents that we say are high-level internal communications

8    that should be sealed as a matter of comity.

9            THE COURT:  But you still are moving to seal them, to

10   keep them under seal.

11           MR. RAPAWAY:  So I understand that —— I'm told that

12   cited in the motion papers are a total of about 288 documents

13   from Saudi Arabia.  So that is 177 over 288 that we have a

14   confidentiality issue for.

15           THE COURT:  Tell me what comity that compels a

16   decision by this Court to keep the documents under seal.  I'm

17   not sure I understand anything in comity that addresses this

18   issue.

19           MR. RAPAWAY:  Very good, your Honor.  Should I start

20   with the Vienna Convention, which is the largest group, or

21   should I go directly to comity?

22           THE COURT:  I thought those were two different

23   arguments.

24           MR. RAPAWAY:  They are two different arguments.

25           THE COURT:  Let's finish this one, because I think the

1    bulk of your argument is convention argument.

2        MR. RAPAWAY:  That is correct, your Honor.

3        So with regard to the documents that we've asserted

4    comity for, those are internal Saudi government communications.

5        THE COURT:  What rule are you relying upon?  What rule

6    am I supposed to apply to say comity allows you to keep these

7    documents from the public even though you produced them in

8    litigation?

9        MR. RAPAWAY:  Well, your Honor, the principles of

10   international comity are not written down anywhere, but in the

11   *Societe Aérospatiale* case, the Supreme Court has said a

12   district court of the United States should give due regard to

13   any sovereign interest asserted by a foreign state.

14       THE COURT:  Right.  But why does that translate into

15   Saudi Arabia, as a defendant, gets the benefit of comity to the

16   extent that it means that the documents that they're relying

17   upon, they don't have to disclose in what would otherwise be a

18   public courtroom forum?

19       MR. RAPAWAY:  Well, my best authority for that, your

20   Honor, is Judge Netburn's order ECF No. 4696, at an earlier

21   stage of the case, I grant you, which your Honor overruled the

22   objections to, which did permit us to seal 11 of these very

23   same documents at issue in the discovery context, recognizing

24   that comity, as a higher value, was sufficient to overcome the

25   presumption that applied at that stage.

1          Now, just to be clear, we're now at the dispositive

2    motion stage, so the other side of the scale has gotten

3    heavier.  But in terms of what is my authority for saying that

4    comity can support sealing?  This Court has said so, and I

5    think the Court was right to say so because it is an extremely

6    unusual step for a foreign sovereign that has been brought into

7    the United States, courts of the United States, as a defendant

8    over whom jurisdiction has not yet been established, to

9    cooperate with the Court's discovery request and provide

10   documents at the most senior levels of its government.

11         THE COURT:  Can you cite a more authoritative source

12   than myself?

13         MR. RAPAWAY:  I can't think of one, your Honor.  We do

14   cite a couple of cases that we cite the *Omari* case which Judge

15   Netburn's order relied on.  It's an unpublished decision.

16         THE COURT:  It's in a slight different context.

17         MR. RAPAWAY:  It is a different context.  I think it

18   stands for the general principle, but ——

19         THE COURT:  I'm trying to understand the rule first.

20   So any country that is a party to litigation has the ability to

21   produce documents in that litigation under seal and deny those

22   the view of those documents to the general public based solely

23   on the courtesy of this country saying, well, the relationships

24   between countries makes us grant you this favor.

25         MR. RAPAWAY:  Yes, your Honor, and I'll try to make

1   that sound better for you because I think that, you know, your

2   Honor sitting here in this courtroom has the judicial power of

3   the United States, and that power has requested and, in some

4   cases, directed the sovereign nation of Saudi Arabia to produce

5   documents that are traditionally nonpublic documents, to put it

6   mildly, the internal deliberations of the cabinet.  And Saudi

7   Arabia has said we will do this because we respect the United

8   States and its authority, but what we ask that these documents

9   be used for the case in which they were produced and not made

10  public, for reasons unrelated to the case, and not be treated

11  as something that can simply —— I shouldn't say "reasons

12  unrelated" to the case.  Strike that.

13          But not be made public simply because plaintiffs claim

14  that they support their side of the case.  I don't believe that

15  we put in very many of those 28 documents ourselves.

16          THE COURT:  Why is that more important than the basic

17  principle that we don't try cases in back rooms, we try cases

18  in open court, and litigants can expect that there will be the

19  scrutiny of the public and the press with regard to the nature

20  of those disputes and how those disputes are resolved?  I would

21  think that the cautious position is that the thing that we

22  don't want to do is have secret proceedings.

23          MR. RAPAWAY:  That is ultimately a decision for your

24  Honor to make.  But if I can add one more thing that I think is

25  on my side of the scale in this argument, it is that if your

 1    Honor rules that, then any other foreign litigant in this case,

 2    while it is unique in many ways, it's certainly not the only

 3    case in which a foreign government has responded in an FSIA

 4    case, the fight will happen earlier.  The foreign government

 5    will say, I can't produce these documents if I know that they

 6    are going to be released to the press as soon as the other side

 7    claims they're relevant, regardless of whether they are

 8    relevant, by the way, because that's the nature of the *Lugosch*

 9    analysis.  They just have to assert the relevance.

10             THE COURT:  Why would that be a problem?

11             MR. RAPAWAY:  It would be a problem for future courts

12    that wouldn't get the evidence they want.

13             THE COURT:  Why?  It sounds to me I would have been

14    better off if this was resolved earlier than later.  Why is

15    that such a bad thing?

16             If you know that you have a right to withhold the

17    documents, it seems to me it makes more sense to oppose the

18    production of those documents than it makes to submit the

19    documents voluntarily under seal and then later on say we don't

20    want anybody to know what these documents say.

21             MR. RAPAWAY:  Well, we did think we had a right to

22    produce and reserve our confidentiality objections, and there

23    was an order of this Court stating that comity was a higher

24    value for this purpose when we made our submissions and that

25    our interest was not waived by producing or even by using the

1    documents.  So that's where we are, your Honor.

2          THE COURT:  The greater —— the additional, not

3    greater, the additional concern that I have with regard to

4    where we are is two things:  One is that you want to rely on

5    these documents in order to get the case dismissed against your

6    client.  There are documents that you have voluntarily

7    produced, not because you've made a decision that it helps the

8    other side, because you made a decision that it helps you, and

9    you want me to rely on those documents in a decision to dismiss

10   the case and not have the public have the benefit of knowing

11   why I did it and what evidence I relied upon.

12         MR. RAPAWAY:  So that, I think, I disagree with, your

13   Honor.

14         THE COURT:  OK.

15         MR. RAPAWAY:  Because I think that —— and I hope my

16   colleagues will correct me if I'm misremembering this.  I

17   believe that the 28 documents for which we've invoked the

18   comity rationale are —— few, if any of them, are documents that

19   we affirmatively submitted.

20         THE COURT:  I see.

21         MR. RAPAWAY:  We produced them in compliance with the

22   Court's order.  We did do that, and we could have at that time,

23   it's true, sought to frustrate the process and take appeals of

24   discovery orders.  We chose not to do that.

25         But I don't think there are many —— if you look at the

1    documents that we're relying on affirmatively in our case,

2    those are the ones that are cited in our averment, it's a much

3    shorter document than plaintiffs' averment, and —— OK.

4         (Counsel conferred)

5         MR. RAPAWAY:  Strike that.  We rely on some of them.

6         THE COURT:  All right.

7         MR. RAPAWAY:  I don't want to make a misstatement to

8    your Honor.

9         THE COURT:  Yes, sure.

10        MR. RAPAWAY:  We do rely on some of them, and we did

11   so pursuant to the ——

12        (Counsel conferred)

13        MR. RAPAWAY:  Further news update, your Honor.  I do

14   apologize.  There's a lot of stuff in the record.  I can't keep

15   it all in my head.

16        We rely on some of them in our reply.  So when

17   plaintiffs have brought various things into issue, we have come

18   back with some of those documents to contradict their

19   allegations.  With regard to our opening averment, I believe my

20   statement is true.  So ——

21        THE COURT:  What is the interest that you're trying to

22   protect by comity?  What is the bad thing that's going to

23   happen to the defendant if these documents are made public?

24        MR. RAPAWAY:  The only interest —— I mean, I don't

25   think these documents hurt us, your Honor.  I don't think they

 1    hurt us in the litigation.  You'll read them ——

 2            THE COURT:  A lot of those documents you rely on and

 3    ask me to rely on those documents as evidence in support of

 4    your motion to dismiss.

 5            MR. RAPAWAY:  On reply, yes.

 6            Your Honor, my client has directed me to express its

 7    desire to seal the communications at the highest government

 8    levels and to make that request on behalf of Saudi Arabia to

 9    the United States.  They don't necessarily —— I think this is

10    true of a lot of foreign governments that wind up litigating in

11    the U.S. —— they are not as familiar with this judicial system.

12    They are not necessarily familiar with the very strong

13    presumption in this circuit, particularly, for the publication

14    of documents.

15            THE COURT:  They have an army of very capable lawyers

16    to explain that to them.

17            MR. RAPAWAY:  I certainly hope I'm capable, your

18    Honor.  Sometimes I even explain things correctly.

19            But when they authorized us to produced these

20    documents, they requested that we keep them out of the public

21    eye, if possible, and that's the request I've made to you.

22            THE COURT:  But the reality is that when you produced

23    these documents and they authorized you to produce these

24    documents, there was no guarantee that these documents were

25    going to stay sealed.  The confidentiality was your designation

 1   of these documents.  And I think I read part of your papers

 2   that said you relied on the protective order or the

 3   confidentiality, but most protective orders —— and I meant to

 4   go back and look at this one —— specifically warn parties that,

 5   look, just because you file this under seal doesn't mean it is

 6   going to stay under seal.  And I assume that there is some

 7   comparable language that is within this protective order that

 8   let the parties know that just because you say I'm going to

 9   assert this privilege or I want to file this under seal,

10   there's no guarantee that the Court's going to ultimately agree

11   with you that it's going to be under seal.

12          So to say that somehow you relied on the protective

13   order in order —— in thinking that this was always going to

14   remain forever outside of the public domain, that would not be

15   a reasonable assumption, would it?

16          MR. RAPAWAY:  There is language to that effect in the

17   protective order.  It doesn't authorize sealing on its own.  It

18   contemplates that the Court is going to make a determination at

19   the sealing stage.  I won't dispute any of that because that's

20   all true.

21          But I will say, your Honor, that I don't think it was

22   unreasonable for my client to rely upon the protective order,

23   to rely on the order that was issued in discovery, which was

24   before some of these documents, I believe, were produced,

25   saying that comity was a higher interest and that the Court

1   would respect that higher interest.  I don't think that was a

2   question of unreasonable reliance at all.  We may — I may lose

3   today, but I think it was a reasonable thing for my client to

4   want and expect and for my client to ask, because they really

5   have gone to extremely unusual lengths in complying with this

6   Court's discovery process over the past four or five years.

7           THE COURT:  I assume you were not in a position nor

8   would you have advised them that that ruling meant that none of

9   these documents will ever see the light of day.

10          MR. RAPAWAY:  I certainly could not have told them

11  that, your Honor, in those terms, but I do think it was a basis

12  for — I do think it established that this Court would consider

13  comity a higher interest, a higher value under *Lugosch*, because

14  it does say that.

15          THE COURT:  Well, let's go to your primary argument,

16  the convention.

17          MR. RAPAWAY:  Yes, your Honor.

18          THE COURT:  On what basis do you say the convention

19  has been applied and should be applied in this context?

20          MR. RAPAWAY:  So the documents at issue are documents

21  that the convention — that the various — both conventions, in

22  one form or another, the diplomatic and the consular

23  conventions, describe as being inviolable.  So, effectively,

24  that's a limit that the United States has undertaken on its

25  authority to deal with these documents, and in exchange, other

1    countries, my client included, have undertaken a reciprocal

2    commitment to the United States to respect the confidentiality

3    of its own embassies and consulates abroad.

4            THE COURT:  But with regard to these documents, the

5    documents that you're trying to apply this rule to, these

6    documents were — most of these documents were voluntarily

7    produced by the defense.  As a matter of fact, a lot of those

8    documents are documents that you believe that are in your

9    favor, that support your position.

10           MR. RAPAWAY:  Yes, your Honor, there are some that we

11   think support our position.  There are some we think that are

12   irrelevant or attenuated from the issues that are actually

13   before the Court.  There are some that we cite for issues that

14   we think are attenuated but that we had to respond to

15   plaintiffs on.

16           THE COURT:  But those are not treaty issues.

17           MR. RAPAWAY:  No, but I'm just responding to your

18   Honor's point about the fact that we voluntarily submitted some

19   of the documents.

20           THE COURT:  Because those documents you weren't forced

21   to turn over.

22           MR. RAPAWAY:  We made the election to produce the

23   documents voluntarily to cooperate with the Court's discovery

24   process.

25           THE COURT:  To do more than that, because you wanted

1    to rely on those documents in the course of this litigation in

2    support of your position, which is what you're currently doing.

3           MR. RAPAWAY:  We are currently doing that, your Honor,

4    but I also think that a big part of that decision — and I was

5    there at the time — was we wanted to show the Court that we

6    respected its inquiry, and to have said you can't see anything

7    from the embassy, you can't see anything from the consulate,

8    which we had a treaty right to do, would have sharply limited

9    the scope of discovery.

10          THE COURT:  Isn't that exactly what you're doing now?

11          MR. RAPAWAY:  Well, to the — not to the Court.  As

12   your Honor has pointed out, these documents are all available

13   to you.

14          THE COURT:  All right.  I see what you're saying.  Go

15   ahead.

16          MR. RAPAWAY:  Right.  Some of those documents were

17   produced in response to the investigative theory that

18   plaintiffs had that there was somebody at the embassy that told

19   al Bayoumi and al Thumairy to help the hijackers, the one

20   that's been completely debunked now and rejected by the FBI on

21   multiple occasions.

22          THE COURT:  There's one question that I have not yet

23   answered and I want to see if you can answer for me that would

24   advance your argument significantly.

25          MR. RAPAWAY:  OK.

1          THE COURT:  What good reason can you give me that

2     these documents should be kept sealed?

3          MR. RAPAWAY:  Good reason ——

4          THE COURT:  What is the bad thing that's going to

5     happen if they're unsealed and what is the good thing that is

6     going to happen if they remain sealed?

7          MR. RAPAWAY:  The good thing that will happen if they

8     are kept sealed is that the United States will have kept its

9     treaty promise to treat them as inviolable.

10         THE COURT:  I'm talking about the substance of these

11    documents.  These documents are not —— you're not making an

12    argument, Judge, you shouldn't disclose this document because

13    of the content of this document.

14         MR. RAPAWAY:  No.  Our argument is based on the United

15    States' treaty promise.

16         THE COURT:  So what interest am I advancing?  Just the

17    interest of recognizing and abiding by the treaty?  Doesn't the

18    treaty —— I have to look at it more carefully, but doesn't the

19    treaty address more so the issue of whether or not you would be

20    compelled to produce these documents rather than, once you've

21    voluntarily made a decision to produce these documents in

22    litigation, whether or not you can have your cake and eat it

23    too, as they say?

24         MR. RAPAWAY:  Well, I always try to get as much cake

25    for my clients as I can, your Honor.  But the answer to your

 1    question is the treaty says the documents are inviolable.  It

 2    doesn't just say that you can't be compelled to produce them.

 3    It says it's inviolable.

 4         THE COURT:  What does that mean?  That means you can't

 5    ask for them?  You can't force somebody to give them?  You

 6    can't use them if you decide that you want to offer them to

 7    help your case?  I'm not sure what you're saying that means in

 8    this context.

 9         MR. RAPAWAY:  So what I would say it means in this

10    context is that the United States couldn't have compelled Saudi

11    Arabia to produce these documents over its objection.

12         THE COURT:  Nor did they.

13         MR. RAPAWAY:  Nor did it.  And when Saudi Arabia ——

14    the convention also says that the inviolability is not waivable

15    except by an express statement.

16         THE COURT:  That means they still can't force them to

17    turn over these documents.

18         MR. RAPAWAY:  I think it also means the documents

19    should not be made public without Saudi Arabia's consent.

20         THE COURT:  Well, I'm not sure where I see that being

21    bifurcated, a two-step process.  It means you can't be forced

22    to turn over the documents, but if you voluntarily turn over

23    the documents in your own favor, that it also means that you

24    can't tell anybody else, disclose what those documents are.

25    That's extrapolated, but what law principle produces that

1    result?

2         MR. RAPAWAY:  I'm going to have to go back to Judge

3    Netburn's order that your Honor adopted before which goes

4    through the plain language, the history, and the case law

5    applying the Vienna Convention and concludes that inviolability

6    includes confidentiality.

7         THE COURT:  But this isn't — technically,

8    confidentiality means that you have it and you're the only

9    person who, except for who you want to have it, can have it.

10   The plaintiffs aren't violating any confidentiality that you

11   have by accepting the documents that you voluntarily want them

12   to have and you want to use against them.

13        MR. RAPAWAY:  And they can use against us, subject to

14   the protective order, if they find them helpful, as they've

15   attempted to do, but —

16        THE COURT:  Right.  Why does the public need to

17   continue to be ignorant about that, about that evidence?

18        MR. RAPAWAY:  So the public has a weighty right of

19   access to these documents.  We don't dispute that.  The

20   countervailing interest is the treaty commitment.

21        THE COURT:  And you think that the treaty's interest

22   that you articulate as being — or the interests that you

23   articulate as being living up to our treaty obligations, you

24   say that I should determine that that is a more powerful — I

25   don't know what to call it — that that's more powerful than

1   what we know to be a very strong interest, as equal, if not

2   greater, that we have that the public has the right to attend

3   proceedings, see the evidence that's presented in proceedings,

4   unless there is something secret about those proceedings.

5           What is it about this proceeding that's secret, is

6   confidential?

7           MR. RAPAWAY:  So we don't think that the —— so there

8   have been some documents that have been produced by the FBI and

9   by us that maintain —— that retain some confidentiality

10  interest despite the fact that they've been produced in this

11  proceeding.

12          And your Honor, if I could go back to the convention

13  for just one second, as your Honor considers this, there are a

14  couple of words I want to point you to in that convention.  One

15  of them is that the inviolable applies "wherever they may be."

16  "They" being the documents.  It's not merely that as long as we

17  keep them in the embassy, they're confidential.  They maintain

18  their inviolability unless and until we waive that protection.

19          THE COURT:  Give me an example in a case that

20  describes that inviolability, other than in the context of

21  whether you have to affirmatively produce the documents.

22          MR. RAPAWAY:  I'm going to do this without a citation,

23  which is always dangerous, but I believe that there are cases

24  that recognize Vienna Convention inviolability as continuing to

25  apply to documents that are in the hands of a contractor, for

1    example, who has a relationship with an embassy.  It's not in

2    the embassy anymore.  They've given it to somebody subject to

3    an NDA.  This is not necessarily Saudi Arabia.  This could be

4    any foreign sovereign.  And the documents, under the

5    convention, remain inviolable because the foreign sovereign

6    hasn't consented to their release beyond the people they gave

7    them to.

8         THE COURT:  OK.  They haven't consented to their

9    release beyond the people they gave it to.  You think that's

10   the rule I should apply in this litigation?

11        MR. RAPAWAY:  I think that's how ——

12        THE COURT:  That you produced these documents under

13   those circumstances.

14        MR. RAPAWAY:  We produced the documents.  We expressly

15   reserved our Vienna Convention protections when we produced

16   them.

17        THE COURT:  I'm sorry.  In what way did you do that?

18        MR. RAPAWAY:  In a letter to plaintiffs.

19        THE COURT:  OK.  There was a letter that specifically

20   accompanied these documents that said that they were being

21   produced under those circumstances?

22        MR. RAPAWAY:  To the best of my recollection, your

23   Honor, when we did our production letters and we had any

24   documents that were Vienna Convention protected, we would

25   include that express reservation language.

1          THE COURT:  What were you telling them that they

2     couldn't do with these documents?

3          MR. RAPAWAY:  I mean, at the time we were designating

4     them as subject to the protective order, and we were consenting

5     for them to be used for this litigation in connection with the

6     protective order.  Now, obviously, we're past the protective

7     order now, for the reasons your Honor has articulated, and

8     we're into the *Lugosch* balancing.  But I do think that we did

9     not waive our right to keep those documents confidential by

10    consenting to their use in this proceeding and for purposes of

11    this proceeding, but not their publication.

12         THE COURT:  So explain to me how I'm supposed to

13    conduct a public trial.

14         MR. RAPAWAY:  Well, first, I don't think there's a ——

15    if you look at these documents compared to the entire run of

16    documents, it's a fairly small percentage.  I think that

17    there's a number of ways —— we've had hearings already in this

18    case where there are documents that remain confidential.

19    You're going to have to do something like this for the redacted

20    FBI documents if the redactions stay in those.  We can have a

21    monitor for your Honor and for counsel to look at the document

22    and not necessarily put it up in front of everybody and just ——

23         THE COURT:  If the document is already under seal and

24    we have a trial and —— might want to address whether we have a

25    jury trial or a bench trial.  Clearly, if we have a jury trial,

1  in what way is this information that you've already used in

2  support of your motion to dismiss, if you end up going to

3  trial, how are you going to utilize that in a public trial?

4           MR. RAPAWAY:  So, first, there will not be a jury

5  trial in this action, your Honor, because the FSIA only grants

6  jurisdiction for a bench trial.  I think that's the reason,

7  because these types of cases might come up, might involve very

8  sensitive issues.  If there were to be a trial before your

9  Honor —— and I hope that we'll prevail on our motion to dismiss

10  and never get there —— but if we were to have a trial before

11  your Honor, we would treat it in much the same way:  Here's a

12  document for your Honor to look at.  We'll refer to it in

13  general terms.

14           THE COURT:  And I should say publicly that I have

15  found this document, which I won't identify, to be compelling

16  and I rely on it as evidence, and it convinces me to rule in

17  the defendants' favor?

18           MR. RAPAWAY:  Well, I don't think your Honor would

19  need to do that, but if you did get there —

20           THE COURT:  I'm sure if we did have a trial, this room

21  would be full of people who have an interest in what the

22  outcome of that trial is and why.

23           MR. RAPAWAY:  OK.  But let me take a step back, then,

24  your Honor, and refer to the Second Circuit's decision in HSBC,

25  which said that there were some documents in that case —— it

1    was a monitor's report that had been filed with the court,

2    didn't need to be filed with the court at that time.  It was an

3    error that required its filing, and the Second Circuit said

4    it's not a judicial document yet.  There might be some future

5    stage of the case in which the document does have to be relied

6    upon by the court, and that might change the analysis, but

7    right now this isn't a judicial document.  Now, that's only an

8    analogy because some of the documents here are judicial

9    documents, but if your Honor determined that the need to have

10   the trial changed the balance, caused you to come out in a

11   different way with regard to the *Lugosch* analysis, you could

12   certainly change your mind and then say, "I change my mind.

13   This document does need to be public after all despite the

14   treaty promise.  Here it is.  Everybody can look at it."

15        But I think that, as in the posture that we have

16   before you now where we have a limited set of documents in a

17   very large motion record that the majority of, we think, are

18   tangential to the issues presented to the Court, there's no

19   need to unseal all of them and give effectively zero weight to

20   the higher value of the United States complying with its treaty

21   promises.

22        THE COURT:  When you say there's no need to seal all

23   of them, what would be the difference between the ones that

24   would be sealed and the ones that aren't sealed?

25        MR. RAPAWAY:  Well, you heard from my friends on the

 1   other side before about the need to do a document-by-document

 2   balancing.  Our Exhibit 4 goes through each document.  It has

 3   to be under seal because it discusses their contents and

 4   provides your Honor with a discussion of why the document is

 5   one in which the interests weighing disclosure are particularly

 6   strong or the interests against disclosure are particularly

 7   strong.  It is true, with regard to the Vienna Convention

 8   documents, the interest is always the same against disclosure

 9   because it's the treaty promise.  But there's also a discussion

10   of why we believe that many of those documents are tangential

11   to the limited jurisdictional question before the Court, which

12   is whether and to what extent these two individuals, al Bayoumi

13   and al Thumairy, at the direction of senior Saudi officials,

14   assisted the hijackers or others at their direction.

15           So I do think that the hearing before you actually is

16   limited and is not as broad ranging as a trial would be, and

17   you could conclude, not in determining whether the documents

18   are judicial documents, but in conducting the balancing at the

19   end of the stage where you have to exercise your discretion to

20   determine whether the higher value overcomes the interest in —

21   overcomes the interest in confidentiality, you could take that

22   into account on a document-by-document basis if you so chose.

23           THE COURT:  I think that I want to be clear that I

24   don't want to unfairly prejudice your case, and so I'm trying

25   to understand, other than that you're entitled to enforcement

1    of the treaty, whether there's a good reason for me to keep

2    these documents from the public view.

3         MR. RAPAWAY:  I understand, your Honor.  With regard

4    to the Vienna Convention documents, the interest is the treaty

5    promise.

6         THE COURT:  I'm sorry.  I didn't hear the last part.

7         MR. RAPAWAY:  With regard to the Vienna Convention

8    documents, the interest is the treaty promise of the United

9    States.  So if your Honor finds that is insufficient, I have

10   failed to persuade you.

11        THE COURT:  That is not an interest of the litigants,

12   as litigants, in terms of whether or not it supports or

13   prejudices one side or the other by sealing or unsealing.  I

14   still have to weigh —— I think it's appropriate for me to weigh

15   whether there is something bad that's going to happen if these

16   documents are unsealed, and I am struggling with what is the

17   bad thing that's going to happen other than the argument that,

18   well, you promised, and you didn't give us what we expected

19   from the treaty.  But I'm not sure that —— I see nothing in the

20   papers that I can articulate that this is seriously adverse

21   consequences for the defendant in this litigation if the public

22   is aware of most, if not all, of these documents.

23        MR. RAPAWAY:  Your Honor, the bad thing that would

24   happen is that, before the community of nations, the United

25   States would be saying we will not keep our promise.

1          THE COURT:  And you believe that that is a more

2    compelling interest than the public interest in public

3    proceedings?

4          MR. RAPAWAY:  I do.

5          THE COURT:  All right.  Thank you.

6          MR. RAPAWAY:  So we had a couple of other categories

7    of documents.  We had the personal privacy of individuals,

8    which we've invoked for a very small number of documents, and

9    redactions in two respects.  One of those were the documents

10   produced from the private office of Prince Abdulaziz bin Fahd,

11   which were produced to us voluntarily when the Court directed

12   us to produce them.  That is a private office.  I understand

13   plaintiffs have argued to the contrary.  They're wrong.  It's a

14   private office.  He didn't have to cooperate.  He did.  He

15   asked that his documents be kept confidential and, much the

16   same as many of the other witnesses, that his name not be

17   unnecessarily dragged into this litigation.

18         THE COURT:  Why?  There are plenty of people in all

19   litigation that people whose names are dragged in

20   unnecessarily.  They have no interest in this.  There's no

21   reason for me to say that only if he has a personal interest in

22   this litigation.  Again, what is the bad thing that's going to

23   happen if the nature of whatever statements he might have made

24   are disclosed?

25         MR. RAPAWAY:  The bad thing that would happen would be

1    that documents that are traditionally nonpublic that persuade

2    —— that relate to charitable donations in his individual

3    capacity, that ultimately have nothing to do with this case

4    whatsoever ——

5        THE COURT:  But that's like saying I run over somebody

6    with my car and I give an interview and I talk about it, and

7    some privacy interest is the most compelling interest so that

8    people don't know it was me or what I said.  I mean, I'm not

9    sure what it advances, what issue it advances, to simply say,

10   well, we'll make an exception for him.  We don't want him to be

11   tainted by this litigation.

12       MR. RAPAWAY:  I don't think it's an exception.  I

13   think that, in general, as you heard from Ms. Normand, there

14   are a lot of individuals whose names have gotten dragged into

15   this, one way or another, because of providing evidence, who

16   would prefer that that exposure be limited.

17       THE COURT:  I agree.  And you put it the right way.

18   That's a preference, and I understand that as a preference.

19   But I'm not sure I understand that as compelling law to say

20   that, oh, well, this person can give a deposition or give a

21   statement to the FBI and they have a compelling reason greater

22   than anybody else to simply say, I don't want anybody to see my

23   deposition, or, I don't want anybody to see my statement.

24       MR. RAPAWAY:  Your Honor, I'll put it to you this way:

25   If somebody sent me a subpoena for all of the charitable

 1   donations I've given for the last ten years because they argued

 2   that it had some relevance to a case, I would feel a little bit

 3   personally violated if those documents were then published and

 4   it turned out they had nothing to do with the case at all, but

 5   everybody can look at them over the Internet.

 6            THE COURT:  I'm not sure you could prevent it.

 7            MR. RAPAWAY:  Well ——

 8            THE COURT:  What basis could you legally say, oh, I'm

 9   going to stop you from using that in a courtroom during your

10   trial?

11            MR. RAPAWAY:  Well, I mean, personal privacy is a

12   recognized higher value under *Lugosch*.

13            THE COURT:  Right.  But I don't understand what the ——

14   and I don't want to get into the details of it, obviously ——

15   but I don't understand what the compelling personal privacy is

16   with regard to one witness as opposed to another witness.  All

17   that I have with regard to this witness is that this witness

18   has made the decision and has the resources and a public

19   reputation that he wants to somehow protect, and that should

20   compel me to give him that protection as opposed to giving that

21   protection to every witness who's related to this case.

22            MR. RAPAWAY:  I mean, I think that there are probably

23   a lot of witnesses who are related to this case that you should

24   give it to, your Honor.  They don't happen to be associated

25   with my client, so I can't assert their interest.  But you

1   certainly have received letters, or Judge Netburn has, that

2   make the point about the hardship of being associated with this

3   case by individuals who don't have those resources, who may not

4   have lawyers, and I think that they should get what they want.

5   I mean, I'm not — I don't have standing to assert that, but I

6   think they're right.  I don't think that the personal privacy

7   interest is any less because this particular individual happens

8   to be a — or happened at one time, no longer is, to be a

9   senior Saudi official.

10         THE COURT:  Well, I guess, as they say in most cases,

11   it depends.  Can I anticipate that this person might be a

12   witness to be called by either the plaintiffs or the defense?

13   That's one analysis.  And if that's so, there's less of a

14   reason to say, well, don't worry about this.  We'll keep your

15   name out of this.  That's basically what is being requested,

16   and it's not really even that.  It's not the identification of

17   the other individual, it's the substance of what he has to say.

18   It hasn't been articulated to me what the nature of the

19   substance of what he had to say that would compel me to say,

20   oh, yeah, I can understand why he didn't want anybody to know

21   that's what he said.  That's not the appropriate way to look at

22   it.

23         But, again, I'm trying to figure out who I'm supposed

24   to give this confidentiality protection to and for what reason,

25   and I'm not sure I even know an articulable reason why this

1    person should be granted this privilege.

2             MR. RAPAWAY:  All right.  I want to be respectful of

3    the Court's time.  I know there's a lot of other issues to get

4    to, so I'll move on from that argument.

5             The other privacy redaction we had requested was from

6    the information from the al Jarrah deposition that I think your

7    Honor is familiar with in the parallel sanctions proceeding.  I

8    do think that should remain under seal.  I don't think I need

9    to explain why there is something bad that would happen to that

10   individual if that information were released.  So I'd request

11   that the personal privacy be granted at least to that extent.

12            THE COURT:  OK.

13            MR. RAPAWAY:  And there was a point I was going to

14   touch on initially, which is the question of which documents

15   count as judicial documents.  I've understood your Honor this

16   morning to say that you view all the documents that are in the

17   record as judicial documents.

18            THE COURT:  No, for the purposes of this argument, I

19   don't — the first presumption that I am making at this stage

20   is that they're judicial documents.  I have to make a finding

21   one way or the other, and the argument, as I understand it —

22   well, I'm not sure.  Let me not put words in your mouth.

23            What's your position as to why these aren't judicial

24   documents?

25            MR. RAPAWAY:  All right.  I'll make the argument,

1    then, your Honor.

2            So as I mentioned before, there are a total of about

3    2,446, I think it was, documents in what I'll loosely refer to

4    as the motion record; meaning, they were attached to someone's

5    declaration in support of or in opposition to our renewed

6    motion to dismiss.  And our position is that merely attaching a

7    document to a declaration does not in and of itself represent

8    — make that document a judicial document.  Instead, it has to

9    be the actual subject of a request for relief or an opposition

10   to relief that's before the Court, and I think that is not true

11   of all 2,400 documents that are in this motion record.

12           THE COURT:  What do you say is the current status of

13   these documents?

14           MR. RAPAWAY:  So we've submitted a list with our

15   letter, your Honor, of documents that aren't cited at all in

16   any parties' brief or averments.  Plaintiffs attached them to a

17   declaration and then never cited them.  Those include some of

18   our confidential documents, some that came from the embassy.

19   Plaintiffs just ——

20           THE COURT:  Until and unless those documents are

21   rejected, they're in the possession of the Court.

22           MR. RAPAWAY:  But in the possession of the Court isn't

23   enough, your Honor, because it's ——

24           THE COURT:  Well, that's what I'm asking.

25           MR. RAPAWAY:  So in the *Lugosch* decision itself and in

1    cases before and after it, the Second Circuit has repeatedly

2    said the mere filing of a document is not enough to make it a

3    judicial document.  Now, the Second Circuit has also said that

4    a document that is submitted in support of or in opposition to

5    a dispositive motion is a judicial document.

6          THE COURT:  Right.

7          MR. RAPAWAY:  And our argument is that some of these

8    documents are attached to the declaration but aren't actually

9    submitted in support of the motion because they're not cited.

10   They don't tell your Honor what to do with those documents at

11   all.  I don't see how that's enough to make it a judicial

12   document even under *Lugosch*.

13         THE COURT:  But the case also says that the question

14   of public access to the contested documents is thus completely

15   separate from the merits of the underlying action, satisfying

16   the second prong.

17         MR. RAPAWAY:  Right.  It doesn't matter ──

18         THE COURT:  So I don't look at the documents and say,

19   well, these are going to be good documents or bad documents, or

20   this advances their argument or doesn't advance it, this is

21   relevant or irrelevant.  Isn't the court specifically saying

22   that's not the nature of the inquiry?

23         MR. RAPAWAY:  So I absolutely agree you don't say it's

24   relevant or irrelevant; you don't say it's good or bad.  I do

25   think you can and should say this isn't even cited to me.

1          THE COURT:  It isn't even cited?

2          MR. RAPAWAY:  Isn't even cited.

3          THE COURT:  But what does that change its status to?

4          MR. RAPAWAY:  I think it's not a judicial document.

5   It's something that they happen to attach to their motion, but

6   it's not something that they cited of —— in support of a

7   request for relief or in opposition to a request for relief.

8          THE COURT:  So if they write a letter to the Court, is

9   that a judicial document?

10         MR. RAPAWAY:  It would depend on the letter, but it

11  could be, certainly.

12         THE COURT:  I mean, is there any —— under any

13  circumstances it wouldn't be a judicial document?

14         MR. RAPAWAY:  Yeah.  It could be a discovery motion ——

15  no, I'm sorry, discovery motions are judicial documents but

16  subject to a lower presumption.

17         I think if —— actually, there's a good example

18  actually in the *HSBC* case where there was the —— the district

19  court ordered the filing of this motion, this monitor's report,

20  and it turned out the monitor's report wasn't properly before

21  the Court.  And so the Second Circuit said, well, it's not a

22  judicial document because it wasn't —— it's not properly before

23  the Court at all.

24         THE COURT:  But I have to look back and remember what

25  the status was of the document when that decision was made.

 1    Had the document been rejected?  Was the document still a part

 2    of the record?

 3              MR. RAPAWAY:  So the district court thought it was

 4    properly part of the record and ordered its unsealing.  The

 5    Second Circuit on appeal reversed, saying the district court

 6    never had the power to order the production of the document in

 7    the first place.  So it shouldn't have been part of the record,

 8    and therefore, it wasn't a judicial document.

 9              THE COURT:  OK.

10              MR. RAPAWAY:  So I think there's an analogy — I

11    concede it's an analogy, your Honor — to a situation under

12    which plaintiffs have put in documents that they don't cite at

13    all or that they cite in violation of the Court's briefing

14    order, and I'll get to that in a second.  That are not properly

15    before the Court and are not properly part of the record.

16              I guess relinquished explain what I mean by not

17    properly cited now.

18              (Continued on next page)

19

20

21

22

23

24

25

 1          THE COURT:  You say that applies to every part of that

 2    submission?

 3          MR. RAPAWY:  We made a list of what documents they

 4    cited and what documents they didn't cite.  We made the list

 5    for the Court.  The Court can look at them.  We spent a lot of

 6    time putting them together.

 7          THE COURT:  You say because the status issue, you say,

 8    is dependent on whether they cited it or not.

 9          MR. RAPAWY:  Yes.  The brief is a judicial document.

10    An affidavit in support of the brief that's cited in the

11    affidavit, that's a judicial document.

12          THE COURT:  If I attach something to the brief that I

13    don't specifically reference in the brief, you say that means

14    it's not a judicial document.

15          MR. RAPAWY:  Yes.  I would refer your Honor to the

16    *Parifus* case that we cited in our letter where there was an

17    unauthorized filing, and the Court said, I didn't give you

18    permission to make this additional filing in support of your

19    request for relief, so I am not going to consider the documents

20    that are attached to it as being part of the record, and I

21    think that there is a similar analysis here.

22          The Court issued an order on -- Judge Netburn issued

23    the order -- your Honor's review was not sought of it --

24    saying, put the facts in the brief, support the facts in the

25    briefs with citations, specifically citations to the averment.

1    And what we have is a brief and then an averment of which many,

2    many of the paragraphs are not specifically cited in the

3    briefs.  They have these long-range citations, 10 photographs,

4    20 photographs, 100 photographs, a whole section.

5            And we argued to Judge Netburn on a motion to strike

6    that that stuff wasn't properly before the Court, and she said,

7    I am going to leave it in the record because it would take too

8    much time, it would delay things too much to make plaintiffs go

9    back and refile.

10           THE COURT:  Did she deny it without prejudice?

11           MR. RAPAWY:  She just said denied.  I don't think she

12   said without prejudice.

13           THE COURT:  You think she postponed the decision or

14   she denied your motion?

15           MR. RAPAWY:  She granted in part and denied in part.

16   The grant is the subject of Rule 72 objections that are before

17   your Honor.  The rest of it was denied.

18           But I don't think it is reasonable for plaintiffs to

19   put in these extra documents, get to keep them in the record,

20   because it would take too long to sort out what they did and

21   didn't put in properly and then say, oh, but it's all public

22   now, and you have to spend that -- you, we, everybody, has to

23   spend the time going through these documents to determine

24   whether the *Lugosch* balancing analysis applies, even though

25   they are not cited in the briefs, and they are not cited in any

1  part of the averment that's properly cited in the briefs.  I do

2  think your Honor can do something about that, actually.  I

3  think you should.

4          THE COURT:  Thank you.

5          Who wanted to be heard?

6          MR. SIMPSON:  Kevin Simpson for plaintiffs.

7          Your Honor, you asked the question about a good

8  reason, and I'd like for the Court and all present to be clear

9  that the standard we are discussing presently under the *Lugosch*

10 posture is in fact that any restrictions on the public's access

11 to judicial documents should only be imposed for the most

12 compelling reasons under *Lugosch*.

13         What Saudi Arabia has articulated widely deviates from

14 these standards, from the *Lugosch* standards that apply at this

15 stage of the proceedings.  The order that Mr. Rapaway referred

16 to was a discovery order issued by Judge Netburn at a phase of

17 the proceedings which was aptly distinguishable from where we

18 have arrived now.

19         We have before us not only dispositive motions, but

20 also an extraordinary level of public interest in hearing and

21 understanding all the evidence about the critical role that

22 Saudi Arabia played in the 9/11 terrorist attacks, and we have

23 already arrived at the point where the media and the public's

24 interest, as well as the rights of the 9/11 families, are

25 invoked.  As your Honor is aware, no fewer than six different

1    media organizations have already intervened.  We have arrived

2    at that point.  This is not a distant destination.

3           The *Lugosch* analysis requires Saudi Arabia to meet a

4    burden showing exceptional circumstances and higher values to

5    overcome the presumption of public access, and nothing that Mr.

6    Rapaway has articulated meets that burden.

7           The arguments that Mr. Rapaway has engaged in in fact

8    go to points such as relevancy and weight of the evidence that

9    are properly before your Honor in the motion papers.  These are

10   points that your Honor will properly address at oral argument.

11          And Saudi Arabia's efforts to prelitigate those

12   matters in their presentation today is improper.  It's also,

13   your Honor, not for Saudi Arabia to seek to define what is

14   relevant to the record or not.  That is in the gift of your

15   Honor and this Court.

16          It is simply not true that plaintiffs have submitted

17   what Saudi Arabia described as large batches of uncited

18   documents.  Every paragraph of plaintiffs' averment is properly

19   cited in our briefs.  We have an opposition brief, we have a

20   court-authorized surreply, and every one of the paragraphs of

21   our averment is properly cited in those briefs.

22          Saudi Arabia invented terms, such as lengthy paragraph

23   ranges or citations to whole sections which it sought to use to

24   slash away evidence that plaintiffs have submitted for your

25   Honor's consideration in a dispositive motion which, to

1    reiterate what we said earlier, as a matter of law, are

2    judicial documents under the *Lugosch* First Amendment right of

3    access.

4         THE COURT:  Answer this question for me.  Didn't

5    Magistrate Judge Netburn set out restrictions and directions as

6    to how you should file these documents and you went beyond

7    those restrictions?

8         MR. SIMPSON:  Your Honor, Magistrate Judge Netburn set

9    forth a protocol by which parties were required to cite to

10   their evidence in their briefs, and we in fact complied with

11   that protocol to the letter.  Saudi Arabia raised a motion to

12   strike vast numbers of the paragraphs of our averment, and, as

13   Mr. Rapaway conceded, that motion, in the relevant part, was

14   denied by Judge Netburn.  There is no dispute as to whether our

15   evidence is properly cited in the record according to the terms

16   of Judge Netburn's order.

17        Furthermore, there are several relevant points to make

18   about this claim.  Saudi Arabia itself undertook an entirely

19   unbalanced and one-sided analysis of the documents that

20   plaintiffs have submitted in the record.  The example given was

21   that of the executive order production, Plaintiffs' Exhibit 2.

22        Saudi Arabia took what were initially only a small

23   number of subparts to Exhibit 2 and fragmented that exhibit

24   into literally hundreds of individual documents, breaking down

25   the executive order production even further than the FBI had

1   done upon its release on the FBI vault, according to the terms

2   of the executive order.

3          The number that you have heard today, your Honor, of

4   2,449 documents submitted in evidence, is a phony claim.  There

5   are not 2,449 exhibits at issue.  Hundreds of that number are

6   in fact part of a single exhibit, Exhibit 2, which is the

7   executive order production released under President Biden's

8   September 3, 2021 Executive Order 14040.

9          It is entirely proper for plaintiffs to cite to the

10  relevant portions of that production and for the remaining

11  parts of that production to be in the judicial record because

12  controlling Second Circuit authority, as your Honor is well

13  aware, demands that the record be viewed in its entirety.  This

14  indeed is the fallacy of Saudi Arabia's claim that a string

15  cite or a cite to multiple paragraphs is not a proper cite.  We

16  are dealing with a record that requires careful brick-by-brick

17  building of the evidence to demonstrate complex issues of Saudi

18  Arabia's and its agents' involvement in supporting the 9/11

19  hijackers.

20         It is, quite frankly, impossible to expect a party to

21  pin cite an individual paragraph, nor would that be reflective

22  of the evidence.  Many of these paragraphs necessarily build

23  upon one another, and plaintiffs have properly pointed the

24  judge to the parts of the averment in sometimes sections,

25  sometimes a sequence of two, three, or five or 10 paragraphs,

1   which is relevant to the point being made in either our

2   opposition brief or our surreply brief, which were necessarily

3   limited to 70 pages and to 20 pages.

4        You have heard Saudi Arabia characterize certain

5   evidence as tangential.  You heard the words remote and

6   attenuated.  These are not legal standards, your Honor.  These

7   are made-up expressions which seek to prelitigate issues of

8   relevancy that are in fact at the heart of your determinations.

9        Furthermore, your Honor, it is at the very heart of

10  the public access to judicial documents, the First Amendment

11  presumption of access under *Lugosch*, that the performance of

12  the judicial function in determining relevancy, in determining

13  the credibility of witnesses, in determining the weight of the

14  evidence, should also in itself be subject to public access.

15       In that regard, Saudi Arabia's efforts, whether by

16  seeking to request sealing or by seeking to slash away vast

17  swaths of plaintiffs' evidence by other means, by stealth, is

18  not permissible under the *Lugosch* framework.  We should all be

19  clear that that is the point at which we have arrived.  We are

20  operating under the *Lugosch* framework.

21       The Kingdom of Saudi Arabia's arguments regarding its

22  other sealing grounds, the grounds for its sealing requests,

23  also do not amount to the most compelling reasons required by

24  the Constitution and by the authority of *Lugosch*.

25       They have made generalized, conclusory arguments in

1    which they invoke these broad categories, such as international

2    comity or Vienna Convention, not by specific particularized

3    showings as to what interest is being protected or what harm

4    might be done by public disclosure, but rather by sweeping

5    labels, which they have attached in nothing more than a

6    highlighted label in a PDF document not specific to the

7    contents of the documents in question, but rather invoking

8    these concepts, such as in viability in the broadest possible

9    manner.

10        Your Honor was absolutely correct that Saudi Arabia

11   already availed itself of the full protections of the Vienna

12   Convention during discovery.  We should not be misled by their

13   statement that they voluntarily produced documents that they

14   need not produce and that this was some sort of extraordinary

15   step.

16        On the contrary, their production was highly

17   selective.  It was part of a calculated litigation strategy.

18   They employed the enviability privilege already as a shield at

19   the time of the discovery, refusing to furnish any privilege

20   log, and selectively curating the set of documents that they

21   would place before the Court.  They cannot, your Honor, now

22   seek to hide further behind that shield to keep properly

23   produced judicial documents from public access.

24        We aver, your Honor, that Saudi Arabia has

25   relinquished whatever protections it may have had during

 1    discovery, according to this Court's orders, and that any

 2    reservation made by the Kingdom of Saudi Arabia in its letters

 3    to the parties are, quite frankly, irrelevant to the First

 4    Amendment framework of analysis for public access to judicial

 5    documents.  There is no right of the sort that Saudi Arabia has

 6    averred to keep these documents sealed.  We have heard several

 7    representations by Saudi Arabia's counsel that are simply not

 8    concordant with the record.

 9         Firstly, the Vienna Convention protections that they

10    aver, which are supposed to attach to documents from embassy or

11    consulate locations, were, in many instances, able to have been

12    produced from non-Vienna Convention protected locations, such

13    as Saudi Arabia's Ministry of Islamic Affairs.

14         This has been proven, your Honor, by productions from

15    other parties in the case, including the production of the

16    Metropolitan Police Service from the United Kingdom, the MPS

17    production, which produced hundreds of documents from -- seized

18    from the possession of Saudi Arabia's agent, Omar al-Bayoumi,

19    immediately after the 9/11 attacks.

20         In Mr. Bayoumi's possession were copies of

21    correspondence that he had sent to embassy and consulate

22    officials.  He held copies of those documents himself, and they

23    were duly produced by the MPS.  We, in our papers, your Honor,

24    have set forth a whole slew of examples of documents as to

25    which Saudi Arabia has averred this Vienna Convention

1   protection illegitimately for the same and for other reasons.

2   Currently, your Honor, our submissions on that point have had

3   to be made under seal because they do address documents that

4   are currently subject to the litigation protective order.

5        The named Saudi government official, Prince Abdulaziz,

6   also has no privacy right.  He has not articulated any

7   compelling reason as to why documents allegedly under his

8   protection should be denied from public access, and he has not

9   articulated any risk as to -- or harm as to what would happen

10  to him were these documents to be unsealed.

11       Your Honor, if I may, I'd like to address the point

12  that Mr. Rapaway made about an alleged broken promise and

13  perhaps a harm that would be incurred from public access to

14  judicial documents that were produced by Saudi Arabia under a

15  misunderstanding of international comity or the Vienna

16  Convention.

17       There is no broken promise, your Honor.  The United

18  States District Court has the application of laws and the

19  application of the Constitution as its single responsibility,

20  and Saudi Arabia never produced documents assuming that either

21  constitutional or controlling Second Circuit authority would

22  somehow be suspended to protect its documents from public

23  access.

24       I'd like to address the questions around privacy

25  interests as well, if I may, your Honor, because it's important

1    that you should have some concrete examples in response to your

2    questions earlier as to the types of individuals whose names

3    are proposed for redaction under both the FBI's redactions and

4    those that Saudi Arabia supports in its briefing.

5        We are talking about individuals such as the first

6    person who assisted the two 9/11 hijackers, Hazmi and Mihdhar,

7    upon their arrival in the United States in January of 2000.

8    His name in certain documents that plaintiffs have submitted

9    has been proposed for redaction by the FBI, notwithstanding the

10   fact that there are media organizations now represented and who

11   have appeared in our proceedings who have reported since many

12   years this individual's name in the precise context in which he

13   acted.

14       Another example, the Saudi official held a private

15   meeting with Omar al-Bayoumi at the Los Angeles consulate on

16   the day, February 1, 2000, when Bayoumi went to meet those two

17   9/11 hijackers.  His name has also been subject to redaction in

18   certain of our papers by the FBI under these generalized

19   categories, such as privacy, notwithstanding the fact that his

20   name too has been reported in the media for many years in

21   exactly that capacity, including by some of the media

22   organizations who are represented now in this courtroom and

23   before your Honor in these proceedings.

24       The FBI has not represented that its redactions

25   weren't sealing under the *Lugosch* standard.  Rather, it has

1    complied with the Privacy Act protection order that applied in

2    this case, the FBI protective order.  It was a discovery order.

3            And, as your Honor has rightly recognized, and as the

4    Court in *Lugosch* dealt with in analogous circumstances, a

5    confidentiality order of this sort was known to expire at the

6    point when dispositive motions practice would arrive.  The

7    specific confidentiality protections that were permitted to

8    parties to produce these documents have now expired, your

9    Honor, and we are governed by the *Lugosch* standards, which

10   requires any party, Saudi Arabia, the FBI, or any of those

11   others who have submitted sealing requests to meet the most

12   compelling reasons and for your Honor to be able to engage in a

13   careful consideration and to adjudicate as to narrowly tailored

14   means of protecting only those higher interests.

15           Nothing we have heard from either the FBI or the

16   Kingdom of Saudi Arabia today meets those standards, your

17   Honor, and therefore, plaintiffs strenuously object to

18   everything that has been put forward as to reasons why the

19   evidence should not properly be before you at oral argument and

20   subject to public access.

21           THE COURT:  Thank you.

22           MR. SIMPSON:  Thank you, your Honor.

23           MR. KRY:  Your Honor, Robert Kry from MoloLamken for

24   the defendant Dallah Avco.  I'll be very brief, your Honor.

25           Dallah Avco did not submit a letter last week because

1    Dallah Avco is not asking to seal any documents.  Dallah Avco

2    does not oppose any parties' request to unseal any documents.

3    Dallah Avco does not take a position on the dispute between

4    plaintiffs and the FBI over how those redactions should be

5    handled, and Dallah Avco also does not take a position on the

6    dispute between plaintiffs and the Kingdom about the Kingdom

7    redaction requests.

8            Dallah Avco's decision not to submit a request for

9    sealing I think was consistent with some of the themes that

10   plaintiffs have been mentioning here today, including the

11   public interest in not having secret proceedings.

12           Dallah Avco, your Honor, you will recall, is a

13   government contractor in Saudi Arabia that handled payroll and

14   other administrative functions for 1400 employees on a Saudi

15   civil aviation authority project.  One of those 1400

16   individuals happened to be Omar al-Bayoumi, who went to the

17   United States for a lengthy period pursuing educational studies

18   and being funded through various budgets by the Saudi

19   government agency.

20           We have moved for dismissal and for summary judgment

21   because at this point the evidence is simply uncontradicted

22   that whatever al-Bayoumi may have been doing in the United

23   States in his spare time, when he was not pursuing educational

24   studies, was something that we had no knowledge about

25   whatsoever.

 1          There is zero evidence that Dallah Avco ever had any

 2     knowledge that al-Bayoumi was assisting terrorists in the

 3     United States or engaging in any other illegal conduct in the

 4     United States from which the 9/11 attacks were reasonably

 5     foreseeable.

 6          And we appreciate that if and when this Court reaches

 7     the conclusion that our assessment of the record is correct,

 8     the public certainly may have a legitimate interest in seeing

 9     the evidence on which this Court based that determination.  We

10     welcome that scrutiny, your Honor.

11          For that reason, Dallah Avco has not made any request

12     to seal records, and Dallah Avco is not going to oppose any

13     parties' request to unseal records.

14          With respect to most of what has been said today,

15     Dallah Avco simply has no position.

16          I will add, your Honor, that Dallah Avco does have a

17     position on how the case should go forward.  We strongly

18     believe that the Court should proceed with the hearing as

19     scheduled on July 31.  We believe that that hearing can be

20     conducted in open court, that the issues of dealing with FBI

21     reactions or Saudi Arabia redactions can be handled capably by

22     all parties.  This is not the first time that a hearing will be

23     held in public in which the record will still be in a few

24     respects perhaps redacted or under seal, so there is no reason

25     that can't happen.

1              And from what I've heard today, I'm not trying to

2    change your Honor's mind or anything, it certainly sounds like

3    your Honor's intent is to proceed with this hearing as

4    scheduled on July 31.  But I do have a couple of additional

5    points as to why that approach is the right approach, and I'm

6    happy to address those now, or if your Honor was planning on

7    covering that later in the hearing, I can save those remarks.

8              THE COURT:  No.  You can go ahead and address it.

9              MR. KRY:  The first set of points just goes to why

10   it's totally a feasible approach.  What's important here is

11   that this is not a trial.  It's not an evidentiary hearing.  It

12   is oral argument on legal motions where the briefs in support

13   of and against those motions are already on the public docket

14   with very limited redactions.

15             So, for the most part, what the parties are going to

16   be arguing about on July 31 is simply drawing this Court's

17   attention and focusing this Court on points that have already

18   been made in written submissions that are already on the

19   docket.  So the vast majority of that legal argument really

20   doesn't raise issues of sealing at all, precisely because those

21   briefs, largely unredacted, are already available.

22             Now, to the extent that the parties may need to

23   respond to certain arguments by alluding to other documents in

24   the record that may not be unredacted in the briefs, it's just

25   not a new problem, your Honor.  This is something that parties

1   routinely deal with whenever they have to argue in open court

2   about documents that are under seal.  Parties or counsel can

3   direct the Court's attention to specific documents that are

4   under seal and proffer them as relevant to a particular point

5   without disclosing what the document actually says.

6        Your Honor pointed out that you'll have a screen,

7   counsel will have a screen.  That screen doesn't necessarily

8   need to be shown to the rest of the court for certain portions

9   of the proceeding.  So it's perfectly feasible -- and we

10  completely agree with your Honor on this point.  It's perfectly

11  feasible and reasonable to handle those documents by directing

12  the Court's attention to unredacted versions of the documents,

13  if necessary, without disclosing those to the public,

14  consistent with whatever your Honor decides on the sealing

15  disputes.

16        Then I'll also point out too that surely the parties,

17  including the plaintiffs, know what documents or what points

18  have not been adequately covered in the briefs but that they

19  would intend to elaborate on at the hearing.  And with respect

20  to those, I just note that the FBI made every reasonable effort

21  to invite the plaintiffs to identify priority documents that

22  plaintiffs expected to use at the hearing so that those

23  documents could be -- specific documents could be put before

24  your Honor for consideration at this very hearing, and the

25  plaintiffs just refused to cooperate with that, your Honor.

1           I do think the FBI made reasonable efforts to give the

2    parties an opportunity to tee up discussions of specific

3    documents they anticipated using at the hearing, and the

4    plaintiffs just didn't engage with that offer of an

5    opportunity, your Honor, so they didn't take the FBI up on that

6    offer, but that is on the plaintiffs.  It's not on the FBI.

7           The other point I'll make on this is that in

8    opposition to the -- let me concede at the beginning that, from

9    the plaintiffs' point of view, proceeding in this matter,

10   having to be mindful about not disclosing unredacted contents,

11   may not be ideal.  It may not be their preferred way of doing

12   this hearing, but it is still a more-than-adequate way to

13   proceed and a more-than-adequate way to enable them to present

14   their legal arguments in support of their motion.

15          And whatever weight plaintiffs' preferences should

16   receive in the analysis has to be weighed against the very

17   strong interests that the defendants have in the prompt

18   resolution of this matter, your Honor, because it's not

19   surprising that practically every time a dispute about this

20   redaction process comes up, it's coupled with an argument from

21   the plaintiffs about why this hearing should be postponed and

22   delayed to some indefinite point in the future, after they have

23   had an opportunity to go through tens of thousands of pages of

24   exhibits and argue about why a particular matter should be

25   redacted or not redacted.

1          The question of prompt resolution of this case is a

2   weighty one for the defendants, and whatever delay this Court

3   imposes in that hearing is going to have an adverse effect on

4   the defendants' right to get a prompt resolution of this case.

5          This litigation has now been pending for 20 years.

6   Our client, Dallah Avco was brought into the litigation, as I

7   mentioned, 20 years ago, based on allegations that it somehow

8   provided cover employment and financial support to al-Bayoumi.

9          And the evidence has just shown, without

10  contradiction, that that's not true, that as far as Dallah Avco

11  knew, this gentleman, Mr. al-Bayoumi, was in the United States

12  pursuing educational studies with the full blessing of the PCA.

13  And to the extent that Dallah Avco processed any payments for

14  al-Bayoumi, it was just fully consistent with the contractual

15  obligations that Dallah Avco had as a government contractor.

16         Plaintiffs have had 20 years now to chase down these

17  theories, and they have not done it.  They have not come up

18  with that evidence.  So at this point the defendants have a

19  very strong interest in the prompt resolution of this case and

20  in drawing this matter to a close.

21         Whatever the Court does with the redaction dispute we

22  take no position on, but what the Court definitely should not

23  do is further postpone the hearing that is set for July 31.

24  The time has come to bring these matters to a conclusion.  That

25  can be done on July 31.  It can be done in open court, it

1    should be done on that day, and it should be done in open

2    court.  And I will just add that we look forward to appearing

3    in front of your Honor then.  Thank you.

4          THE COURT:  Thank you.

5          Did you have something further from the FBI?

6          MS. NORMAND:  Your Honor, if I could just be heard

7    briefly on a few points.

8          There was a mention by my colleague on the PECs who

9    talked about the executive order production, which is Exhibit 2

10   before the Court.  That production is over 3200 pages.

11   According to the exhibits that Mr. Rapaway has put before the

12   Court, it consists of over a thousand discrete documents,

13   meaning 302s, witness reports, internal documents, etc., 927 of

14   which have not been cited in the parties' briefs and averments.

15         The Kingdom has argued that that means they are not

16   judicial documents subject to a First Amendment qualified

17   presumption of public access.  The FBI doesn't take a position

18   on how the Court resolves that issue, but we do urge the Court

19   to resolve that issue because it will certainly define very

20   significantly the number of FBI documents that are at issue in

21   the case.

22         Even if the Court considers the entirety of Exhibit 2,

23   all 3200 plus pages to be judicial documents, we still think

24   that the Court needs to evaluate the redactions to those

25   documents on an individualized basis to determine if the

1    privacy interests of the individuals whose names and other

2    personal information is redacted constitute higher values that

3    overcome any public interest in their names.

4            In this regard, I would point out that there has been

5    a reference to 22 individuals who are of particular interest in

6    the plaintiffs' briefs and averment, and Mr. Simpson

7    identified, generally speaking, a couple of those individuals

8    whose names have been redacted.

9            The FBI certainly does not object and takes no

10   position on whether certain names and information that those

11   individuals may have provided should be unsealed where the

12   analysis, the *Lugosch* analysis, favors public disclosure of

13   that information.  But we want to make sure the Court

14   understands and the public understands that within that

15   executive order production and the many, many other documents

16   at issue are not just the private information of 22

17   individuals.  We are talking about hundreds and hundreds of

18   individuals whose names and private information appear in

19   Exhibit 2 and in other documents, not just names, but telephone

20   numbers, street addresses, family members, work and employment

21   history, and school history, a host of information, much of

22   which has never been cited in the briefs or exhibits.

23           Even if the Court determines that those are all

24   judicial documents, we urge the Court to evaluate on an

25   individualized basis whether those names and that private

1  information should be disclosed, should be unsealed in the

2  context of the individual's role in relation to the issues

3  before the Court, as identified by the fact that the

4  individuals are or are not cited in the various briefs or

5  averments, and the information that's redacted.  Does it

6  matter?  Is the information of value?  Does it matter whether a

7  telephone number or an individual's family history is

8  disclosed?

9          It certainly seems to us that, under the *Lugosch*

10 balancing test, in order to determine whether there is a higher

11 value, you have to compare that value with what is the public

12 interest in the information.  And certainly where there is no

13 citation of the individuals or the particular information

14 that's identified, it seems to us that there may very well be a

15 higher value.  Again, those are determinations for the Court to

16 make, and the FBI is not taking a position as to -- how the

17 Court should weigh those values in regard to particular

18 redactions.

19         But we do think that blanket unsealing of the names

20 and phone numbers and personal identifying information of

21 hundreds of individuals who cooperated with the FBI or about

22 whom the FBI may have received information from witnesses would

23 be inappropriate.

24         It's not just the privacy interests of those

25 individuals that are at stake here.  The FBI also has a

1    compelling interest in avoiding wholesale disclosure of

2    personal identifying information of individuals who cooperate

3    with a counterterrorism investigation.

4            There is no doubt that this case is extraordinary on a

5    number of levels.  The public interest is high.  We certainly

6    acknowledge that.  There are a number of other important

7    aspects of this case.

8            But one important aspect of this case is the

9    extraordinary nature of the FBI's production of information.

10   As far as we can tell, it's unprecedented that the FBI would

11   have produced the level -- both the volume and the nature and

12   the scope of materials as it did in this case, including

13   materials produced as a result of a declassification order by

14   the president of the United States which then resulted in the

15   disclosure of yet more information.  But that order made clear

16   that the FBI, in producing that material, and the intelligence

17   community, in producing that material, had to comply with the

18   Privacy Act and redact certain individuals' names and

19   information.

20           Now, it may well be that some of that information is

21   relevant to the Court's inquiry and should be unsealed, and

22   that's for the Court to determine.  But we urge the Court to do

23   that on an individualized basis, to focus on the individuals

24   whose privacy interests are at stake, and the content of the

25   information in the documents in which it appears in evaluating

1    those matters.

2            I would add one last thing, which is there was a

3    reference to the Privacy Act order and the FBI protective order

4    expiring.  We don't view it that way at all, your Honor.  There

5    is nothing in the document that suggests that it expires.

6            In fact, under the Privacy Act, the information that

7    the FBI has identified for protection under the Privacy Act,

8    that information remains protected by law unless and until this

9    Court issues a further order authorizing its disclosure.

10           So we are not saying, certainly, that the Privacy Act

11   outweighs the First Amendment interest in disclosure where the

12   Court determines that the *Lugosch* balancing test requires

13   disclosure, but we certainly would need a further order

14   authorizing disclosure of information protected by the Privacy

15   Act.

16           Thank you, your Honor.

17           THE COURT:  Thank you.

18           MR. CARTER:  Your Honor, may I briefly respond?

19           THE COURT:  Yes.

20           MR. CARTER:  Your Honor, just a few points in response

21   to Ms. Normand's presentation and Mr. Kry's presentation.

22           With regard to Ms. Normand's articulation of the

23   process that the FBI proposes the Court to follow, I think we

24   are largely in agreement.  In the meet-and-confer process we

25   made clear that they were only seeking to have the FBI unseal

1     the information in the cited executive order documents, not the

2     full spectrum of them, and we provided a list of the

3     executive-order documents that were cited.

4            And we have been advocating for some time that the

5     sealing analysis should take into consideration the status of

6     the individuals, the relevance of them, their significance to

7     the issues being adjudicated, and the particularized analysis

8     of their privacy interests.  And the FBI has acknowledged that

9     many of the redactions likely do not meet the *Lugosch* sealing

10    standard.  It has proposed that the Court should go through all

11    of these redactions on its own and conduct a balancing analysis

12    on its own, without any proffer having been made, and that

13    seems very difficult.

14           What we tried to do to expedite this process was to

15    urge the FBI to take a look at the individuals involved and to

16    remove the redactions as to at least the key participants in

17    the events and transactions at issue in the briefs, those that

18    were cited specifically in the averment, those who attended

19    particularly significant events.

20           If that were done, what would be left, in our view, is

21    the potential incidental references to additional witnesses

22    somewhere in other parts of the report that is submitted of

23    record who perhaps don't matter and whose privacy interests may

24    warrant sealing, and we are perfectly happy to give

25    consideration to those.

1          The concern here is that the redactions you have right

2    now, under the Privacy Act, capture people at the very core of

3    the judicial function, who are deeply involved in the

4    activities at issue, whose involvement is known, and for whom

5    no resulting risk of harm can really be identified because they

6    are already all there.  Nothing that happens in an unredacting

7    process here is going to change any of that since they have

8    already been identified.

9          So that is the process that we had identified and that

10   we agree with, but it's not done, in part, because we don't

11   even have redactions for most of the exhibits at this point in

12   time.

13         And there is a practical dimension to this.  Once we

14   reached a status where we have an agreed-upon adjudicated set

15   of redactions that are going to survive, we have to implement

16   them, and then we have to get things on file, and that's not

17   going to happen if we are receiving documents from the FBI on

18   the eve of an argument.  It's simply logistically impossible.

19   These take a while to work through, in all honesty.

20         We are eager to get this done, and we have been

21   advocating a reform of this approach since April of 2023, and

22   the reform of the approach we have been advocating is exactly

23   the one we are articulating right now.  This is where we always

24   thought this needed to be, and we have been frustrated that it

25   hasn't been implemented already and the documents aren't

1    already in the public domain.

2            With regard to Mr. Kry's arguments about the conduct

3    of the hearing, he suggested that this is essentially a

4    relatively antiseptic legal argument that will be conducted

5    before the Court.

6            But that ignores the nature of Saudi Arabia's

7    challenge to this Court's jurisdiction.  Saudi Arabia has not

8    simply argued that issues of agency and attribution are

9    unsatisfied, such as those identified in the Court's March 2018

10   decision.

11           It is argued that this Court's analysis of its

12   jurisdiction requires it to make determinations as to the full

13   merits of plaintiffs' claims and that plaintiffs are obligated

14   to come forward with evidence, make a *prima facie* showing of

15   evidence as to evidence satisfying all elements of their

16   claims.

17           So there will be a significant evidentiary profile to

18   any argument here, because the nature of the question is

19   whether or not we have proffered evidence sufficient to make

20   our *prima facie* showing.

21           We do not agree that this Court's inquiry is as

22   expansive as Saudi Arabia has proposed.  We believe the Court

23   can determine its jurisdiction simply by confirming that the

24   actions at issue are attributable to Saudi Arabia and were

25   taken within the scope of agency, and we think the record

1    provides a clear path in three different ways for the Court to

2    reach that decision.  But we do have to have the opportunity

3    and ability to respond to the full scope of Saudi Arabia's

4    anticipated arguments at the hearing.

5            With regard to Mr. Kry's arguments about what Dallah

6    Avco knew in its role in Bayoumi's cover employment that

7    allowed him to stay in the United States for years, including

8    when he was assisting the hijackers and conducting casings of

9    the U.S. Capital building, all I will say is that the

10   unavailability of aspects of the record right now, because they

11   are under seal, make it hard for us to respond, but we disagree

12   with what he said, and we will make those points at argument.

13           Thank you, your Honor.

14           MR. RAPAWY:  May I be heard briefly in response to

15   that, your Honor?

16           THE COURT:  Yes.

17           MR. RAPAWY:  Just three quick points in response to

18   Mr. Carter, your Honor.

19           First, this will be before your Honor at the

20   subsequent hearing, but we disagree that our position required

21   plaintiffs to prove the merits of their case.  Their position

22   is that plaintiffs have to prove the jurisdictional elements of

23   their case.

24           Second, and maybe more relevant to what's going on

25   today, I heard Mr. Carter say that he had agreed with the FBI

1    that only the cited documents from within the executive order

2    of production should become public.  I think the same rule

3    should apply to Saudi Arabia, and the cited documents of Saudi

4    Arabia's that were previously designated as confidential should

5    remain confidential.

6          I also want to point out, in case I did not adequately

7    emphasize it before, that also applies to deposition

8    transcripts where small parts have been cited, but the entire

9    transcript has been placed in the record.  And I think that a

10   consideration of the remaining confidentiality interests of

11   Saudi Arabia in the parts of those declarations that have not

12   been cited, including for some very high-level officials, is

13   also appropriate.

14         THE COURT:  Thank you.

15         I am going to try to keep this on schedule.  I am

16   going to try within the next week to resolve this issue.

17         MR. SIMPSON:  Your Honor, may I be heard briefly in

18   response to one of Mr. Rapaway's points?

19         THE COURT:  Yes.

20         MR. SIMPSON:  Your Honor, two brief points from

21   plaintiffs in conclusion.

22         Firstly, with regard to deposition transcripts, Saudi

23   Arabia is urging the Court in this conclusory fashion to seal

24   off a vast majority of the deposition testimonies of witnesses,

25   including its own current and former government officials.

1    This would be inappropriate in light of Saudi Arabia's

2    extraordinary arguments that are at the very heart of its

3    motion to dismiss.

4         What Saudi Arabia is doing is attempting to narrow

5    severely the reviewable record in order that it can rely solely

6    on its own sharply disputed claims about the evidence and

7    advocate that the comprehensive and compelling proof that

8    plaintiffs have submitted should somehow be ignored or

9    dismissed or sidelined or stricken or, in this case, kept under

10   seal.

11        As I pointed out before, this is a case that requires

12   the evidence to be viewed in its totality, in the context of

13   all of the other evidence in the record and deposition

14   transcripts, which allow your Honor to assess credibility and

15   weight of evidence, which are at the very heart of the judicial

16   function in that regard.

17        Secondly, with regard to the proposal that the

18   hearing, the oral argument on July 31, could somehow proceed

19   with a narrowing of the record to some pre-agreed subset of

20   judicial documents, plaintiffs regard that as unworkable and a

21   nonstarter.

22        The Court in *Lugosch*, your Honor, rejected that very

23   proposal, and it should be pointed out that one party that has

24   not been heard today is the press, and such restrictions, a

25   reversion to some kind of closed proceedings or in camera

1    hearing would be intolerable to the press and the general

2    public and the 9/11 families under the *Lugosch* standards.  It

3    would be impermissible and it would, of course, be subject to

4    challenge.

5            Your Honor, plaintiffs are prepared to work as

6    expeditiously and constructively as possible to try to resolve

7    these disputes, in light of all that we have said in our

8    representations.  Thank you.

9            THE COURT:  Yes, sir.

10           MR. SCHAFER:  Thank you, your Honor.  My name is

11   Matthew Schafer.  I represent CBS Sports, doing business as CBS

12   News.

13           If your Honor would indulge me on behalf of the press,

14   I would like to make just a few comments.

15           THE COURT:  Briefly.

16           MR. SCHAFER:  First, your Honor, moving to brass

17   tacks, if no one is moving to seal, as your Honor was getting

18   at earlier, the documents that no one is contesting should be

19   under seal shouldn't be sealed.

20           The parties mentioned 2,449 documents.  177 of those

21   documents the defendant is asking the Court to seal those

22   documents; 56 documents it's asking the Court to redact them.

23   That's a combination of 233 documents.  By my math, which might

24   not be great, but my math is that there is 2,216 documents that

25   are currently disclosable and not subject to a motion to seal.

1          Along the same lines, the FBI has made various

2     statements relating to the Privacy Act.  It hasn't proved to

3     seal specific documents.  It suggested redactions.  If the FBI

4     wants to keep those redactions under seal, it should file a

5     motion requiring sealing.

6          There has also been some questions about privacy of

7     witnesses.  The FBI has put forward a generic category of

8     concern about witness safety.  I am not trying to undermine

9     witness safety, but if we applied that reasoning to every case,

10    every case would require sealing of witness names, and that is

11    simply not the law.

12         Defendant Saudi Arabia has argued in favor of applying

13    the Vienna Convention.  I point your Honor to *Boos v. Barry*,

14    485 U.S. at 324.  In that case it was the First Amendment right

15    to protest outside of consulates and embassies.  The Vienna

16    Convention was also at issue in that case.  The Supreme Court

17    said that the Vienna Convention could not necessarily overcome

18    the First Amendment right to protest.  By analogy, I would

19    argue the same thing here as well.

20         There has also been discussion about balancing, that

21    perhaps if the information in the documents is less relevant to

22    the adjudication that your Honor has to undertake, that that

23    might change the level of the right of access, that access is

24    on a dimmer switch.

25         But the Second Circuit has repeatedly said that when

1    it comes to the constitutional right of access, it is an on/off

2    proposition.  Your Honor can look in our letter that we filed.

3    It is the *Gannett Media* case where the Court says specifically

4    that the presumption either applies or does not.  It is then

5    the FBI's obligation or the defendants' obligation to come up

6    with a compelling interest.

7        Your Honor asked earlier about the compelling

8    interest.  How do I actually do the math and figure out if

9    something is compelling.  It's not simply asking whether there

10   is a compelling interest at stake.

11       Rather, if your Honor looks at *Press-Enterprise v.*

12   *Superior Court* (1986) from the Supreme Court, at page 14, it's

13   478 U.S. at page 14, the court said there that what this Court

14   has to do is decide whether, absent closure, there is a

15   substantial probability of harm to the compelling interest.

16       The FBI mentioned that if certain names are revealed,

17   they could be subject to harassment.  But the Supreme Court in

18   *Press-Enterprise* made clear that the standard is not could be,

19   but rather the standard is there must be a substantial

20   probability of harm to a compelling interest, so I submit that

21   that is the standard that the Court should apply here.

22       Finally, the Court is not in an enviable position.

23   This is, obviously, a large record.  It is the Court's

24   obligation, as has been made clear today, as the Second Circuit

25   has said, to review these documents on a document-by-document

1    basis and decide whether or not there is a substantial

2    probability of harm to a compelling interest, and that whatever

3    the solution is that the Court adopts that it's narrowly

4    tailored.

5        I would ask the Court to look at *Lugosch* once again.

6    In that case, it was a summary judgment record.  4,000 pages of

7    documents were at issue in the original motion.  In response,

8    as the Second Circuit put it, there were 15 volumes filed

9    wholesale in that case.

10        I recognize the gravity of the situation and the scope

11    of the record before the Court, but the fact is that the *sui*

12    *generis* nature of this particular proceeding does not change

13    the underlying tried and true First Amendment interests here.

14        I think with that, unless the Court has any questions,

15    CBS would request again that any documents that aren't

16    currently subject to a motion to seal be unsealed as promptly

17    as possible, and that if the FBI does not make a motion showing

18    that there is a compelling governmental interest in secrecy and

19    that there is going to be a substantial probability of harm,

20    that the Court unseal those redactions as well.

21        THE COURT:  Thank you.

22        I will try to keep us on schedule.  I'll try to get

23    back to you in the next few days on this issue so we still can

24    be prepared to move forward on the 31st.  Thank you, all.

25        (Adjourned)